ORIGINAL

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF GEORGIA
SAVANNAH DIVISION

JACK LEIGH, an Individual,        )
                                  )
        Plaintiff,                )
                                  )    CIVIL ACTION
v.                                )    FILE NO. 96-CV-497-340
                                  )
WARNER BROS., a Division of TIME  )
WARNER ENTERTAINMENT              )
COMPANY, L.P.                     )
                                  )
        Defendant.                )

**DEFENDANT'S MEMORANDUM OF LAW IN SUPPORT**
**OF ITS MOTION FOR SUMMARY JUDGMENT**

Pursuant to Rule 56 of the Federal Rules of Civil Procedure, Defendant Warner Bros.

("WB") submits this Memorandum of Law in Support of its Motion for Summary Judgment.

## I.    INTRODUCTION

This lawsuit originally involved a host of allegations and claims related to WB's use of

photographed and filmed images of the public domain Bird Girl sculpture in its motion picture

Midnight in the Garden of Good and Evil and a supporting advertising campaign. On June 22,

1998, this Court granted WB summary judgment on all of Plaintiff Jack Leigh's trademark

claims and on all of his copyright claims except for WB's use of an image of the sculpture in a

diminutive icon which appeared as one of only dozens of graphic links on the Warner Bros.

Online home page for one week in December 1997.

WB excluded this icon from its original summary judgment motion because it believed it

needed further discovery regarding the origin of the icon's blurry background image and the

nature and scope of the icon's use. WB has since discovered that the image is a small portion of

Leigh's photograph, and WB has admitted as much to Leigh. However, WB has also discovered -- and the record on this fact is indisputable -- that the designer who created the icon used Leigh's photograph by accident. With regard to scope of use, WB has discovered that no more than nineteen people clicked on the icon during the one week it was posted on WB Online's home page.

For the reasons set forth in full below, WB submits that it is entitled to summary judgment on Leigh's claim of copyright infringement because WB's icon does not copy any of the original elements of Leigh's photograph over which he may properly claim copyright protection, or, in the alternative, because any copying of original elements was *de minimis* and therefore not actionable under the Copyright Act. If the Court determines that Leigh's claims can somehow withstand WB's motion for summary judgment, WB moves in the alternative for partial summary judgment on the grounds that: (1) it is entitled to summary adjudication on Leigh's request for WB's profits arising from the alleged infringement; (2) it is entitled to summary adjudication on Leigh's attempt to collect punitive damages as a part of his request for actual damages; and (3) it is entitled to summary adjudication on Leigh's claim that WB's alleged infringement was willful.

## II.    UNDISPUTED FACTS

### A.    Leigh's Photograph And WB's Movie

The material facts of this matter are not in dispute. Leigh is a professional photographer who took the photograph that appears on the cover of the John Berendt book Midnight in the Garden of Good and Evil, published by Random House. (Complaint at ¶ 7.) Leigh's photograph features a head-on, centered photograph of a public domain sculpture created in 1938 by Sylvia

- 2 -

Shaw Judson and popularly referred to as "The Bird Girl." (Court's Summary Judgment Order, June 22, 1998 at 1, 10.)

Berendt granted WB's Theatrical Division (hereinafter "WB Theatrical" or WB) the exclusive motion picture rights to his book. (Complaint at ¶ 12.) On April 17, 1997, before any filming on the movie began, Leigh's counsel sent a letter to Debbie Padrick, Director of Clearance and Permissions for WB Theatrical, stating that any use by WB of The Bird Girl sculpture in Bonaventure Cemetery in scenes in the film would infringe Leigh's alleged copyright in his photograph. (Complaint at ¶ 13, Exhibit C.) Leigh has testified that the purpose of this letter was to stimulate a negotiation with WB Theatrical for the licensing of his photograph for use in the film. (Deposition of Jack Leigh, Nov. 4, 1998 ("Leigh Dep."), at 10, 49-50, attached as Exhibit A to Appendix of Exhibits.[1]) On April 28, 1997, Jeremy Williams, then General Counsel of WB Theatrical, responded to Mr. Leigh's counsel's letter, noting that WB had obtained the right from Ms. Judson's heir to replicate The Bird Girl sculpture and that WB intended to create its own original images of the sculpture in Bonaventure Cemetery for the film, which WB was entitled by law to do. (Complaint at ¶ 13, Exhibit D.)

WB Theatrical subsequently created its movie based on the book and released the movie nationwide on November 21, 1997. (Complaint at ¶¶ 12, 19.) WB Theatrical heralded the release with a major national advertising campaign that included nationwide television and print advertising, movie posters, outdoor advertising, and a movie web site (located at "www.goodandevil.com"). (Exhibits D-G to Defendant's Memorandum of Law in Support of its Motion for Partial Summary Judgment, Jan. 22, 1998.) True to its word, WB Theatrical did not make any use of Leigh's photograph in any manner in the film or in any of its promotional

---

[1]     Because of the length of the supporting exhibits, WB has filed the exhibits in the form of a supporting Appendix.

material for the film. Rather, it created its own original photograph of the sculpture which it used in each of these materials. (Id.)

## B.    WB Online And The Internet Icon

WB Online is a division of WB and is in the business of providing commercial online services. WB Online is responsible for the WB web site operated at "www.warnerbros.com" (the "WB Online Web Site"). WB's Online and Theatrical divisions are operated, for all practical purposes, as separate companies. Each division has a separate operational structure with its own president, general counsel, management staff, operations department, sales department, marketing department, and personnel department. (Second Declaration of Elizabeth Sherman ("Sherman Decl."), at ¶ 5, attached as Exhibit B to Appendix; Declaration of Don Buckley ("Buckley Decl."), at ¶ 5, attached as Exhibit C to Appendix.) WB Online has no creative input or involvement in any of WB Theatrical's business operations, such as, for example, the creation or production of any motion pictures or any promotional material relating thereto.[2] (Sherman Decl. at ¶ 6; Buckley Decl. at ¶ 6.) Likewise, WB Theatrical has no input or involvement in any of WB Online's business operations. (Sherman Decl. at ¶ 7; see Buckley Decl. at ¶ 4.)

WB Online's home page serves as a directory to WB's many products, services and online features. (Exhibit 7 to Sherman Dep.; Sherman Dep. at 33.) One feature of the WB Online home page is the inclusion of ten graphic icons which serve to link users to content created by WB Online or another WB division, such as movie related sites created by WB Theatrical. (Sherman Dep. at 21.) In the late 1997 time period, these ten icons were changed on a weekly basis. (Sherman Dep. at 15.)

- 4 -

At or about the time WB Theatrical released the movie <u>Midnight in the Garden of Good and Evil</u> (the "movie"), the Director of Programming for the WB Online home page, Elizabeth Sherman, requested that her assistant, Andrew Lloyd, have a home page icon created that would serve as a link to WB Theatrical's web site for the movie (the "Icon"). (Sherman Dep. at 37-40.) Mr. Lloyd then sent an e-mail message to Suzanne Abramson, Director of WB Online's Art Department, requesting that her department create the Icon as soon as possible. (Deposition of Andrew Lloyd, Sept. 15, 1998 ("Lloyd Dep."), at 26-27, attached as Exhibit E to Appendix.) Ms. Abramson instructed Sara Larkins, a Digital Artist for WB Online, to create the Icon. (Deposition of Suzanne Abramson, Sept. 15, 1998 ("Abramson Dep."), at 49, attached as Exhibit F to Appendix.) Ms. Larkins had sole input and control over the graphic content of the Icon. (Deposition of Sara Larkins, Sept. 15, 1998 ("Larkins Dep."), at 24, attached as Exhibit G to Appendix.) In creating the Icon, Ms. Larkins went to the web site for the movie to get artwork to use for the background of the Icon. (<u>See id.</u>) This is a standard practice for WB Online's digital artists because the artists want an image for an icon that will tie visually into the content of the site to which the icon serves as a portal -- in this case, the site for the movie <u>Midnight in the Garden of Good and Evil</u>. (Abramson Dep. at 29; Lloyd Dep. at 30.) WB Online's digital artists also know that the images they find in a WB movie web site will have been cleared for use online, including in WB Online icons. (Declaration of Suzanne Abramson at ¶ 4, attached as Exhibit P to Appendix.) Ms. Larkins does not recall the specific image she used to create the Icon, but it is undisputed that she did not own the book and had not seen the book before she created the Icon; accordingly, a graphic depiction of the image from the movie web site is the only plausible source. (Larkins Dep. at 34.)

---

[2]     Although WB creates web sites for most of its movies, these web sites are designed by WB Theatrical's marketing department, not by WB Online. (Deposition of Elizabeth Sherman, Sept. 15, 1998 ("Sherman Dep.") at

ATL01/10387678v2

At the time Ms. Larkins went to the movie site to get an image for the Icon, the first page of the site contained a small, graphic advertising link to Amazon.com, a third-party Internet bookseller. (Deposition of Donald Buckley, Oct. 21, 1998 ("Buckley Dep."), at 24-26, attached as Exhibit H to Appendix.) The link consisted of a small image of the cover of the book and the words to the effect: "Click here to buy the book." (See Buckley Dep. at 26.)[3] A mouse click on the link would take the user to the page within Amazon.com's web site where the user could buy Berendt's book. (Buckley Dep. at 26.) Based upon the content of the digital file for the Icon, it appears that Ms. Larkins accidentally used this image as opposed to WB Theatrical's original photograph of The Bird Girl sculpture, which also appeared on the web site. (Complaint at ¶ 16.) Leigh has testified that he believes Ms. Larkins used his photograph because she could not tell the difference between his photograph and WB's own photograph of The Bird Girl sculpture. (Leigh Dep. at 57-58.) Leigh further testified that: (1) WB Online's Icon would not have looked any different if it included WB Theatrical's image of The Bird Girl and not Leigh's; and (2) that there was no reason for WB Online to have used Leigh's photograph and not WB's own photograph given the similarity of the photographs. (Leigh Dep. at 58-59.)

The Icon Ms. Larkins created is a small, postage stamp-sized image that was displayed on WB Online's home page for only one week, December 5-12, 1997. (Lloyd Dep. at 17-18.) The Icon shows just the head and shoulders of The Bird Girl sculpture from Leigh's photograph and some background trees and moss. (Summ. J. Order at 11; see also Exhibit I to Appendix.) The remainder of the Icon includes the title "Midnight in the Garden of Good and Evil" in prominent orange lettering and in the same typeface used to present the title of the movie in WB Theatrical's advertising material. No more than nineteen (19) individuals -- and possibly less --

---

7-8, attached as Exhibit D to Appendix; Buckley Dep. at 9-10; Buckley Decl. at ¶¶ 3, 6.)

ATL01/10387678v2

clicked on the Icon during the week it was posted on WB Online's home page. (Deposition of

Chuck McDaniels, Nov. 2, 1998 ("McDaniels Dep."), at 18-20, attached as Exhibit J to

Appendix.)

## C.  Procedural History

Leigh filed his original Complaint against WB on November 24, 1997, and served the

Complaint on WB's agent for service of process in Delaware the next day. Leigh amended his

Complaint on December 23, 1997 to add claims related to the Icon. Leigh attached a small,

illegible copy of the Icon as Exhibit E to his amended Complaint.

WB moved for summary judgment on all of Leigh's claims on January 22, 1998. WB

subsequently amended its motion on March 20, 1998, to withdraw the Icon from consideration

on the motion after learning for the first time at John Berendt's deposition on February 20, 1998

that the Icon might not have been based on a copy of WB's own photograph of The Bird Girl

Sculpture, as WB had believed prior to that time. This Court granted WB's motion in an Order

dated June 22, 1998. Consequently, the only issue that remains before this Court is whether

WB's accidental use of a small portion of Leigh's photograph in the Icon infringes any aspect of

Leigh's photograph over which he can properly claim copyright protection. For the reasons set

forth below, WB submits that its Icon does not infringe any copyrightable expression Leigh may

claim in his photograph as a matter of undisputed fact and law.

---

<sup>3</sup>       There has been no contention that the use of the cover of the book for purposes of promoting purchase of
the book from Amazon.com was in any way improper.

## III. ARGUMENT AND CITATION OF AUTHORITY

### A. Summary Judgment Standards

Summary judgment is proper when there is no genuine issue of material fact, and the

moving party is entitled to judgment as a matter of law. F.R.C.P. 56(c). On a motion for

summary judgment,

> [e]vidence is viewed in a light most favorable to the nonmoving party; this,
> however, does not mean that [the court is] constrained to accept all the
> nonmovant's factual characterizations and legal arguments. If no reasonable
> jury could return a verdict in favor of the nonmoving party, there is no
> genuine issue of material fact and summary judgment will be granted.

Beal v. Paramount Pictures Corp., 20 F.3d 454, 458-59 (11th Cir. 1994) (citation omitted).

The movant bears the initial burden of showing that there is an absence of evidence to

support the plaintiff's claim. Celotex Corp. v. Catrett, 477 U.S. 317, 325 (1986). The burden

then shifts to the plaintiff, who must "go beyond the pleadings" and by its own affidavits or other

admissible evidence establish that there is a material issue of fact for trial. Id. at 324. A mere

scintilla of evidence in support of the non-moving party's position is insufficient to defeat a

motion for summary judgment; "there must be evidence on which the jury could reasonably find

for the plaintiff." Anderson v Liberty Lobby, Inc., 477 U.S. 242, 252 (1986) ("The judge's

inquiry, therefore, unavoidably asks whether reasonable jurors could find by a preponderance of

the evidence that the plaintiff is entitled to a verdict—'whether there is [evidence] upon which a

jury can properly proceed to find a verdict for the party producing it, upon whom the *onus* of

proof is imposed.'"). Moreover, if the evidence is merely colorable or is not sufficiently

probative, summary judgment should be entered. Id. at 249-50.

Rather than an instrument to be used only in the most extreme of circumstances, "[t]he

motion for summary judgment can be a tool of great utility in removing factually insubstantial

- 8 -

cases from crowded dockets, freeing courts' trial time for those cases that really do raise genuine issues of material fact." City of Mt. Pleasant, Iowa v. Associated Elec. Coop., Inc., 838 F.2d 268, 273 (8th Cir. 1988). A court should grant a copyright defendant summary judgment if "the similarity between the works concerns only noncopyrightable elements...." Beal, 20 F.3d at 459; Warner Bros. v. American Broad. Cos., 720 F.2d 231, 240 (2nd Cir. 1983).

## B.    WB Is Entitled To Summary Judgment.

WB's admission that it used a small portion of Leigh's Photograph in the creation of the Icon is only the beginning of the liability inquiry. Leigh must still prove that WB copied expression from his photograph that is protected by copyright. See Bateman v. Mnemonics, Inc., 79 F.3d 1532, 1541 (11th Cir. 1996) ("[W]hile there may be evidence of copying, not all copying is legally actionable."). For the reasons set forth below, WB is entitled to summary judgment on Leigh's claim because a comparison of the Icon to Leigh's photograph reveals that WB did not copy any protectable expression from Leigh's photograph, or, in the alternative, because any copying of original expression was *de minimis*.

### 1.    WB did not Copy any Copyrightable Expression from Leigh's Photograph.

To establish that the Icon constutes copyright infringement, Leigh must prove (a) that he owns a valid copyright in his photograph and (b) that WB copied elements of the photograph original to Leigh in the Icon. Feist Publications, Inc. v. Rural Tel. Serv. Co., 499 U.S. 340, 361 (1991); BellSouth Adver. & Publ'g Corp. v. Donnelly Info. Publ'g, Inc., 999 F.2d 1436, 1440 (11th Cir. 1993) (en banc). As stated by the Eleventh Circuit, "[c]opyright infringement occurs only if one copies protected elements of a copyrighted work; in other words, the portion of the copyrighted work that is copied must satisfy the constitutional requirement of originality as set forth in Article I, § 8, cl.8." MiTek Holdings, Inc. v. Arce Eng'g Co., Inc., 89 F.3d 1548, 1554

(11th Cir. 1996) (quotations omitted). WB does not concede that Leigh owns a valid copyright in his photograph. Nevertheless, WB need not address this issue because Leigh cannot carry his burden of demonstrating that WB copied protectable expression from Leigh's photograph in the Icon as a matter of undisputed fact and law.

This Court has previously found that the scope of original expression in Leigh's photograph is quite limited. Specifically, the Court found that Leigh "is not entitled to copyright protection of his choice of subject matter, i.e., the Bird Girl in the Bonaventure Cemetery." Summ. J. Order at 8; see also Epic Metals Corp. v. Condec, Inc., 867 F. Supp. 1009, 1013 (M.D. Fla. 1994); Gentieu v. John Muller & Co., 712 F. Supp. 740, 742 (W.D. Mo. 1989). The Court further found that Leigh is not entitled to copyright protection in the background of his photograph, "in the expression, pose or appearance of the Bird Girl in his photograph," or in the "eerie" or "spiritual" mood of the photograph. Summ. J. Order at 8; see also Beal, 20 F.3d at 459-60. The Court concluded that any originality in Leigh's photograph is therefore limited to any originality in his selection of lighting, shading, timing, angle and film. Summ. J. Order at 9; see also Burrow-Giles Lithographic Co. v. Sarony, 111 U.S. 53, 60 (1884); Rogers v. Koons, 960 F.2d 301, 307 (2d Cir. 1992); Gentieu, 712 F. Supp. at 742. None of these elements are copied in WB's Icon:

• Lighting, shading and timing: Leigh alleges that his photograph contains a halo lighting effect behind the sculpture and an intentional darkening of the "framing" trees and leaves. Neither element is visible in WB's Icon. (See Exhibit I.) Even Leigh's expert witness, Jane Kinne agrees:

> Q.    (Defendant's counsel) You testified [WB's Internet Icon] doesn't convey the meaning [of Leigh's photograph]. It doesn't convey the mood either I take it?

- 10 -

> A.     (Ms. Kinne) That's correct. The lights and darks are almost
> indistinguishable here. (Deposition of Jane Kinne, December 1, 1998
> ("Kinne Dep."), at 240:15-19, attached as Exhibit K to Appendix.)

•      Film: Leigh's photograph is in black and white. WB's Icon is a bluish-green.

•      Angle: Despite the fact that Leigh's work is a head-on centered photograph of the

Bird Girl sculpture (Summ. J. Order at 10), Leigh alleges that his choice of angle is original

because it causes the statue to appear taller and focuses the viewer on the sculpture's heart. See,

e.g., Leigh's Opposition to Defendant's Motion for Partial Summary Judgment, at 16 and Exhibit

3, ¶ 7, thereto.) WB's Icon includes only the head and shoulders of the Bird Girl sculpture and

some background branches and moss around the sculpture's head, all of which is difficult to

perceive in the Icon. Leigh's alleged originality in angle is thus not reflected in WB's image.[4]

(See Exhibit I.)

In sum, WB's Icon does not include any elements from Leigh's photograph that are

original to Leigh. Moreover, Leigh has in effect admitted as much. He testified that if WB had

used its own photograph in the Icon -- a photograph whose similarities to Leigh's photograph

this Court has held relate entirely to unprotected expression -- the Icon would not have looked

any different. (Leigh Dep. at 58.) If the Icon would not have looked any different if it was based

on a non-infringing photograph, it must necessarily be because WB used only unprotectable

expression from Leigh's photograph in the Icon. WB is therefore entitled to summary judgment

---

[4]     WB is uncertain from the Court's Summary Judgment Order whether the Court found Leigh's angle to be
original, or simply potentially original, because the Order does not discuss what aspect of the angle would render
Leigh's angle original, copyrightable expression. To the extent, the Court did not make such a finding, WB contests
Leigh's assertion that the angle of his photograph is original. There are a limited number of logical angles from
which Leigh could have taken a head-on, centered photograph of the Bird Girl. And to avoid distortion of the true
height of the statue, there is only one angle -- Leigh's angle. The fact that Leigh's angle shows the Bird Girl's entire
face is logical, rather than original. It is thus hardly worthy of granting Leigh a monopoly over taking a photograph
of a public domain sculpture from a frontal, slightly-lowered, vantage point.

ATL01/10387678v2

on Leigh's claim as a matter of undisputed fact and law. See, e.g., Feist, 499 U.S. at 361;
BellSouth, 999 F.2d at 1440.

### 2.    Any Use of Leigh's Original Expression in the Icon is *De Minimis*.

The legal maxim *de minimis non curat lex* ("the law does not concern itself with trifles")

insulates from liability "those who cause insignificant violations of the rights of others."

Ringgold v. Black Entertainment Television, 126 F.3d 70, 73 (2d Cir. 1997). Courts have

applied this legal maxim in all areas of the law, including copyright. When the unauthorized use

of a copyrighted work is *de minimis*, no cause of action will lie for copyright infringement.

Sandoval v. New Line Cinema Corp., 147 F.3d 215, 217 (2d Cir. 1998).[5]

The question posed in resolving a *de minimis* defense is not simply whether the defendant

used a copyrighted work, but whether the use is actionable. See, e.g., id. Thus, even where there

is no dispute about copying as a factual matter, a defendant's use of the plaintiff's work may be

so trivial that no substantial similarity exists, and thus infringement exists. See, e.g., id.; see also

Ringgold, 126 F.3d at 75 (discussion of difference between factual copying and actionable

copying); Melville B. Nimmer & David Nimmer, Nimmer on Copyright, § 8.01[G], at 8-25

(1998) [hereinafter Nimmer] ("[F]or similarity to be substantial, and hence actionable, it must

apply to more than a de minimis fragment.").

---

[5]     Some courts have addressed the issue of *de minimis* copying within the context of whether the defendant's
copying is a "fair use." Nimmer § 8.01[G], at 8-25 (citing Elsmere Music, Inc. v. National Broadcasting Co., 482 F.
Supp. 741 (S.D.N.Y. 1980)). The Second Circuit has recently held that the *de minimis* analysis is more properly
addressed as a separate defense. Sandoval, 147 F.3d at 217; Ringgold, 126 F.3d at 75 ("If the allegedly infringing
work makes such a quantitatively insubstantial use of the copyrighted work as to fall below the threshold required
for actionable copying, it makes more sense to reject the claim on that basis and find no infringement, rather than
undertake an elaborate fair use analysis in order to uphold a defense."). WB first articulated its *de minimis* defense
in response to Leigh's Cross-Motion for Partial Summary Judgment under a fair use analysis. (See Defendant's
Response in Opposition to Plaintiff's Cross-Motion for Partial Summary Judgment at pp. 8-11.) WB concurs with
the Second Circuit's recent analysis, however, and therefore addresses its defense for purposes of this motion as an
independent defense. Nevertheless much fair use case law is relevant on this point.

- 12 -

Copying that rises to the level of being actionable has both a quantitative and a qualitative component. Ringgold, 126 F.3d at 75. If either of these components are missing, a plaintiff's claim fails as a matter of law. See, e.g., Sandoval, 147 F.3d 215. Because WB's use of Leigh's photograph in the Icon is neither quantitatively nor qualitatively significant, the Icon is not an actionable copy as a matter of law.

### a.    WB's use of Leigh's photograph is not quantitatively significant.

To establish that an alleged infringement is *de minimis*, the defendant must demonstrate that the copying of the protected material is so trivial as to fall below the quantitative threshold of actionable copying. Sandoval, 147 F.3d at 217 (citing Ringgold, 126 F.3d at 74). In cases involving visual works, courts consult two factors to determine whether the allegedly infringing use meets this "quantitative threshold": (1) the amount of the copyrighted work copied; and (2) the observability of the copyrighted work in the allegedly infringing work. Sandoval, 147 F.3d at 217 (holding that, although defendant used copyrighted photographs in their entirety in the allegedly infringing works, copying was *de minimis* because the works were "virtually unidentifiable"). WB used such a small portion of Leigh's photograph in such an unidentifiable way for such a short period of time, the use cannot be considered "quantitatively similar" to Leigh's copyrighted photograph. By Leigh's own admission, the Icon contains only a small portion of his photograph. (Leigh Dep. at 89:13-15.) As set forth above, the only visible portion of Leigh's photograph used is the Bird Girl's head, shoulders, and some hardly detectable tree branches and moss in the background. In the words of Leigh's expert, the portion of Leigh's photograph used in the Icon is "miniscule." (Kinne Dep. 239:15.)

With regard to observability, the Second Circuit has recently held that in cases involving visual works the lighting and positioning of a copyrighted work in the infringing work are

- 13 -

critical elements in the analysis of this factor, as is the recognizability of the image used as the plaintiff's work. Sandoval, 147 F.3d at 217. Each of these elements weigh in WB's favor. The copy of Leigh's photograph used in the Icon is dark, out of focus, and of such poor quality that, without the aid of magnification, it is unidentifiable.[6] Leigh himself has testified that the Icon is "a terrible reproduction of the image," is "blurry," and has a "strange" color and layout. (Leigh Dep. at 253:21-22; 255:5-6; 299:18-20.) A full fifty percent of the Icon is darkened and covered by the large and distinctive movie title, which is presented in eye-catching orange and red lettering. Leigh's own expert states that there is a "disproportionate emphasis on the lettering" and that the Icon is of "small size." (Kinne Dep. at 240:4-9.)

The Icon was one of only ten diminutive graphic icons included on the home page and one of only dozens of visual images and graphic links included on the home page.[7] The home page spanned over three or more screens. The Icon was positioned at the bottom of the home page and would thus have been observed only by someone who scrolled through all the pages of the home page and then examined the content of each page in detail. Because WB Online's home page is a directory page, not a destination site, it is unlikely many visitors to the site spent the time necessary on the site to see the Icon. Viewers of the site pick the link to the site they are interested in and move on. As testimony both to this practice and the obscurity of the image and Icon on WB's home page, it is undisputed that only **19** people -- at maximum -- clicked on the Icon during the **one** week it was posted to WB Online's home page. (McDaniels Dep. at 18-20.)

---

[6]    In this regard, WB notes that Leigh had to blow the image up sizably to even begin to discuss similarities between the background image in the Icon and his photograph in a brief filed earlier in the case. (Exhibit 2 to Leigh's Cross Motion for Partial Summary Judgment.) Cf. Sandoval v. New Line Cinema Corp., 973 F. Supp. 409, 411 (S.D.N.Y. 1997) (finding *de minimis* use and noting that the plaintiff had to view enlarged still frames from the scene before he was able to conclude that some of the images used were his images).

[7]    Cf. Mura v. Columbia Broadcasting System, Inc., 245 F. Supp. 587, 590 (S.D.N.Y. 1965) (in evaluating the "amount and substantiality" factor in a fair use analysis, the court found use of copyrighted puppets in children's television program was fair use, in part, because the puppets were not a principal attraction but were used in an "incidental" manner).

- 14 -

Such fleeting, "obscured," "severely out of focus," and "virtually unidentifiable" uses of a photographer's photograph are precisely the grounds that support a finding of quantitative insignificance. Sandoval, 147 F.3d at 218.

### b.    WB's use of Leigh's photograph is not qualitatively significant.

The qualitative component of the infringement analysis "concerns the copying of expression, rather than ideas...." Ringgold, 126 F.3d at 75 (emphasis added); Nimmer, § 13.03[A][2]. For the reasons set forth in Section III.B.1. above, the Icon does not include any of the protectable elements of Leigh's photograph. However, even if it does, WB submits that any use of any protectable expression is so minimal as to be qualitatively insignificant. Cf. MiTek, 89 F.3d at 1560 (finding *de minimis* copying where "the elements that were original and appropriated were not of such significance to the overall program to warrant an ultimate finding of . . . infringement. The burden is on the copyright owner to demonstrate the significance of the copied features, and, in this case, [the plaintiff] has failed to meet that burden."). WB therefore submits that it is entitled to summary judgment on Leigh's claim of copyright infringement as a matter of law.

### C.    In The Alternative, WB Is Entitled To Partial Summary Judgment On A Number Of Issues.

If this Court denies WB's Motion for Summary Judgment, WB submits in the alternative that it is entitled to summary judgment on a number of issues related principally to Leigh's prayer for relief. Each of these issues is addressed in turn below.

### 1.    WB is Entitled to Summary Judgment on Leigh's Claim for WB's Profits.

Leigh has prayed under Section 504(b) of the Copyright Act for recovery of WB's profits attributable to its alleged infringement of Leigh's photograph in the Icon. (Complaint, Prayer for Relief at ¶ h.) Under this section, Leigh carries the burden of proving that WB generated

- 15 -

revenue attributable to the infringement. 17 U.S.C. § 504(b). Leigh further carries the burden of establishing the amount of gross revenue WB derived from the infringement. 17 U.S.C. § 504(b); Georgia Lee Miller Roulo v. Russ Berrie & Co., 886 F.2d 931, 940-41 (7th Cir. 1989); Konor Enters., Inc. v. Eagle Publications, Inc., 878 F.2d 138, 140 (4th Cir. 1989).

The record is devoid of any evidence that WB derived any revenue attributable to its alleged infringement. The record is further devoid of any gross revenue amounts of any sort related to the Icon or to WB's motion picture. WB is therefore entitled to judgment on Leigh's request for WB's alleged profits as a matter of undisputed fact.

## 2. WB is Entitled to Summary Adjudication on the Scope of Actual Damages Leigh May Recover.

Leigh has also prayed under Section 504(b) for recovery of the actual damages he purports to have sustained as a result of WB's alleged infringement. (Complaint, Prayer for Relief at ¶ h.) When asked to identify the damage amounts he is seeking, Leigh responded, with regard to actual damages, merely by incorporating the report of his damages expert, Jane Kinne. (Plaintiff's Responses to Defendant's First Interrogatories, attached as Exhibit L to Appendix; Expert Witness Report of Jane S. Kinne (Kinne Report), attached as Exhibit M to Appendix.) Ms. Kinne bases her damage calculation on a lost royalty theory, i.e., what royalties Leigh would have gotten had WB obtained permission to use Leigh's photograph prior to use. Ms. Kinne alleges that the base amount for a such a license would have been $2,500. (Kinne Report at 4.) She then alleges that this amount should be multiplied by a factor of between three and ten times (and, in this case, ten times) because WB "forced" Leigh to sue to obtain any recovery related to the Icon.[8] (Kinne Report at 5.) Kinne makes this allegation despite the fact that the record is

---

[8]    Kinne also asserts that the damage to Leigh would have been three times the normal license fee had WB obtained a retroactive license from Leigh prior to Leigh adding the Icon claim to his lawsuit (which was done without prior notice to WB). (Kinne Report at 5.)

undisputed that Leigh made no attempt to address the Icon in any manner with WB prior to suing

WB for infringement related to the Icon.  Finally, Ms. Kinne alleges that Leigh is entitled to

another $5,000 (twice the normal license fee) for failing to give Leigh a photo credit with the

Icon, bringing the total alleged actual damage to $30,000.  (Id.)

For purposes of this motion and case, WB accepts Ms. Kinne's lost royalty theory as an

acceptable basis for computing actual damages to Leigh.  However, Leigh's allegation that he is

entitled to multiply his lost license fee by any factor, let alone ten, is an impermissible attempt to

recover punitive damages and attorneys' fees and costs under the guise of recovering actual

damages.  Leigh's attempt to recover twice his lost license fee for WB's failure to give him a

photo credit is likewise an attempt to obtain a punitive damage award under the guise of actual

damages as well as an impermissible attempt at double recovery.

### a.    Lost royalty damages.

Section 504(b) of the Copyright Act provides in relevant part that "[t]he copyright owner

is entitled to recover the actual damages suffered by him or her as a result of the infringement...."

17 U.S.C. § 504(b).  Federal courts have accepted a lost royalty theory as a permissible form of

actual damage recovery under the Copyright Act, either because it represents a lost sale by the

plaintiff or a saved acquisition cost by the defendant.  Data Gen. Corp. v. Grumman Sys. Support

Corp., 36 F.3d 1147, 1170 (1st Cir. 1994) (stating that damages are traditionally "calculated with

reference to the loss in the fair market value of the copyright, often measured by the profits lost

as a result of the infringement.") (citing Nimmer, § 14.02[A], at 14-8 to 14-9); Deltak, Inc. v.

Advanced Sys., Inc., 767 F.2d 357, 363 (7th Cir. 1985) ("Deltak cannot recover its lost sales to

ASI and the value of use to ASI of the infringement, even though they are both measures of

actual damages, since that would double count the same counterfactual transaction."); see also

- 17 -

Holabird and Root Architects Eng'rs Interiors v. Physicians Management of Indiana, Inc., 1995 WL 248066, at *3 (N.D. Ill. Apr. 24, 1995) (attached as Exhibit N to Appendix); Joseph J. Legat Architects, P.C. v. United States Dev. Corp., 1991 WL 38714, at *6 (N.D. Ill. Mar. 20, 1991) (attached as Exhibit O to Appendix). However, it is well-established that punitive damages are not recoverable on a claim for actual damages under the Copyright Act. Budget Cinema, Inc. v. Watertower Assocs., 81 F.3d 729, 733 (7th Cir. 1996); Nintendo of America, Inc. v. Aeropower Co., 34 F.3d 246, 251 (4th Cir. 1994); Oboler v. Goldin, 714 F.2d 211, 213 (2d Cir. 1983).

Lost royalty damages must be calculated by reference to what the plaintiff would have gotten through an arm's length transaction at the time of the infringement. See Deltak, 767 F.2d at 362. In this regard, lost royalty damages under copyright law parallel the reasonable royalty damage recovery under patent law, where the relevant damage figure is calculated "based upon a hypothetical negotiation between the patentee and the infringer when the infringement began." Unisplay v. American Elec. Sign Co., 69 F.3d 512, 517 (Fed. Cir. 1995) (emphasis added); see also Deltak, 767 F.2d at 362 n.3.

Both Ms. Kinne and Leigh have admitted that multipliers such as those Ms. Kinne uses in her actual damage calculation are penalties for an infringer's failure to secure a license ahead of time and for the alleged infringer's failure to settle the dispute short of litigation. (Kinne Dep. at 34-36; Leigh Dep. at 242, 267, 294.) Ms. Kinne further alleges that, once litigation commences, the manner in which the stock photo industry determines whether the alleged infringer should pay three times, ten times, or some figure in between is the amount of time and expense the photographer has put into the matter at the time of settlement. (Kinne Dep. at 35, 296:11-13 ("Between three and ten times gets determined by how much time and how much resources have been expended to get to the retroactive license.")) This is nothing more than an approximation

- 18 -

of the plaintiff's fees and costs. Litigation fees and costs do not represent <u>actual damage</u>

suffered by a party. To the extent such expenses are recoverable at all, they are recoverable only

under Section 505 of the Copyright Act (entitled: "Remedies for infringement: Costs and

attorney's fees"). Leigh's attempt to argue that he is entitled to multiply his alleged actual

damage of $2,500 by a factor of ten is therefore an impermissible attempt to sweep into his

request for actual damages recovery of punitive damages and costs and fees. WB submits that

the Court should rule that, on this record, Leigh is not entitled to recover anything more in actual

damages than $2,500.[9]

### b.    **Alleged Photo Credit Damages.**

As an initial matter, Ms. Kinne testified that a photographer would normally waive any

right to receive a photo credit for use of his credit in an Internet Icon. (Kinne Dep. at 299:23-

25.) WB is therefore entitled to summary judgment on Leigh's attempt to recover any damages

related to WB's failure to provide Leigh a photo credit for the Icon. Ms. Kinne further testified

that the value of the photo credit is part and parcel of the license fee. (Kinne Dep. at 271:14-18

("Q" So now ... the credit issue is addressed with the fee that you pay for a photograph? A:

Yeah.")) Leigh's attempt to recover a fee attributable to a missing photo credit is therefore an

impermissible attempt at double recovery of an amount that is already subsumed in his lost

royalty damage calculation. Moreover, Leigh's claim that his damage for a missing photo credit

should be doubled is a transparent attempt to recover a punitive damage award under the guise of

seeking recovery of actual damages. WB thus submits that this Court should rule by summary

adjudication that Leigh is not entitled to seek recovery of anything more in actual damages than

---

9        WB disputes that Leigh's actual damage is anywhere near $2,500 on a lost royalty theory. Nevertheless,
WB recognizes that calculation of the precise amount of Leigh's actual damage involves genuine issues of material
fact and is therefore not suitable for resolution on this motion.

the reasonable license fee he would have received for WB's use of the photograph in the Icon at
the time of use.

## 3. **WB is Entitled to Summary Judgment on Leigh's Claim that WB's Alleged Infringement is Willful.**

Willfulness in a copyright case requires proof that the defendant "knows his actions
constitute an infringement...." Cable/Home Communication Corp. v. Network Prod., Inc., 902
F.2d 829, 851 (11th Cir. 1990) (citing Nimmer, § 14.04[B][3]). It is undisputed in this case (a)
that Sara Larkins was the only person with input into the creation of the Icon, (b) that she did not
intend to copy Leigh's photograph, and (c) that she had not even seen a copy of Leigh's
photograph at the time she created the Icon. Leigh himself has testified that he believed the
reason WB used his image is that Larkins could not tell the difference between his photograph
and WB's. (Leigh Dep. at 57.) Accordingly, not one shred of evidence in the record supports
Leigh allegation that Larkins – or WB – used his photograph knowing it to be an infringement.

Recognizing this fact, Leigh now predicates his claim of willfulness on the grounds that:
(1) WB has allegedly destroyed relevant e-mails since the commencement of this litigation, and,
under the adverse interest rule, he is therefore entitled to draw an inference that these "e-mails
contained communications harmful or contradictory to Defendant's position" on the willfulness
issue; and (2) Leigh put WB on notice of his claim of rights in his photograph prior to the
creation and posting of the Icon; therefore, WB's use of the photograph was willful. (Plaintiff's
Responses to Defendant's Interrogatories, Supplement to Interrogatory No. 10.) For the reasons
set forth below, neither of Leigh's arguments withstand scrutiny. WB is therefore entitled to
summary judgment on Leigh's continued claims of willfulness as a matter of undisputed fact and
law.

- 20 -

### a.    Leigh is not entitled to any adverse inference on willfulness.

In this Circuit, an adverse inference may be drawn "from a party's failure to preserve evidence <u>only</u> when the absence of that evidence is predicated on bad faith." <u>Bashir v. Amtrak</u>, 119 F.3d 929, 931 (11th Cir. 1997) (emphasis added). "'Mere negligence' in losing or destroying the records is not enough for an adverse inference, as 'it does not sustain an inference of consciousness of a weak case.'" <u>Id.</u> at 931 (quoting McCormick, <u>Evidence</u> § 273, at 660-61 (1972)); <u>see also</u> <u>Vick v. Texas Employment Comm'n</u>, 514 F.2d 734, 737 (5th Cir. 1975) (holding that that the adverse inference rule is inapplicable where the documents were destroyed under routine procedures with no bad faith); <u>Aramburu v. Boeing Co.</u>, 112 F.3d 1398, 1407 (10th Cir. 1997).  The burden of proving bad faith destruction falls squarely on Leigh,[10] yet not one shred of evidence in the record supports such a finding.

Leigh's belief that he is entitled to an adverse inference on willfulness is predicated on his allegation that WB has not produced any e-mails from anyone involved in using Leigh's photograph on WB's web site.  (<u>See</u> Plaintiff's Second Supplemental Response to Defendant's First Interrogatories, at ¶ 10.)  The only people involved in the creation of the Icon were:  (1) Elizabeth Sherman, who requested that an icon be created; (2) Andrew Lloyd, who carried Sherman's request to the WB Online Art Department; (3) Suzanne Abramson, who received Sherman's request from Lloyd; and (4) Sara Larkins, who created the Icon at Abramson's request.  Leigh has deposed all four of these individuals.  Other than an e-mail from Mr. Lloyd to Ms. Abramson on November 24, 1997, which requested that the Icon be created (and an e-mail which WB has produced), the only certain recollection of any witness that there even was another e-mail is Mr. Lloyd's testimony that Ms. Larkins sent the completed Icon to him as an

- 21 -

attachment to an e-mail message. (Lloyd Dep. at 33-34.) However, nothing in the record

evidences that this e-mail discussed the content of the Icon in any way, let alone contained any

discussion that would indicate that WB purposely used Leigh's photograph in the Icon. To the

contrary, the undisputed evidence of record demonstrates that the e-mail would not have

contained any such discussion. As set forth above, Ms. Larkins testified that she had sole input

into the selection of the artwork used in the Icon and that she had not even seen the book cover at

the time she created the Icon. (Larkins Dep. at 24, 33-34.) Leigh's inability to evidence the

existence of an e-mail that would -- or that even might -- offer any support to his claim of

willfulness is fatal to his claim under the adverse interest rule. Kronisch v. United States, 150

F.3d 112, 127-28 (2d Cir. 1998); Wigmore, Evidence in Trials at Common Law § 291, at 228.[11]

Leigh's reliance upon the adverse inference rule is further unfounded in that the record is

devoid of any evidence that WB has deleted any e-mails at any time out of bad faith. For the

time period at issue, WB destroyed all e-mails related to its Online Division sixty days after they

were created in accordance with WB's then-current e-mail retention policy. Any e-mail message

from Ms. Larkins to Mr. Lloyd would thus have been destroyed in January 1998. Nevertheless,

nothing in the record even remotely evidences that WB destroyed this or any other e-mail for any

reason other than an accidental failure to suspend its e-mail retention policy during the pendency

of the litigation. Because there is no evidence in the record to suggest that any e-mail would

have contained any information harmful to WB on Leigh's claim of willfulness, the undisputed

evidence of record compels the conclusion that WB did not destroy any e-mails out of bad faith.

---

[10]    Bashir, 119 F.3d at 932; Aramburu, 112 F.3d at 1407; Anderson v. Cryovac, Inc., 862 F.2d 910, 926 (1st Cir. 1988) (requiring movant to "successfully demonstrate" that the other party's failure to produce documents was "knowing or deliberate").
[11]    Wigmore states in relevant part: "The failure or refusal to produce a relevant document, or the destruction of it, is evidence from which alone its contents may be inferred to be unfavorable to the possessor, provided the

WB is therefore entitled to summary adjudication on Leigh's claim of willfulness under the

adverse inference rule as a matter of undisputed fact and law. Bashir, 119 F.3d at 932; Vick, 514

F.2d at 737.

> **b.    Leigh's notices to WB do not create a genuine issue of material fact
> regarding Leigh's claim of willfulness.**

The record is undisputed that neither Sara Larkins nor anyone else at WB Online had

actual knowledge of any kind of either Leigh's April 17, 1997, letter to WB Theatrical or Leigh's

lawsuit at the time WB Online created the Icon and posted it to the WB Online Home Page. This

prong of Leigh's willfulness claim is thus based solely on his allegation that a letter to another

division of WB and a lawsuit served on WB but unrelated to WB Online were sufficient to

render WB Online's use of Leigh's photograph willful.

Leigh's claim is meritless. This Circuit and other courts have found that notice to one

department cannot be imputed to another as a matter of law absent evidence of a pattern or duty

to communicate such facts. See, e.g., Schrader v. Prudential Ins. Co. of America, 280 F.2d 355,

360-61 (5th Cir. 1960) (holding that knowledge of insurance company's claims department

cannot be imputed to underwriting department); Midfirst Bank, SSB v. C.W. Haynes & Co., 893

F. Supp. 1304, 1316 (D.S.C. 1994) (refusing to impute knowledge of one department of the FHA

to another because the departments operated independently of each other, employees of one

department had no duty to report to employees of the other department, and it was "unrealistic"

to charge one department with knowledge of the other department); Master Consol. Corp. v.

BancOhio Nat'l Bank, 1990 WL 65666, at *15 (Ohio Ct. App. 1990) (refusing to impute

knowledge between BancOhio's commercial lending department and its marketing trust

department) (a copy of this opinion is attached hereto as Exhibit B) (citing Addison v. Citizens

---

opponent, when the identity of the document is disputed, first introduces some evidence tending to show that the

Trust & Savings, 6 Ohio Law Abs. 322 (1927), in which the court refused to impute knowledge held by a bank's bond department to its lending department because officers of these departments, as a matter of bank policy, had no obligation to report information to the other department, and because "officers of the respective departments dealt exclusively with [their own] departments"). If this is the standard with regard to departments, the same or even a more stringent standard should certainly be applied in this case because WB Online and WB Theatrical are, for all practical purposes, operated as separate companies. The divisions have their own presidents, general counsels, management structure, marketing staffs, and the divisions pursue wholly separate lines of business. (Buckley Decl. at ¶¶ 4-6; Sherman Decl. at ¶¶ 5-7.)

The record in this case is devoid of any evidence of either a duty of WB Theatrical to communicate facts such as those at issue to WB Online or a pattern of WB Theatrical doing so. To the contrary, in light of the independent nature of the divisions' businesses, it would be implausible for such facts to be communicated. In light of the size and diversified nature of WB's business, it would also be unrealistic -- if not crippling to WB's business -- to impute the knowledge of each of WB's varied divisions to the others.[12] WB is therefore entitled to summary adjudication on Leigh's claim of imputed notice as a matter of undisputed fact and law.

Even assuming for purposes of argument that Leigh's letter or lawsuit were sufficient to impute relevant knowledge to WB Online, the uncontroverted facts of this case simply do not give rise to a legitimate claim of willfulness. WB Online's use of Leigh's photograph was an accident, plain and simple. And Leigh has admitted as much. He testified that he believes

document actually destroyed or withheld is the one as to whose contents it is desired to draw an inference."
[12]     Given the disparate nature of the divisions' business, it makes perfect sense that the record would be devoid of any evidence that anyone at WB Online had notice of Leigh's April 28 letter or his lawsuit at the time WB Online created the Icon and posted it to the WB Online Home Page. WB Online would have no more reason to be put on notice of these things than it would have reason to be put on notice of claims of copyright infringement related to a

- 24 -

ATL01/10387678v2

Ms. Larkins intended to use WB's photograph of the Bird Girl sculpture but used his by mistake. (Leigh Dep. at 57-58.) He further testified that, because WB had its own image of the sculpture, it had no reason to use his. (Leigh Dep. at 58-59.) WB has been unable to find any authority of any kind that would support a finding a willfulness on the facts of this record. WB therefore submits that no genuine issue of material fact exists regarding Leigh's claim of willfulness and that WB is entitled to summary adjudication on the claim.

## IV.  CONCLUSION

For the reasons set forth in full above, WB submits that it is entitled to summary judgment on the only remaining claim in this litigation on the grounds that its Icon does not copy any protectable expression from Leigh's photograph and/or that any such copying is *de minimis* and therefore not actionable. In the alternative, WB submits that it is entitled to summary adjudication that Leigh is not entitled to recovery of any of WB's profits allegedly attributable to the infringement, that Leigh's actual damages are $2,500 or less, and that WB's use of Leigh's photograph was not willful.

Respectfully submitted this 7th day of December, 1998.

MARTIN J. ELGISON
Georgia Bar No. 243187
DAVID J. STEWART
Georgia Bar No. 681149
ANGELA PAYNE JAMES
Georgia Bar No. 568086
ALSTON & BIRD, L.L.P.
1201 West Peachtree Street
Atlanta, Georgia 30309-3424
(404) 881-7000

STEVEN E. SCHEER
LEE, BLACK, SCHEER & HART, P.C.
24 Drayton Street
P.O. Box 8205
Savannah, Georgia 31412

Counsel for Defendant WARNER BROS.,
a Division of Time Warner Entertainment
Company, L.P.

---

song recorded by Warner Records, a sweatshirt licensed by Warner Bros. Consumer Products, a Bugs Bunny cartoon created by Warner Bros. Television Animation, or any other action taken by any other WB division.

- 25 -

## CERTIFICATE OF SERVICE

I hereby certify that I have this day served a copy of **Defendant's Memorandum**

**of Law in Support of its Motion for Summary Judgment** upon Plaintiff by hand

delivering true and correct copies of the same to Plaintiff's counsel of record at the

following address:

>  Robert Bartley Turner
>  Savage, Herndon & Turner
>  Post Office Box 8969
>  Savannah, Georgia 31412
>
>  Todd Deveau
>  Deveau, Colton & Marquis
>  Two Midtown Plaza, Suite 1400
>  1360 Peachtree Street, N.E.
>  Atlanta, Georgia 30309

This 7th day of December, 1998.

DAVID J. STEWART
Georgia Bar No. 681149

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF GEORGIA
SAVANNAH DIVISION

| | |
|---|---|
| JACK LEIGH, an Individual, | ) |
| | ) |
|     Plaintiff, | ) |
| | )   CIVIL ACTION |
| v. | )   FILE NO. 96-CV-497-340 |
| | ) |
| WARNER BROS., a Division of TIME | ) |
| WARNER ENTERTAINMENT | ) |
| COMPANY, L.P. | ) |
| | ) |
|     Defendant. | ) |

**APPENDIX OF EXHIBITS IN SUPPORT OF
DEFENDANT'S MOTION FOR SUMMARY JUDGMENT**

**TABLE OF CONTENTS**

A.    Deposition of Jack Leigh

B.    Second Declaration of Elizabeth Sherman

C.    Declaration of Don Buckley

D.    Deposition of Elizabeth Sherman

E.    Deposition of Andrew Lloyd

F.    Deposition of Suzanne Abramson

G.    Deposition of Sara Larkins

H.    Deposition of Donald Buckley

I.    Side-by-Side Comparison of Leigh's photograph and WB Online's Icon

J.    Deposition of Chuck McDaniels

K.    Deposition of Jane Kinne

L.    Plaintiff's Responses to Defendant's First Interrogatories

M.     Expert Witness Report of Jane S. Kinne

N.     Holabird and Root Architects Eng'rs Interiors v. Physicians Management of Indiana, Inc., 1995 WL 38714 (N.D. Ill. Apr. 24, 1995)

O.     Joseph J. Legat Architects, P.C. v. United States Dev. Corp., 1991 WL 38714 (N.D. Ill. Mar. 20, 1991)

P.     Declaration of Suzanne Abramson

## Page 1

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF GEORGIA
SAVANNAH DIVISION

```
JACK LEIGH,                        )
                                   )
              Plaintiff,           )
                                   )
vs.                                )
                                   )
WARNER BROTHERS, INC.,             )
a Division of TIME WARNER          )
ENTERTAINMENT COMPANY,             )
L.P.,                              )
                                   )
              Defendant.           )
```

The Deposition of the Plaintiff, JACK LEIGH,
taken by counsel for the Defendant on the 4th day
of November, 1998, at the offices of Savage,
Herndon & Turner, 304 East Bay Street, Savannah,
Georgia, before Linda C. Drake, C.V.R., C.C.R.,
Georgia, beginning at 10:00 a.m.

APPEARANCES:

For the Plaintiff:      ROBERT BARTLEY TURNER
                        Savage, Herndon & Turner
                        Post Office Box 8969
                        Savannah, GA 31401

For the Defendant:      DAVID J. STEWART
                        ANGELA PAYNE JAMES
                        Alston & Bird
                        One Atlantic Center
                        1201 W. Peachtree Street
                        Atlanta, GA 30309-3424

                DRAKE REPORTING, P.C.
                    P.O. BOX 30574
                SAVANNAH, GEORGIA 31410

## Page 2

### INDEX

Preliminaries. . . . . . . . . . . . . . . .   4
Cross Examination by Mr. Stewart . . . . . .   4
Cross Examination by Ms. James . . . . . . .  90
Certificate. . . . . . . . . . . . . . . . . 304

#### EXHIBIT INDEX

| | | |
|---|---|---|
| Exhibit 1 | Byrd Cookie Company ad. . . . . . . | 17 |
| Exhibit 2 | Byrd Cookie Company agreement . . . | 17 |
| Exhibit 3 | License with Byrd Cookie Company. . | 17 |
| Exhibit 4 | Cookie tin card . . . . . . . . . . | 26 |
| Exhibit 5 | Leigh web site puzzle . . . . . . . | 29 |
| Exhibit 6 | Michael Graham letter . . . . . . . | 35 |
| Exhibit 7 | Random House art purchase order . . | 74 |
| Exhibit 8 | amazon.com web page . . . . . . . . | 83 |
| Exhibit 9 | Book cover photo from amazon.com. . | 85 |
| Exhibit 10 | Warner Brothers web page. . . . . . | 151 |
| Exhibit 11 | Georgia Magazine article. . . . . . | 151 |
| Exhibit 12 | Georgia Journal article. . . . . . | 151 |
| Exhibit 13 | Professional Photographer article . | 151 |
| Exhibit 14 | Savannah News Press article . . . . | 151 |
| Exhibit 15 | "Booming After Midnight". . . . . . | 151 |
| Exhibit 16 | Sarasota Herald Tribune article . . | 151 |
| Exhibit 17 | "Jack Leigh Revisited". . . . . . . | 151 |
| Exhibit 18 | Photo Review Catalogue. . . . . . . | 157 |
| Exhibit 19 | Photo Review invitation . . . . . . | 157 |
| Exhibit 20 | Photo Review newsletter . . . . . . | 157 |
| Exhibit 21 | Houston Center letter . . . . . . . | 169 |
| Exhibit 22 | License for Random House calendar . | 185 |
| Exhibit 23 | Random House art purchase order . . | 189 |
| Exhibit 24 | License Jutta Klein - Portugal . . | 191 |
| Exhibit 25 | Random House floor display license. | 200 |
| Exhibit 26 | Random House Audiobooks CD. . . . . | 205 |
| Exhibit 27 | Random House audio package. . . . . | 207 |
| Exhibit 28 | License Recorded Books. . . . . . . | 209 |
| Exhibit 29 | Letter to Recorded Books. . . . . . | 210 |
| Exhibit 30 | License Columbia Arts Management. . | 212 |

## Page 3

| | | |
|---|---|---|
| Exhibit 31 | Purchase Order Doubleday. . . . . . | 212 |
| Exhibit 32 | Mystery Guild bulletin. . . . . . . | 213 |
| Exhibit 33 | License Albert Bonniers Forlag. . . | 218 |
| Exhibit 34 | Leigh/Gelber 2/12/96. . . . . . . . | 221 |
| Exhibit 35 | Leigh/Gelber 2/1/96 . . . . . . . . | 221 |
| Exhibit 36 | Gelber/Leigh 2/1/96 . . . . . . . . | 221 |
| Exhibit 37 | Gelber/Leigh 2/1/96 Memo. . . . . . | 221 |
| Exhibit 38 | License agreement - Dutch . . . . . | 224 |
| Exhibit 39 | Random House art purchase order . . . | 225 |
| Exhibit 40 | Random House license N.A. English . . | 227 |
| Exhibit 41 | Random House license audio/large. . . | 229 |
| Exhibit 42 | License Gylrendal - Danish . . . . . . | 230 |
| Exhibit 43 | License - Norwegian . . . . . . . . | 231 |
| Exhibit 44 | License - Norwegian . . . . . . . . | 234 |
| Exhibit 45 | License WSOY - Finnish. . . . . . . | 235 |
| Exhibit 46 | Random House license Audiobooks . . . | 237 |
| Exhibit 47 | License Vintage U.K. - England. . . . | 238 |
| Exhibit 48 | Letter John F. Blair Publishers . . . | 266 |
| Exhibit 49 | Color cover photograph. . . . . . . | 299 |

## Page 4

1   MR. STEWART:  This is the deposition of Jack
2   Leigh.  It's taken pursuant to the Federal Rules of
3   Civil Procedure for all purposes permitted thereunder.
4   It's taken pursuant to notice and consent of counsel.
5   Would you swear the witness, please?
6       (NOTE:  Whereupon, the oath was administered
7   to the witness by the reporter, and the reporter
8   disclosed that no contract for ongoing reporting
9   services existed with any party.)
10  JOHN DAVID LEIGH, II, HAVING BEEN DULY SWORN,
11      TESTIFIED AS FOLLOWS:
12  CROSS EXAMINATION BY MR. STEWART:
13      Q Mr. Leigh, would you state your full name,
14  please?
15      A John David Leigh, II.
16      Q What is your home address?
17      A It's 132 East Oglethorpe Avenue, Savannah.
18      Q What's the zip?
19      A 31401.
20      Q What's your date of birth?
21      A November 8th, 1948.
22      Q Mr. Leigh, as I understand it from this
23  litigation, you are the photographer who took the
24  photograph that appears on the cover of the Random
25  House book, Midnight in the Garden of Good and Evil.

Page 9

1   MR. TURNER: What he's saying is you've seen
2   the use now. Would you have let them use it that way?
3   MR. LEIGH: No.
4   Q Well, why not?
5   A Well, for one thing, this image has come to
6   be the identifying image of my career, which I've been
7   very happy about, obviously. It's changed my career.
8   I am known professionally really by the nature of this
9   image. So I've been very diligent in making sure that
10  the uses are done with integrity and done within a
11  kind of context that I feel comfortable with. And so
12  all the uses, since it is my identifying image, have
13  been so protected, so – so looked at very carefully
14  by me.
15  So I think this particular use and the way that
16  it eventually showed up would not have fallen into
17  something I would have felt appropriate for the image
18  that has become to be identified by my career, and I'm
19  not saying that some other kind of arrangements
20  couldn't have been made, you see. I'm just saying
21  that the way it showed up here would not have been
22  something I would have considered to my liking.
23  Q I'm having –
24  A But since I never had the choice to make
25  those decisions then as I have all since I've had all

Page 11

1   people, they'd fax me designs, the art directors would
2   fax me, you know, "What do you think about this? Yes?
3   No?" that kind of relationship, a creative – co-
4   creative relationship is what I've been used to
5   generally.
6   Q But there are uses of your photograph that
7   you've turned down?
8   A Oh, yeah.
9   Q What's type of uses?
10  A The most recent one was a puzzle company out
11  of Charleston, South Carolina, wanted to a Midnight in
12  the Garden of Good and Evil puzzle, and we all turned
13  them down, "we all" meaning, me, Random House, and
14  John Berendt. It just didn't fit in – for me, as the
15  image maker, it didn't fit into the character of how I
16  wanted the image to be used. That's the most recent.
17  That was a few months ago.
18  The puzzle company didn't believe that I was
19  serious and so they wrote Random House independently
20  after having already talked with me, and counsel for
21  Random House had to finally send them a letter saying,
22  "Look, Mr. Leigh, Mr. Berendt and Random House have
23  all turned you down. Case closed," when they didn't
24  believe me.
25  T-shirt companies – I mean, as you probably well

Page 10

1   those other choices and have worked with others
2   extensively on modification and change and sometimes
3   struck the use entirely because of the nature of the
4   intended use.
5   Q Modification and change of what?
6   A In terms of – if we got as far as we were
7   going in the negotiations of a desired use and they
8   said, "Well, here's how we would like to use it," and
9   I said, "Well, that doesn't – that doesn't work for
10  me. So let's" – and if I still wanted to continue
11  with, you know, there are some folks that right off
12  the bat I said, "No. That's just not – that's not in
13  keeping with how I want the image to be used." So
14  I've turned many, many, many requests down.
15  But if the use was legitimate and again, going
16  back to my letter to Warner Brothers, I was really
17  desiring a relationship with Warner Brothers. That's
18  what the whole thing was about and, therefore, would
19  have worked with Warner Brothers as I had worked with
20  everybody else. Let me see how you want to use it in
21  each and every instance and let's talk about it. If
22  you want to use my picture. You know, if you want to
23  use my picture, then let's talk about each use and how
24  it's going to be presented.
25  So in a sense the way it's worked the other

Page 12

1   know, this image has spawned a cottage industry. So
2   I've had to turn a lot of things down when asked.
3   Q Anything other than the puzzle company and
4   T-shirts?
5   A I think I've been asked by a coffee mug
6   company, and I can't remember who that was, you know,
7   just at certain times. My point is that I've been
8   very careful – I'm a professional photographer. I've
9   been very fortunate to have made this picture and to
10  have what's happened to this picture be a career
11  moment for me. It's been incredible. And I'm a fine
12  art photographer. It means that I exist within the
13  integrity of the images that I produce in museums,
14  galleries, collectors. And when something like this
15  happens to a photographer in the realm that I'm in,
16  which I think is a once in a lifetime oppor – you
17  know, this doesn't often happen, when one image
18  becomes the identifying image of your career. So
19  obviously, the integrity of the image has been
20  paramount in my dealings with people, but at the same
21  time, as a Savannahian, it's been an incredible moment
22  for Savannah, this whole Midnight phenomenon. So I've
23  tried to in good faith allow the phenomenon to express
24  itself without being overly concerned when aspects of
25  the image showed up in areas that just were – I mean

Page 49

1  **written Warner Brothers?**
2      Q Letters that you would have written or
3  letters that your lawyers would have written.
4      MR. TURNER: Dave, I don't understand the
5  purpose of this question. If we're in the middle of
6  litigation, we're not writing anyone other than you.
7  So if you've got the letters, you've got the letters.
8  If they don't exist, they don't exist. You're our
9  only point of contact after the lawsuit's filed.
10     MR. STEWART: I'm asking the witness whether
11 there is any correspondence. I would assume that
12 that's what you're doing. That doesn't that is what
13 you or anyone else is doing, and Mr. Leigh is not
14 subject to the same ethical restriction that you are.
15 So my question –
16     MR. TURNER: Jack, did you write anyone?
17     MR. LEIGH: No.
18     Q I believe you testified earlier, Mr. Leigh
19 – and I want you to make sure that I'm accurate on
20 this – that part of the purpose of this letter from
21 Mr. Graham to Warner Brothers was to express an
22 interest in entering into a relationship with Warner
23 Brothers, and that's a relationship about the use of
24 Warner Brothers – the use of your photograph by
25 Warner Brothers in connection with the movie. Is that

Page 51

1      Q That's fine, but you would have given them
2  permission to use it in promotional material?
3      A Those uses would have had to have been
4  **articulated.**
5      Q Any licensed use that would have increased
6  the visibility of your photograph would have –
7      **A Right.**
8      Q – would have increased the fame of the
9  photograph?
10     **A But my whole expression that I've said today**
11 **is that the nature of the use has always been**
12 **paramount to me, not just the use, not just the**
13 **visibility. The context and how the image is used is**
14 **also critical to me. So it's not just the use. It's,**
15 **you know, the context. It's all those things.**
16     Q But if you're approaching Warner Brothers
17 about entering into a relationship with you, you
18 clearly envisioned that there would be a context that
19 you would license?
20     **A Oh, sure. Many contexts probably –**
21 **contextses (sic).**
22     Q And in those multiple contexts, that use by
23 Warner Brothers would have helped the fame of your
24 photograph, wouldn't it?
25     **A Sure.**

Page 50

1  right?
2      **A That's right.**
3      Q In fact, if you could have worked it out,
4  you probably would have been thrilled to have Warner
5  Brothers use your photograph, would you not?
6      MR. TURNER: I object to the form of the
7  question. Worked what out?
8      MR. STEWART: If you could have worked out a
9  relationship with Warner Brothers.
10     MR. TURNER: That's too vague. I object to
11 the question. You mean wrote his own ticket?
12     Q Would you have been happy to license it to
13 Warner Brothers?
14     **A I would have been happy to license it to**
15 **Warner Brothers as I had been happy to license it to**
16 **everybody all over the world who entered into a**
17 **relationship with me in good faith, yeah.**
18     Q And so if Warner Brothers used it, it would
19 be under license at that point, if you had given them
20 permission to use it?
21     **A Yeah. Well, what I – you know, in all the**
22 **other instances, it's always a one-use license which**
23 **means that I would work out each specific use**
24 **separately, which is just the nature of how I do my**
25 **business and how this business is done.**

Page 52

1      Q Probably also would have helped you with
2  sales of other products you sell related to the
3  photograph?
4      **A You mean – well, my products are the image**
5  **itself, basically.**
6      Q Well, you know, sales would have been
7  enhanced by that, wouldn't they?
8      **A Oh, yeah. I mean that's – that was**
9  **understood.**
10     Q So there really at that point was any reason
11 not to license Warner Brothers?
12     **A That's what this was for. (Indicated**
13 **Exhibit 6)**
14     Q You mentioned earlier, Mr. Leigh, that there
15 were several reasons why you believed that Warner
16 Brothers' use of your photograph in its Internet icon
17 constitutes willful infringement. Is that right??
18     **A (Nodded)**
19     Q And I believe one of the reasons you
20 testified to was that the use was after the lawsuit
21 was filed?
22     **A (Nodded)**
23     Q I have a little bit of trouble with that
24 because I don't understand how that makes any sense.
25 How does that show that the infringement was willful?

## Page 57

1  material for the movie?
2  A Uh-huh.
3  Q And that includes newspaper advertising?
4  A It includes everything that I saw, yeah.
5  Q Did you see billboards?
6  A Billboards, newspaper.
7  Q We talked about posters, so you saw posters?
8  A Yeah.
9  Q Help me out a little bit then. If Warner
10  Brothers had its own photograph, why would they use
11  yours? And why would they use yours in the Internet
12  icon? Let me be more specific with that question.
13  A To me, whomever created the icon for the
14  Internet couldn't tell the difference.
15  Q Because they're substantially similar?
16  A Uh-huh.
17  Q And you've testified that you believe
18  they're substantially similar?
19  A Right.
20  Q Couldn't tell the difference? Well, that
21  sounds to me like then you're admitting this was an
22  accident.
23  A Couldn't tell the difference in terms of one
24  became the other, but that doesn't mean that it was an
25  accident.

## Page 58

1  Q It doesn't mean that what was an accident?
2  A The use of my picture.
3  Q But it just –
4  A I think it's two different issues.
5  Q You believe somebody saw your photograph and
6  thought it was this photograph? Thought it was Warner
7  Brothers' photograph?
8  A I say that the images became the same in the
9  minds of many.
10  Q Who are the many that we're talking about
11  now?
12  A Well, I would say the folks who created
13  the web site couldn't tell the difference.
14  Q Couldn't tell the difference between your
15  photograph and Warner Brothers' own photograph of the
16  Bird Girl sculpture?
17  A Uh-huh.
18  Q And again, you've testified previously in
19  this case that these images are substantially similar?
20  A Right, that this is a derivative of this.
21  Q If Warner Brothers used its own photograph
22  in the Internet icon, the Internet icon wouldn't
23  really look any different than if they'd used your
24  photograph?
25  A Yeah.

## Page 59

1  Q Yes, they wouldn't look any different?
2  A They'd look about the same, yeah.
3  Q So there's no reason to use your photograph
4  if they'd looked the same?
5  A True.
6  MR. STEWART: I need to take just a couple
7  minute break.
8  (NOTE: Brief recess.)
9  Q Mr. Leigh, I understand that Random House
10  commissioned you to take the photograph that appears
11  on the cover of the book. Is that correct?
12  A That's correct.
13  Q How much did Random House pay you for that?
14  A For the one-time use on the hardbound
15  edition, they paid $1500 plus, I believe, a hundred
16  dollars for travel, I think, something like that.
17  Q So a total of $1600?
18  A Uh-huh.
19  Q When you say "one-time use on the hardbound
20  edition," what do you mean by that?
21  A In publishing, there is a distinction of
22  different titles that are produced and the hardbound
23  edition is generally, for a book like this, the first
24  product they bring out. And then you would sign a
25  contract for the use on that one title and it would be

## Page 60

1  to the extent of the title's production, you know.
2  Q By "extent of the production's title," do
3  you mean that that license covers all printings of
4  that particular title?
5  A All printings, yeah.
6  Q So your payment or the payment of Random
7  House to you for that photograph was $1600 for all
8  printings of this hardbound edition?
9  A Right.
10  Q The original hardbound edition of the book?
11  A Right.
12  Q The $1500 plus the hundred dollars expenses,
13  does that rate reflect a day rate of any sort?
14  A Well, different photographers work in
15  different ways. We just negotiated – I don't
16  generally – this was a unique commission for me. I
17  don't generally work on a day rate or anything like
18  that. It was a negotiated fee based on an
19  understanding of the nature of the commission. So
20  it's not something that I would have as a day rate,
21  per se, but it was a figure that we agreed was a fair
22  and reasonable figure for something like this.
23  Q Do you have a day rate?
24  A I have a day rate for lectures and
25  workshops, but not for photography. Since I'm not a

Page 89

1  Q But would you agree with me that this is a
2  better image of your photograph than appears in
3  Defendant's Exhibit 10?
4  A It's a better image.
5  Q Much more clear, isn't it?
6  A Uh-huh.
7  Q Much more crisp?
8  A (Nodded)
9  Q Better use of the lighting?
10  A It's a better image. It's my book cover.
11  Q And it's the entire image, isn't it?
12  A Uh-huh.
13  Q And in Defendant's Exhibit 10, it's only a
14  small portion of the image?
15  A Uh-huh.
16   MR. STEWART: Those are the questions I had
17  and I'm running late, so I need to get out of here.
18  Let me talk with Angela for just a second.
19   (NOTE: Brief recess.)
20   MR. STEWART: There have been sometimes when
21  you've been saying uh-huh or giving a nod of the head.
22  Just for purposes of the record, and I'm sure Bart
23  will agree with me on this, we need a verbal yes or no
24  just for clarity of the record.
25   MR. TURNER: Anything you thought he meant

Page 90

1  that agreed with you in the past is the opposite of
2  what he actually meant.
3   MR. STEWART: I'm sure you'll reserve the
4  right to read and sign and correct all this.
5   (NOTE: Mr. Stewart exited.)
6  CROSS EXAMINATION BY MS. JAMES:
7   Q For the record, Mr. Leigh, my name is Angela
8  Payne James. I'm also an attorney for Warner Brothers
9  and, pursuant to the stipulation by the parties, I'm
10  going to continue the deposition from this point
11  forward for Mr. Stewart who had to leave us.
12   I want to ask you a little bit about your
13  background and credentials, education, that kind of
14  thing. Can you tell me where you attended college?
15  A I attended college at the University of
16  Georgia.
17  Q And did you receive a degree from there?
18  A I did.
19  Q In what?
20  A In journalism.
21  Q Journalism. What year?
22  A '72.
23  Q '72. And did you attend graduate school?
24  A I did, but did not receive a degree.
25  Q Where did you attend?

Page 91

1  A Ohio State.
2  Q Ohio State. From what year to what year?
3  A '73 to '74.
4  Q What were you studying there?
5  A Photography.
6  Q Photography. Since that point, have you had
7  any other education, any special courses?
8  A Yeah. I've studied with individual
9  photographers in the late '70s. I can name those
10  photographers.
11  Q Could you, please?
12  A George Tice.
13  Q And could you also include the years
14  approximately that you studied with those –
15  A Yeah, '78.
16  Q And that was in New York?
17  A That was in New Jersey. The rest of the –
18  and then Marie Cassendas (phonetic), and that was in
19  '78 as well. She's a Boston photographer.
20  Q You studied in Boston?
21  A No. She was in New Jersey as well. And
22  then '79 was Joel Freedman and Eva Rubenstein.
23  Q And was that in New Jersey?
24  A That was in Rockport, Maine.
25  Q When you say you studied with those

Page 92

1  photographers –
2  A In a master class setting,
3  Q – can you tell me what that means?
4  A – which means that you had to have
5  submitted a portfolio to be accepted. When you study
6  with individual photographers of that caliber, it is
7  generally in a master class setting, meaning that you
8  are already a professional, but you're going back for
9  further training and refinement.
10   MR. TURNER: Jack, you need to do the court
11  reporter a favor. You need to try not to talk over
12  while she's asking a question because it's very
13  difficult for her to take it down and it gets all
14  jumbled up. So just wait for her to finish her
15  question before you start.
16   MR. LEIGH: Okay.
17   Q Thank you. The master classes, are those
18  offered through any university or educational
19  institution, or are they just offered by the
20  individual?
21  A Maine Photographic Workshops in Rockport,
22  Maine, is a professional educational setting. And in
23  New Jersey, it was Peters Valley Craftsmen, also a
24  professional training area for a variety of media, not
25  just photography. Maine is entirely photography or

Page 241

1 decision that was made not to use my picture in the
2 first place, and he said, "Fine with me." So I think
3 this probably represents about three times average.
4     Q Okay. And the triple time was because, as I
5 understand it, you made an offer to them originally to
6 –
7     A No. They bypassed me originally for the
8 original paperback edition, used another picture just
9 to see if it was going to work.
10     Q How did you become aware of the fact that
11 they had bypassed you for an original?
12     A It was brought to my attention by some folks
13 who had one of the original editions.
14     Q And was that brought to your attention
15 before or after you began communication with Chris
16 Shamwama?
17     A Shamwama. I think I saw the book and
18 thought, "Well, this is very interesting because, you
19 know, Vintage U.K. is Random House. Why would they do
20 that?" And when I talked to Chris about why they did
21 that, he said, "Well, the person who made that
22 decision is no longer with Vintage U.K." So this was
23 a very interesting little situation. So I said, "In
24 that case, let me think about what I need to charge
25 you," and he said, "Fine."

Page 243

1     Q And at this time in 1996, do you know what
2 800 pounds converted to in American dollars?
3     A I can't remember. Was the dollar one to
4 two, two pounds – I mean two dollars for each pound,
5 something like that?
6     MS. JAMES: All right. Let's take a break.
7     (NOTE: Brief recess.)
8     Q We've just gone through all of the license
9 agreements that you have produced to us, Mr. Leigh.
10 Is there any other license fee arrangement that you
11 are aware of that we have not covered or we do not
12 have documentation of other than the $2,000 use for
13 the cover of the Random House calendar?
14     A Not to my knowledge.
15     Q And there are other instances where you've
16 allowed individuals to use the photograph for free
17 that we don't have documentation of? Is that correct?
18     A That's correct.
19     Q Okay. Today your counsel provided us the
20 supplemental response to your first interrogatories
21 number three, and there are various uses listed of
22 third party licensees, many of which we've covered. I
23 just want to ask you about a couple that we haven't
24 just to clarify. Gwinnett Center of Fine Arts,
25 invitation to exhibition, was that use for free?

Page 242

1     Q So was the triple a sort of penalty for not
2 having –
3     A A sort of penalty, yeah.
4     Q A penalty. And so the double is what you
5 normally would have charged, but you charged triple
6 because they bypassed you originally?
7     A Yes.
8     Q And you were upset about that?
9     A Yes. They were more upset about how badly
10 that first edition did than I was upset about them
11 bypassing me. I just thought it didn't make sense.
12     Q How did you decide how much you were going
13 to penalize them for –
14     A Oh, again, you have to realize that I'm
15 dealing with Random House and we have a great
16 relationship, so the penalty was really just a little
17 tweak.
18     Q And a little tweak being an extra –
19     A And it would have probably –
20     Q – time, an extra amount that you –
21     A – instead of twice, it was – I think a
22 normal fee would have been 400 pounds, I mean 300
23 pounds, so it's just a little bit more than twice.
24     Q So there was a 200 pound penalty?
25     A A 200 pound penalty.

Page 244

1     A Yes.
2     Q And when you allow someone to use your
3 photograph for free, do you have any – do you
4 typically make any documentation of that?
5     A The documentation in these instances where
6 it's promoting an exhibition or an appearance that I'm
7 going to be in is generally verbal.
8     Q So the only documentation you have, like for
9 example of the Houston Photography Center, you've
10 provided to us already? Is that correct?
11     A Yes.
12     Q New York Horticulture Society, invitation to
13 fund-raiser, was that use for free as well?
14     A Yes.
15     Q Genesee Center for the Arts, posters and
16 brochures related to personal appearances and
17 workshop, was there a fee charged for that use?
18     A Not for the use of the image, no. There was
19 a fee charged for my appearance, but not for the
20 specific use of the image.
21     Q Earlier you had testified, I believe, that
22 before the Midnight image, early in your career, you
23 got about $150 per speaking engagement. What is the
24 fee that you typically charge now?
25     A For a speaking engagement, it's $250 plus

Page 253

1  MR. TURNER: And you didn't charge yourself
2  anything?
3  MR. LEIGH: I didn't charge myself anything.
4  Q But again, we've established that Southern
5  Images Gallery is a separate entity from you as an
6  individual, correct?
7  A Yes.
8  Q You stated earlier that you would not have
9  agreed to this use, and by "this use," I mean Warner
10 Brothers' use of the Internet icon as displayed in
11 Defendant's Exhibit 10. Is that a correct
12 understanding of your earlier testimony?
13 A Yes.
14 Q Can you tell me specifically why?
15 A Firstly, because I didn't have a
16 relationship with them, and all the other uses that
17 we've described today have all been authorized uses.
18 Secondly, the way the image has been used would be
19 something that I would not have allowed.
20 Q Why?
21 A Because it's a terrible reproduction of the
22 image, for one thing, even though it's recognizable as
23 mine, which makes it that much worse for me.
24 Considering all that I've said today about the use of
25 my image, then to have it appear like that is

Page 254

1  something that I find offensive.
2  Q Is it the blurriness that –
3  A That's one element, sure.
4  Q Can you tell me everything about that image
5  that you find objectionable or that is one of the
6  reasons that you would not have – or that you base
7  your opinion that you would not have allowed this use
8  on?
9  A Well, again, the top one being that it was
10 unauthorized. Second one is that it's a very poor
11 reproduction of my image, meaning that in my
12 understanding of electronic media, it's – you know,
13 however this was scanned into this site was done maybe
14 third generation.
15 Q What do you mean by "third generation"?
16 A It means that even today, I mean, you can
17 scan even or pull off of another web site better stuff
18 than this, you know, so –
19 Q So you think if Warner Brothers had scanned
20 in a copy of the book, it would appear clearer than
21 that in this – sort of the creation of this tout?
22 A It looks to me like it got pulled off of a –
23 - it's electronic to electronic, in my understanding
24 of the degeneration of the image here.
25 23

Page 255

1  Q And what do you understand that to mean,
2  "electronic to electronic"?
3  A It means that it came from an electronic
4  source rather than from an original source which I,
5  you know, have provided these other folks. The color
6  is strange, the layout. It's just something that I
7  would not have enjoyed work – you know, I wouldn't
8  have worked with Warner Brothers to produce something
9  like this, not given the importance of this image to
10 me and my career as evidenced in all the stuff that
11 we've seen today. And not having the choice,
12 therefore, to work with Warner Brothers has made the
13 use of this image that offensive to me. So visually,
14 it's destructive of my image and, philosophically, it
15 was used without my permission. So those are the
16 reasons why I find this objectionable.
17 Q And visually, again, it's the color you've
18 cited, the layout, the blurriness?
19 A The blurriness or the degeneration –
20 Q The degeneration?
21 A – of the image itself.
22 Q And by that you mean what?
23 A In my understanding, the technology that
24 produced this image, it came from an electronic
25 source, because earlier I testified that when an image

Page 256

1  is downloaded from, say, my web site, that's going to
2  be a very poor reproduction because it's intended to
3  be poor. We put it on the web site to – if you
4  download it, it's going to be poor, just for that
5  reason. And so however this image was acquired of
6  mine, it came through channels that resulted in a very
7  poor reproduction of my image and I would have never
8  okayed something like this.
9  Q Okay. And again, can you tell me
10 specifically why it's okay to have a poor image of
11 your photograph on your web site and it wouldn't be
12 okay for Warner Brothers to do it if they had
13 authorized it with you?
14 A I didn't say that it's the poor image on the
15 web site. I'm saying in the transferring of the
16 image, it is built-in to be poor once it's downloaded.
17 You see, it's different when it's electronic, but once
18 it's downloaded, then you don't get a very good image
19 and it's intended to be poor because we figured people
20 would download it for use. And so part of the
21 protection that one would have or tries to have at
22 this point with Internet use, that's one part of the
23 protection process, that yes, it's going to be
24 downloaded, but it's going to be downloaded in a very
25 poor fashion. It's not poor on the site itself. It's

Page 265

1  Q Do you know how many copies of the book were
2  sold with your image on it?
3  A We have documents on that, I know. I don't
4  see that reflected – or do I? (Reviewed documents)
5  Well, I know that those figures were provided, how
6  many were produced as the edition of this, how many
7  had been already distributed to bookstores and how
8  many remained in inventory.
9  Q But you don't recall any of those figures?
10  A I don't see them here, but I know that we
11  had them.
12  Q Okay.
13  A I'm going to guess. It seems like they
14  produce an initial run of 5,000, and this is a guess
15  just from my memory of these figures, and they had
16  already distributed close to 1300 of those.
17  Q Did those numbers go into the amount of –
18  or go into your consideration of the amount of damages
19  you should be paid?
20  A That was one part of the assessment. That's
21  true.
22  Q What else did you consider in arriving at
23  this $5,000 damages fee?
24  A Primarily, the second aspect of the
25  assessment was how they handled the situation.

Page 266

1  Q Was the $5,000 – well, let me clarify.
2  When you say "how they handled the situation," exactly
3  what do you mean?
4  A I mean that we let them know that there was
5  a problem with the initial correspondence from Mr.
6  Deveau, and then we just wanted to see how they were
7  going to respond to this problem.
8  Q Did they suggest that they pay you $5,000?
9  A I think that was my call.
10  Q And again, the $5,000 was based on their
11  prompt response and the number of books that had been
12  distributed? Is that correct?
13  A And a third factor.
14  Q Okay.
15  A The third fact was my understanding of a
16  parameter of damages in an instance like this.
17  Q And what was your understanding of the
18  parameter of damages in an instance like this?
19  MR. TURNER: Let me ask him a question.
20  (NOTE: Mr. Leigh and Mr. Turner conferred.)
21  MR. TURNER: We object based on
22  attorney/client privilege.
23  Q Okay. Is it your understanding that $5,000
24  includes what would have been a reasonable license fee
25  for that type of use?

Page 267

1  A No, that's not how it was arrived at at all.
2  Q So it was not based on any kind of license
3  fee, whether retroactive or proactive?
4  A No.
5  Q Okay. Was there any sort of punitive
6  element to the damages?
7  A Yes.
8  Q How much would you say you charged them as a
9  punitive – I'm sorry, as a penalty?
10  MR. TURNER: Well, let me object because
11  this is kind of an end run because the only way he got
12  these figures, I understand, is from conversations
13  with his attorney and, therefore, his way of deriving
14  that is based upon attorney/client conversations, and
15  we're going to object to that.
16  Q So you had no independent knowledge of how
17  the $5,000 fee was arrived at other than
18  communications with your attorney?
19  A That's true.
20  Q What was the book about?
21  A The "Georgia Ghost" book?
22  Q Yes.
23  A Collection of ghost stories, most of them,
24  to my memory, located in Savannah.
25  Q Was there anything offensive about using

Page 268

1  your image in connection with that to you?
2  A Everything.
3  Q Can you elaborate?
4  A Not only was it unauthorized and altered
5  without my permission, but it was, therefore,
6  connected to an inferior product and an inferior book
7  and an obvious attempt to capitalize on the Midnight
8  thing.
9  Q Okay. Do you know where the book was
10  available when it was on sale?
11  A I saw it first in a bookstore here in
12  Savannah when I first became aware of the problem,
13  Shaver's Bookstore.
14  Q Am I correct that you would not have agreed
15  to that type of use had they approached you initially?
16  A I would have agreed to no use in that
17  instance.
18  Q Because you did not approve of it visually?
19  Is that correct?
20  A Well, I wouldn't have allowed that image to
21  be used on any other book cover.
22  Q Other than Midnight?
23  A Of course.
24  Q And why is that?
25  A Because to do that would have diminished the

Page 293

1 photograph?
2 A Yes.
3 Q And who would that be?
4 A Through my attorneys.
5 Q Okay. Other than that?
6 A It's an interesting issue here because the
7 answer is yes, but it's the same issue.
8 MR. TURNER: Can we talk for just a second?
9 MS. JAMES: Sure. We can go off the record.
10 (NOTE: Off the record.)
11 Q We've established that the last question I
12 asked you, the answer is privileged, attorney/client
13 communication. You said that you have never employed
14 a multiplier of ten times for an unauthorized use.
15 Have you ever employed any kind of multiplier of a
16 license fee for an unauthorized use?
17 A Well, the John Blair thing, you know, was –
18 MR. TURNER: Can we agree that if he's
19 already testified to using a penalty or multiplier,
20 he's already done that?
21 MS. JAMES: He hasn't, to my knowledge.
22 MR. LEIGH: Hasn't what?
23 MS. JAMES: Have you testified that you've
24 used a multiplier before?
25 MR. TURNER: I thought he said with John

Page 294

1 Blair that he doubled the normal use as a penalty.
2 MS. JAMES: No, I don't believe so.
3 MR. LEIGH: I think my understanding –
4 MS. JAMES: I mean he said that, you know –
5 go ahead, Mr. Leigh.
6 MR. TURNER: It was punitive. I know he
7 said that.
8 A Yeah, it was punitive. My understanding of
9 what I said, if my brain continues to function here,
10 is that I understood a range, given the John Blair
11 situation, of what that could be given their immediate
12 response and et cetera, all the variables that I ended
13 up using to assess what the punitive damages would be.
14 I chose that number out of this range.
15 Q So did you –
16 A Yeah. I was aware that there were
17 multipliers involved. That's how I came up with that
18 number. If I wasn't clear before, I apologize, but
19 like I've said all day long, you start from a base and
20 then you move this way given your variables.
21 Q What was the multiplier you used?
22 A For the John Blair thing?
23 Q Yes.
24 A Two to three times.
25 Q Two to three times?

Page 295

1 A (Nodded) Much like Jane said in her report,
2 you know, the three times thing gave me some sense of
3 what to do.
4 Q Have you lost any licensing opportunities
5 because of the use by Warner Brothers of the Internet
6 icon in Defendant's Exhibit 10?
7 A I'm not sure I understand the question.
8 Q I'm asking have you had, to your knowledge,
9 an opportunity to license your photograph that was
10 lost because of the presence of this Internet icon on
11 WB's home page?
12 A I don't know if I can answer that in the
13 sense that ... I guess the only way I can answer that
14 is this. If this use appeared on a web site such as
15 Warner Brothers' in an unauthorized fashion, the
16 potential losses could be gargantuan because if they
17 can do it, then why not others.
18 Q Okay. But are you aware of any losses? Are
19 you aware –
20 A I'm not aware.
21 Q Okay. Are you aware of any lost publishing
22 opportunities because of the Internet icon?
23 A Again, I'm not really sure of the nature of
24 the question. I'm not following this train of
25 thought.

Page 296

1 Q Are you aware of any instance where a
2 publisher was going to publish some of your work, but
3 didn't because – or going to pay you to publish some
4 of your work, but didn't because they had access to it
5 from the Internet icon, or didn't because the image
6 had been used in this fashion by Warner Brothers?
7 A Can I say I don't think it's pertinent to
8 the situation, or do I have to say something?
9 MR. TURNER: No, you have to say something.
10 If you don't know, you don't know, though. You don't
11 have to – if you –
12 A Okay. I don't know.
13 MR. TURNER: You're not required to know the
14 answers to all the questions, but if you do know, then
15 you have to answer.
16 Q Is the answer that you don't know whether
17 you're aware or that you are not aware of any such
18 instances?
19 A I'm not aware.
20 Q Are you aware of any instances where a
21 gallery or museum was going to exhibit your work, but
22 did not because of the presence of the Internet icon?
23 A I don't know. I'm not aware.
24 Q Not aware. How exactly have you been
25 damaged by the use of Warner Brothers of this image on

Page 297

1 its home page?
2    A I think from all the testimony I've given, I
3 think the accumulation of that would indicate my sense
4 of the damages, from what I've said all day.
5    Q Have you lost any money because of the
6 Internet icon, to you knowledge?
7    MR. TURNER:  Other than if they would have
8 paid him?
9    Q Yes, other than – beyond the original
10 license fee that you would have gotten.
11    A Not to my awareness.
12    Q Have your revenues from products bearing the
13 Midnight photo – and by "products," I mean the print
14 and the posters that are sold in Southern Images
15 Gallery – have those decreased in any way because of
16 the presence of the Internet icon on Warner Brothers'
17 home page?
18    A I'm not aware of it.
19    (NOTE:  Off the record.)
20    Q Just quickly, if we can, you claim in this
21 lawsuit that your photograph contains original
22 elements to it that are protectable by copyright laws.
23    MR. TURNER:  I'm going to object to all
24 these questions in that they're not relevant.  Judge
25 Nangle has already made that determination.

Page 298

1    MS. JAMES:  I believe they are relevant for
2 the use in the Internet icon.  If you –
3    MR. TURNER:  Oh, you're going to compare the
4 two?  Well, you can compare the two, but if you're
5 going to go through and ask what all is original,
6 Judge Nangle says that there is nothing original in
7 this photograph, as I understand his determination.
8    MS. JAMES:  I'm asking Mr. Leigh what he
9 thinks is original about the photograph, and I know
10 that we have some documents, your earlier pleadings as
11 I recall, do you believe that the lighting is
12 original?
13    A I think I've stated to the maximum what I
14 believe is original about the photograph, yeah, in
15 prior testimony.
16    Q Do you believe that any of those original
17 elements are visible in the Internet icon?
18    A Absolutely.
19    Q Which ones?
20    A All the aspects of what you can see of my
21 image in the icon are original to my image.
22    Q Okay.  I need you to name those for me
23 specifically, please.
24    A Well, the portion of the icon that's been
25 used, that has been used from this image, all that is

Page 299

1 from my original photograph.  What else can I say?
2 It's visible.  This was made from that, and this is my
3 image that contains all the aspects of what I made to
4 be the image.  So I don't know how else to say –
5 everything you can see there that's from here is
6 original to my work, original to my work, so –
7    Q Well, for example, you claimed in your
8 pleadings that you believed that the lighting effect
9 created in the image on the cover of the book is
10 original and unique and special in some way.  Is that
11 correct?
12    A I've stated that.
13    Q Do you believe that that lighting element is
14 visible in the Internet icon?
15    A Oh, yeah.
16    Q You do?
17    A Oh, yeah.
18    Q You testified earlier that this was a
19 different color and blurry –
20    A Yeah.
21    Q – but we can still –
22    A Oh, yeah.
23    Q – you believe you can still see your
24 lighting?
25    A You can see that it's my image, yeah.

Page 300

1    Q No, I'm not asking you if you can see that
2 it's your image.  I'm asking about the lighting.
3    A But my image is the original work of art
4 which I'm talking about.
5    Q Would you agree that the bulk of the image
6 in the tout is a portrayal of the Bird Girl?
7    A Yeah.  Taken from that, yeah.
8    MR. TURNER:  Is "that" identified as a
9 number so we know what "that" is?
10    MS. JAMES:  I'm sorry.  Let's go ahead and
11 mark this as an exhibit.
12    (NOTE:  Defendant's Exhibit No. 49 was
13 marked for the purpose of identification.)
14    Q For the record, we've been referring to
15 Defendant's Exhibit 49 as Mr. Leigh's image that he's
16 been comparing to the Warner Brothers' icon in
17 Defendant's Exhibit 10.  Is that correct, Mr. Leigh?
18    A That is correct.
19    MR. TURNER:  Which he's called "that"
20 several times in the last few sentences, "that" being
21 in quotation marks.
22    Q Just a couple of follow-up type issues.  Are
23 you divorced now from Ms. Patrice?
24    A Yes, I am.
25    Q Have you any other marriages other than

The statements in the attached Declaration are true and
correct and the Witness has executed the Declaration.
However, WB's counsel had not received the original
Declaration at the time necessary to arrange for delivery of
this Motion to the Court for timely filing. WB will
promptly supplement its Motion with the original
Declaration.

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF GEORGIA
SAVANNAH DIVISION

| | |
|---|---|
| JACK LEIGH, | ) |
| | ) |
| Plaintiff, | ) |
| v. | ) CIVIL ACTION FILE NO. |
| | ) CV-497-340-JFN |
| WARNER BROS., a Division of | ) |
| TIME WARNER ENTERTAINMENT | ) |
| COMPANY, L.P., | ) |
| | ) |
| Defendant. | ) |

## SECOND DECLARATION OF ELIZABETH SHERMAN

Pursuant to 28 U.S.C. § 1746, I, Elizabeth Sherman, hereby declare as follows:

1.

My name is Elizabeth Sherman. I am of legal age and under no legal disability. I have personal knowledge of the facts stated in this declaration and know them to be true and correct.

2.

I am employed by Warner Bros. Online ("WB Online"). My title is Director of Programming and Development. I have held this position for approximately two years.

3.

WB Online is a division of Time Warner Entertainment Company, L.P. and is in the business of providing commercial online services. WB Online is responsible for the WB web site located at "www.warnerbros.com" (the "WB Online Web Site"). In my capacity as Director of Programming and Development, I am responsible for all content that appears on the main page of the WB Online Web Site. The WB Online main page serves as a gateway through which users can access other web sites, some of which are designed and created by other WB divisions.

ATL01/10404862v1

4.

WB Online produces all of the content of the WB Online home page and much of the content of the WB Online Web Site. It also distributes that content and adapts it for different web browsers. WB Online also sells all advertising on the web site.

5.

WB Online has its own operational structure with its own president, general counsel, management staff, operations department, marketing department, and personnel department.

6.

WB Online has no creative input or involvement in any of the WB Theatrical Division's business operations, including the creation or production of any motion pictures or any promotional web sites or other material therefore.

7.

WB Theatrical has no input or involvement in any of WB Online's business operations.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on the _____ day of December, 1998.

                                                                 _____

                                                             ELIZABETH SHERMAN

ATL01/10404862v1

⊠IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF GEORGIA
SAVANNAH DIVISION

| | | |
|---|---|---|
| JACK LEIGH, | ) | |
| | ) | |
| Plaintiff, | ) | |
| v. | ) | CIVIL ACTION FILE NO. |
| | ) | CV-497-340-JFN |
| WARNER BROS., a Division of | ) | |
| TIME WARNER ENTERTAINMENT | ) | |
| COMPANY, L.P., | ) | |
| | ) | |
| Defendant. | ) | |

## DECLARATION OF DON BUCKLEY

Pursuant to 28 U.S.C. § 1746, I, Don Buckley, hereby declare as follows:

1.

My name is Don Buckley. I am of legal age and under no legal disability. I have
personal knowledge of the facts stated in this declaration and know them to be true and
correct.

2.

I am employed in the marketing department of Warner Bros.' theatrical division
("WB Theatrical"). My title is Senior Vice President Theatrical Marketing and New
Media. I have held this position since May 1997.

3.

In my current position, I am principally responsible for the creation, production
and maintenance of all WB Theatrical web sites, including those sites which are designed
to promote motion pictures distributed by WB Theatrical.

4.

WB Theatrical is solely responsible for the creation, production and maintenance of the theatrical web site promoting the movie *Midnight in the Garden of Good and Evil*, located at "www.goodandevil.com".

5.

WB Theatrical has its own operational structure with its own president, general counsel, management staff, operations department, marketing department, and personnel department.

6.

Warner Bros. Online ("WB Online") is another division of WB. It has no creative input or involvement in any of WB Theatrical's business operations, including the creation or production of any motion pictures or any promotional material therefore.

7.

WB Theatrical's marketing strategy for a motion picture is to create one basic still image to use in promotional material for the picture. This still image is referred to as a "one sheet." The one sheet is used consistently and exclusively, in whole or in part, in all advertising and promotional material for the motion picture to generate consumer association with only one image related to the motion picture. Use of more than one image would diffuse the effectiveness of the advertising and promotional material.

- 2 -

I declare under penalty of perjury that the foregoing is true and correct.

Executed on the 4th day of December, 1998.

DON BUCKLEY

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF GEORGIA
SAVANNAH DIVISION


JACK LEIGH,                          )   CIVIL ACTION
                                     )   NO. CV 497-340
                    PLAINTIFF,       )
                                     )
            VS.                      )
                                     )
WARNER BROTHERS INC., A DIVISION)
OF TIME WARNER ENTERTAINMENT         )
COMPANY, L.P.                        )
                                     )
                    DEFENDANT.       )
_____)


DEPOSITION OF
ELIZABETH JANE SHERMAN


SEPTEMBER 15, 1998


REPORTED BY

KARLA M. BARRON
C.S.R. NO. 2842

JOB NO.

98-754

CAROL BRENNAN & ASSOCIATES
CERTIFIED SHORTHAND REPORTERS
4444 RIVERSIDE DRIVE, SUITE 104
BURBANK, CALIFORNIA 91505
TELEPHONE (818) 846-3844
FAX (818) 846-8179

1 ALSO ASK THAT YOU HESITATE FOR A MOMENT AFTER YOU
2 THINK THAT I'VE FINISHED MY QUESTION, SO WE'RE NOT
3 TALKING OVER EACH OTHER.
4       IS THAT AGREEABLE?
5    A  YES.
6    Q  OKAY.  ALSO BECAUSE THIS IS BY TELEPHONE,
7 BY AGREEMENT OF THE PARTIES, IF FOR SOME REASON YOU
8 DIDN'T HEAR WHAT I SAID OR YOU'RE UNCERTAIN OR I'M
9 TALKING IN A GARBLED TONE, JUST LET ME KNOW, AND I'LL
10 REPEAT THE QUESTION OR ASK IT A DIFFERENT WAY.
11      IS THAT ALL RIGHT WITH YOU?
12   A  YES.
13   Q  ALL RIGHT.  STATE YOUR FULL NAME.
14   A  ELIZABETH JANE SHERMAN.
15   Q  ALL RIGHT.  YOUR OCCUPATION?
16   A  DIRECTOR OF PROGRAMMING AND DEVELOPMENT,
17 WARNER BROTHERS ONLINE.
18   Q  HOW LONG HAVE YOU HELD THAT POSITION?
19   A  JUST OVER TWO YEARS.
20   Q  HOW LONG HAVE YOU BEEN WITH WARNER
21 BROTHERS ONLINE?
22   A  JUST OVER TWO YEARS.
23   Q  OKAY.  BEFORE THAT WHERE WERE YOU?
24   A  I WAS WITH TIMING VENTURES OUT OF NEW
25 YORK.

Page 6

1    Q  ALL RIGHT.  AND WHAT TYPE OF BUSINESS ARE
2 THEY IN?
3    A  MAGAZINE PRODUCTION, TELEVISION
4 DEVELOPMENT.
5    Q  WERE YOU IN THE BUSINESS OF PUTTING
6 INFORMATION ON THE WORLDWIDE WEB OR AMERICA ONLINE?
7    A  MARGINALLY.
8    Q  MARGINALLY.  OKAY.
9       AND BEFORE THAT WHERE WERE YOU?
10   A  N.B.C.
11   Q  OKAY.  AND WHAT WAS YOUR POSITION THERE?
12   A  I WAS THE MANAGEMENT ASSOCIATE, ROTATING
13 THROUGH DIFFERENT FUNCTIONAL AREAS OF THE NETWORK.
14   Q  OKAY.  DOES WARNER BROTHERS ONLINE HAVE
15 ANOTHER OFFICE, OTHER THAN WHERE YOU'RE BEING DEPOSED
16 TODAY?
17   A  I DON'T BELIEVE SO.
18   Q  OKAY.  IS THERE A DIVISION THAT DOES THE
19 SAME TYPE OF FUNCTION IN NEW YORK CITY?
20   A  I'M NOT SURE I UNDERSTAND YOUR QUESTION.
21   Q  YES.  DOES WARNER BROTHERS HAVE ANOTHER
22 DIVISION THAT PRODUCES ITEMS TO BE PUT ON THE
23 INTERNET?
24   A  YES.
25   Q  OKAY.  WHAT'S THE NAME OF THAT DIVISION?

Page 7

1    A  I BELIEVE IT'S THEATRICAL ADVERTISING AND
2 PUBLICITY.
3    Q  ALL RIGHT.  AND WHAT IS YOUR
4 UNDERSTANDING OF WHAT THAT DIVISION DOES?
5    A  AD PUB HANDLES ALL THE PROMOTION AND
6 MARKETING FOR THEATRICAL PROJECTS.
7    Q  WOULD THAT BE SUCH AS WEB PAGES FOR
8 WARNER BROTHERS MOTION PICTURES THAT ARE CURRENTLY
9 BEING SHOWN THROUGHOUT THE COUNTRY?
10   A  I BELIEVE SO; YES.
11   Q  SUCH AS "MIDNIGHT IN THE GARDEN OF GOOD
12 AND EVIL"?
13   A  YES.
14      (MR. PENA EXITED.)
15 BY MR. TURNER:
16   Q  OKAY.  "THE POSTMAN"?
17   A  YES.
18   Q  ALL RIGHT.  AND WHAT IS THE PURPOSE OF
19 THAT ENTITY'S FUNCTION?
20   A  AGAIN, I'M NOT SURE I UNDERSTAND YOUR
21 QUESTION.
22   Q  SURE.  I'LL ASK IT ANOTHER WAY.  I
23 APPRECIATE THAT.
24      DOES IT DO ANYTHING OTHER THAN THEATRICAL
25 MARKETING AND PROMOTION?

Page 8

1    A  I'M NOT SURE.
2    Q  OKAY.  AS DIRECTOR OF PROGRAM
3 DEVELOPMENT -- IS THAT CORRECT?
4    A  PROGRAMMING AND DEVELOPMENT.
5      (MR. PENA ENTERED.)
6 BY MR. TURNER:
7    Q  PROGRAMMING AND DEVELOPMENT.
8      YOUR OFFICE IS WHERE?
9    A  4000 WEST ALAMEDA IN BURBANK.
10   Q  AND WHAT ARE YOUR DUTIES AND
11 RESPONSIBILITIES?
12   A  I'M RESPONSIBLE FOR OVERSEEING CONTENT
13 FOR PROJECTS THAT EMANATE OUT OF WARNER BROTHERS
14 ONLINE HERE.  I'M RESPONSIBLE FOR PROMOTING THE FULL
15 UMBRELLA OF PROJECTS AT WARNER BROTHERS ONLINE.  I'M
16 RESPONSIBLE FOR DEVELOPING NEW CONTENT.  I'M
17 RESPONSIBLE FOR INTERFACING WITH DIFFERENT INTERNAL
18 DIVISIONS CREATING CONTENT FOR PROJECTS.
19   Q  OKAY.  DOES YOUR DIVISION OR DEPARTMENT,
20 HOWEVER YOU WANT TO PUT IT, EVER PRODUCE OR GENERATE
21 THEATRICAL SITES TO YOUR KNOWLEDGE?
22   A  NO; NOT TO MY KNOWLEDGE.  MY AREA DOES
23 NOT DO THAT.
24   Q  AND THAT WOULD INCLUDE THE AREA IN WHICH
25 SUZANNE ABRAMSON OVERSEES?

Page 9

BY MR. TURNER:

2  Q   OKAY.

3  A   WE ALSO HAVE AN AOL HOME PAGE. SO I'M
4  JUST TRYING TO BE CLEAR ABOUT WHICH WE'RE SPEAKING
5  ABOUT.

6  Q   WELL, LET'S BREAK IT UP.

7      THE WEB HOME PAGE, DO YOU HAVE SOMEONE
8  WHO REVIEWS THAT ON A DAILY BASIS?

9  A   YES.

10  Q   ALL RIGHT. AND FOR WHAT PURPOSE?

11  A   TO MAKE SURE THAT WHAT WE ARE PROMOTING
12  IS ACCURATE; THAT IT IS ONE CLICK AWAY; THAT THERE ARE
13  NO TYPOS.

14  Q   OKAY. WHAT ABOUT THE A.L.O. HOME PAGE?

15  A   THAT WOULD BE AOL.

16  Q   I'M SORRY. AMERICA ONLINE?

17  A   RIGHT.

18  Q   OKAY. DO YOU HAVE SOMEBODY WHO REVIEWS
19  THAT?

20  A   YES; FOR THE SAME PURPOSES.

21  Q   SAME PERSON?

22  A   NO. FOR THE SAME PURPOSES.

23  Q   I GOTCHA. IT WOULD BE A DIFFERENT
24  PERSON?

25  A   YES.

Page 14

1  Q   OKAY. NOW, DO YOU HISTORICALLY RECORD
2  THE HOME PAGE FOR EACH DAY, SO THAT IT CAN BE ARCHIVED
3  SOMEWHERE?

4  A   NO; NOT FOR EACH DAY.

5  Q   ALL RIGHT. WHAT PERIOD OF TIME?

6  A   DURING WHAT TIME ARE YOU REFERRING TO?

7  Q   HAS THE POLICY CHANGED IN THE LAST YEAR?

8  A   YES, IT HAS.

9  Q   ALL RIGHT. WHEN DID IT CHANGE?

10  A   I DON'T REMEMBER THE EXACT DATE.

11  Q   ALL RIGHT. TELL ME WHAT THE NEW POLICY
12  IS.

13  A   WE NOW CHANGE OUR HOME PAGE ON A DAILY
14  BASIS, BECAUSE WE ARE JUGGLING SO MANY MORE SITES.

15  Q   BECAUSE THE SITES CHANGE ON A DAILY
16  BASIS?

17  A   NO; BECAUSE WE HAVE SO MANY MORE SITES.

18  Q   OKAY. AND WHAT WAS THE OLD POLICY?

19  A   WE HAD FEWER SITES, SO WE CHANGED THE
20  HOME PAGE ONCE A WEEK.

21  Q   ALL RIGHT. AND WHAT WOULD HAVE BEEN THE
22  POLICY BACK IN NOVEMBER OF 1997?

23  A   ONCE A WEEK.

24  Q   IN DECEMBER OF 1997?

25  A   ONCE A WEEK.

Page 15

1  Q   OKAY. AND SO EVERY TIME THAT YOU CHANGE
2  IT, YOU WOULD HISTORICALLY RECORD THAT HOME PAGE?

3  A   YES, WE DID.

4  Q   SO THAT YOU COULD REFER BACK TO IT AT A
5  LATER DATE?

6  A   YES.

7  Q   FOR WHAT PURPOSE?

8  A   WE LIKE TO TRY -- YOU KNOW, ONLINE IS
9  STILL A RELATIVELY NEW MEDIA PLATFORM. WE TRY TO LOOK
10  AT HOW WE PERFORM IN OUR NUMBERS VERSUS WHAT WE
11  PROMOTE TO SEE HOW EFFECTIVE PROMOTIONS ARE.

12  Q   ALL RIGHT. NOW, WHAT IS THE PURPOSE FOR
13  HAVING AN ICON FOR A THEATRICAL SITE?

14  A   THERE ARE A MULTITUDE OF IT.

15     THE FIRST ONE WOULD BE FOR MARKETING AND
16  PROMOTIONAL PURPOSES, TO HELP DRIVE TRAFFIC AND
17  AWARENESS FOR THE FEATURE FILM.

18  Q   TO LET PEOPLE OUT THERE WHO WERE
19  ACCESSING THE INTERNET KNOW ABOUT THE MOVIE?

20  A   YES.

21  Q   AND THAT IS A PROMOTIONAL PURPOSE;
22  CORRECT?

23  A   THAT IS A MARKETING AND PROMOTIONAL
24  PURPOSE.

25  Q   WHICH HELPS SELL MOVIES?

Page 16

1  A   WE HOPE SO.

2  Q   OKAY. THAT'S THE INTENT ANYWAY?

3  A   WELL, I THINK IT'S ALSO TO BUILD A
4  ONE-ON-ONE RELATIONSHIP BETWEEN THE USER AND WHATEVER
5  PROPERTY WE'RE PROMOTING --

6  Q   RIGHT.

7  A   -- BY GIVING YOU THE CHANCE TO GO IN AND
8  INTERACT WITH CONTENT.

9  Q   SURE. BUT THEY'RE ALSO TO LET THE USER
10  KNOW OF WHAT NEW WARNER BROTHERS MOVIES ARE OUT THERE?

11  A   YES.

12  Q   THAT THEY CAN GO SEE IN THEIR
13  NEIGHBORHOOD?

14  A   IF THEY CHOOSE TO; YES.

15  Q   NOW, TELL ME HOW -- IS THERE SOME TYPE
16  OF -- AND WHEN YOU'RE REVIEWING THE CONTENT, WHEN YOU
17  GET READY TO CHANGE AN ICON, DO YOU HAVE SOMEONE IN
18  YOUR DEPARTMENT THAT IS UNDER YOU REVIEW THE ICON
19  BEFORE IT BECOMES PART OF THE HOME PAGE?

20  A   COULD YOU BE MORE SPECIFIC ABOUT WHAT YOU
21  MEAN?

22  Q   SURE. LET'S SAY YOU'VE GOT A NEW MOVIE
23  COMING OUT, AND YOU DECIDE, I WOULD IMAGINE FOR
24  PROMOTIONAL PURPOSES, THAT YOU WANT TO PUT AN ICON
25  THAT PEOPLE CAN ACCESS THE HOME PAGE FOR THAT MOVIE --

Page 17

1 THE WEB PAGE FOR THAT MOVIE. ALL RIGHT.
2          IS THERE SOME FORMULA THAT YOU USE OR AT
3 LEAST SOMETHING THAT YOU DESIRE OF THE ICON WHEN DOING
4 THAT?
5    A   JUST AN ATTRACTIVE ICON.
6    Q   WELL, DOES IT HAVE TO HAVE SOME
7 RELATIONSHIP TO THE MOVIE?
8    A   YES. I MEAN, IT CAN BE -- IT DEPENDS.
9    Q   OKAY.
10   A   I MEAN, IT COULD BE A SIMPLE -- IT
11 REALLY DEPENDS ON WHAT THE KEY ART FOR THE FEATURE IS.
12   Q   YOU CAN PROBABLY HELP ME WITH THIS. ALL
13 RIGHT.
14          YOUR DEPARTMENT OVERSEES THE CONTENT OF
15 THE HOME PAGE. ALL RIGHT? AM I RIGHT ON THAT?
16   A   YES.
17   Q   OKAY. YOU DECIDE THAT YOU WANT TO CHANGE
18 THE HOME PAGE TO HAVE AN ICON OR TOUT FOR A NEW -- A
19 NEW FEATURE OR MOTION PICTURE. OKAY?
20   A   YES.
21   Q   OKAY. IS THERE ANYTHING THAT YOU DESIRE
22 OF THAT ICON, WHEN YOU ARE REVIEWING IT BEFORE YOU PUT
23 IT ON THE HOME PAGE?
24      MR. STEWART: THE WITNESS DOESN'T UNDERSTAND THE
25 QUESTION, BART.

Page 18

1 MOVIE APPEARS IN THE ICON.
2    Q   OKAY. SO IN ORDER TO ASSURE THAT THE
3 USER ASSOCIATES THE MOVIE TO THE ICON, YOU MAKE SURE
4 THAT THE TITLE IS ON THE ICON.
5    A   GENERALLY SPEAKING.
6    Q   ALL RIGHT. AND WHO CREATES THE ICONS FOR
7 WARNER BROTHERS ONLINE?
8    A   THE ONLINE ART DEPARTMENT.
9    Q   ALL RIGHT. AND THAT WOULD BE SUZANNE
10 ABRAMSON'S DEPARTMENT; RIGHT?
11   A   YES.
12   Q   OKAY. NOW, WHEN YOU DESIRE AN ICON --
13 LET ME BACK UP.
14          IS THERE A FORMULA ON HOW LONG THE ICON
15 WILL BE ON THE HOME PAGE FOR A MOTION PICTURE?
16   A   THERE IS NO SET POLICY.
17   Q   ALL RIGHT. WHAT IS THE LONGEST YOU'VE
18 HAD AN ICON ON FOR A MOTION PICTURE?
19   A   I'M SORRY. I DON'T REALLY RECALL.
20   Q   OKAY. WHAT IS THE SHORTEST PERIOD OF
21 TIME?
22   A   I DON'T REALLY RECALL THAT SPECIFICALLY
23 EITHER.
24   Q   SO IT COULD BE A MONTH; IT COULD BE LESS
25 THAN A MONTH?

Page 20

1 BY MR. TURNER:
2    Q   I MEAN -- ALL RIGHT.
3      MR. STEWART: THE PROBLEM IS IT'S SO BROAD.
4      MR. TURNER: SURE.
5    Q   ARE THERE CERTAIN PARAMETERS WHICH ARE
6 ACCEPTABLE AND UNACCEPTABLE FOR AN ICON FOR A MOTION
7 PICTURE?
8    A   IT NEEDS TO BE READABLE. IT'S -- I AM
9 NOT SURE I UNDERSTAND THE QUESTION. I'M SORRY.
10   Q   OKAY. WELL, THERE'S SOME QUALITY CONTROL
11 HERE, ISN'T THERE, BEFORE YOU PUT THE -- YOU PUT THE
12 ICON ON THE HOME PAGE?
13   A   YES. WE DON'T LIKE BLURRY ART THAT'S
14 UNREADABLE.
15   Q   OKAY. ANYTHING ELSE? THAT'S IT?
16 JUST --
17   A   WE GENERALLY WANT SOMETHING THAT'S
18 ATTRACTIVE.
19   Q   OKAY.
20   A   AND DEPENDING ON THE KEY ART FOR THE
21 MOVIE, THE TITLE MAY OR MAY NOT APPEAR IN THE ICON.
22   Q   IS IT IMPORTANT THAT THE ICON -- THE
23 PERSON WHO IS GOING TO ACCESS THE ICON TO GET TO THE
24 WEB PAGE ASSOCIATE THE ICON TO THE MOVIE?
25   A   THAT'S GENERALLY WHY THE TITLE OF THE

Page 19

1    A   AGAIN, I DON'T RECALL SPECIFICS.
2    Q   YOU HAVE NO ABILITY TO TESTIFY AS TO WHAT
3 THE NORMAL LENGTH OF AN ICON FOR A THEATRICAL SITE
4 WOULD BE FOR WARNER BROTHERS ONLINE?
5      MR. STEWART: OBJECTION; ASKED AND ANSWERED.
6          YOU CAN ANSWER IT.
7      THE WITNESS: IT DEPENDS ON HOW MANY FEATURE
8 FILMS ARE COMING OUT IN THAT WINDOW OF TIME. IT
9 DEPENDS ON HOW WELL A SITE IS PERFORMING. IT DEPENDS
10 ON HOW WELL A MOVIE IS PERFORMING.
11          THERE ARE A NUMBER OF FACTORS THAT GO
12 INTO THAT DECISION, IN ADDITION TO WHAT OTHER SITES
13 NEED PROMOTION WITH SPECIAL PROGRAMMING.
14 BY MR. TURNER:
15   Q   BACK IN NOVEMBER OF 1997, HOW MANY SLOTS
16 DID YOU HAVE PUT ON YOUR WEB PAGE?
17   A   WE HAVE TEN PROMOTIONAL ICONS WITH ART ON
18 THE HOME PAGE.
19   Q   ALL RIGHT. NOW, WHO DECIDES ON WHEN TO
20 PUT ON THE WEB PAGE AN ICON FOR A THEATRICAL SITE?
21   A   IT COULD BE A VARIETY OF PEOPLE, BUT IT
22 GENERALLY INVOLVES ME.
23   Q   OKAY. AND WHAT DO YOU USE TO BASE THAT
24 DECISION UPON?
25   A   FOR THEATRICAL SITES OR FOR ALL SITES?

Page 21

1    A    I DON'T THINK A SPECIFIC ICON IS
2 NECESSARILY EFFECTIVE. I WOULD SAY THE COPY IS MORE
3 EFFECTIVE THAN THE ART IN GENERAL.
4    Q    THE COPY BEING THE ENTIRE WEB PAGE?
5    A    NO; THE COPY BEING THREE LINES OF
6 PROMOTIONAL TEXT THAT APPEAR UNDER EACH OF THE TEN
7 ICONS ON THE HOME PAGE.
8    Q    CAN YOU ACCESS HOW MANY TIMES THE WEB
9 PAGE ON A CERTAIN DATE HAS BEEN ACCESSED?
10   A    I'M SORRY. WHICH WEB PAGE?
11   Q    I'M SORRY. LET ME ASK IT THIS WAY.
12        CAN YOU ACCESS HOW MANY TIMES A HOME PAGE
13 HAS BEEN ACCESSED ON A GIVEN DAY, EITHER HOME PAGE?
14   A    I'M NOT SURE I UNDERSTAND WHAT YOU MEAN
15 BY "EITHER WEB PAGE."
16   Q    WELL, DON'T YOU HAVE A WEB PAGE FOR
17 AMERICA ONLINE?
18   A    YES. BUT I CAN'T ACCESS THAT NUMBER.
19 THOSE REPORTS ARE ISSUED TO ME.
20   Q    OKAY. SO IT'S A WRITTEN REPORT?
21   A    I'M TRYING TO REMEMBER IF I GET IT BY
22 E-MAIL OR IF IT'S PRINTED OUT.
23        WE DON'T HAVE ONE PERSON RESPONSIBLE
24 NECESSARILY FOR TRACKING AOL NUMBERS.
25   Q    HAVE YOU EVER HAD AN ICON ON THE AMERICA
                                                Page 30

1    Q    ALL RIGHT. WHAT IS YOUR ASSISTANT'S
2 NAME?
3    A    MY ASSISTANT NOW?
4    Q    WELL, WHOEVER WOULD BE ABLE TO GIVE ME
5 THE INFORMATION OF WHETHER THERE WAS A "MIDNIGHT IN
6 THE GARDEN OF GOOD AND EVIL" -- ART ICON FOR THE
7 "MIDNIGHT IN THE GARDEN OF GOOD AND EVIL" THEATRICAL
8 SITE.
9    A    MICHELLE EHMKE, E-H-M-K-E.
10   Q    IS SHE STILL WITH YOU?
11   A    YES.
12        MR. TURNER: ALL RIGHT. LET'S JUST TAKE ABOUT
13 30 SECONDS. IS THAT ALL RIGHT?
14        MR. STEWART: SURE.
15        (DISCUSSION HELD OFF THE RECORD.)
16            ///
17        (MS. SUSSMAN NOT PRESENT.)
18 BY MR. TURNER:
19   Q    MS. SHERMAN?
20   A    YES.
21   Q    OKAY. WE HAD JUST TALKED ABOUT YOUR
22 ABILITY TO DETERMINE USE OF THE HOME PAGE. I GUESS
23 WHAT I WANT IS TO GET BACK INTO THAT A LITTLE BIT.
24        AS I UNDERSTAND, AND YOU CORRECT ME IF
25 I'M WRONG, BUT THE HOME PAGE IS A VEHICLE WHICH IS
                                                Page 32

1 ONLINE HOME PAGE FOR "MIDNIGHT IN THE GARDEN OF GOOD
2 AND EVIL"?
3    A    AN ART ICON OR A PROMOTIONAL ICON?
4 BECAUSE THOSE -- THE AOL HOME PAGE IS DIFFERENT.
5    Q    ALL RIGHT. AN ART ICON WOULD BE SOME
6 TYPE OF A PICTURE OF SOME ART?
7    A    YES. THE OTHER ICONS ARE SIMPLY TEXT.
8    Q    YES. AN ART ICON.
9    A    I DON'T RECALL AT THIS TIME. I'M NOT
10 SURE.
11   Q    HOW WOULD WE FIND OUT, IF THERE EVER WAS
12 ONE?
13   A    I'M NOT SURE.
14   Q    DO YOU KEEP ANY OF THE HOME PAGES FOR
15 YOUR AMERICA ONLINE FOR HISTORICAL PURPOSES?
16   A    WE MIGHT NOW, BUT I'M NOT SURE IF WE DID
17 AT THAT TIME.
18   Q    THAT WOULD BE NOVEMBER AND DECEMBER OF
19 1997?
20   A    RIGHT.
21   Q    HOW WOULD WE FIND THAT OUT?
22   A    I COULD ASK MY ASSISTANT.
23   Q    HAS ANYONE ASKED YOU THAT QUESTION BEFORE
24 I HAVE TODAY?
25   A    NOT TO MY KNOWLEDGE.
                                                Page 31

1 USED FOR PROMOTIONAL PURPOSES AND MARKETING BY WARNER
2 BROTHERS?
3    A    I'M SORRY. COULD YOU REPHRASE THE
4 QUESTION?
5    Q    YES. THE HOME PAGE, AMERICA ONLINE AND
6 THE WEB HOME PAGE, THOSE HOME PAGES ARE USED FOR
7 MARKETING AND PROMOTIONAL PURPOSES BY WARNER BROTHERS?
8        I'M SORRY. DID YOU NOT HEAR MY QUESTION?
9    A    I'M NOT SURE I UNDERSTAND YOUR QUESTION.
10   Q    WHAT'S THE PURPOSE OF THE HOME PAGE?
11   A    TO DRIVE TRAFFIC THROUGH A VARIETY OF
12 SITES.
13   Q    OKAY. AND IN ORDER FOR YOU TO MONITOR
14 WHETHER YOU'RE EFFICIENTLY DRIVING TRAFFIC THROUGH A
15 NUMBER OF SITES, DO YOU HAVE A WAY TO MONITOR THAT,
16 THE USE OF THE HOME PAGE?
17   A    I GUESS THE ANSWER I WANT TO GIVE YOU IS
18 YES. BUT IT'S NOT ALWAYS RELIABLE. THIS IS STILL
19 VERY MUCH OF A NESCIENT PLATFORM, SO MEASUREMENT IS
20 NOT ALWAYS RELIABLE.
21   Q    AND WHAT ARE YOUR SOURCES TO MEASURE
22 ACCESS TO THE HOME PAGE?
23   A    I RECEIVE PERIODICALLY LOGS ON AMERICA
24 ONLINE TRAFFIC. I HAVE ACCESS TO ARUBA ON THE WEB
25 THAT HELPS ME TRACK SOME OF OUR WEB STUFF. AND THEN
                                                Page 33

1 WE RECEIVE NUMBERS FROM OUTSIDE AGENCIES, BUT I DON'T
2 KNOW THAT THOSE ARE TRAFFIC-RELATED.
3    Q    IS THERE ANYONE WHO IS CHARGED WITH THE
4 RESPONSIBILITY OF RECORDING THIS INFORMATION THAT YOU
5 TAKE IN? IN OTHER WORDS, FOR HISTORIC PURPOSES.
6    A    I'M SORRY. I'M NOT SURE I UNDERSTAND.
7    Q    OKAY. YOU TAKE THIS INFORMATION IN TO
8 RECORD BASICALLY HOW EFFICIENT YOU'RE DOING.
9         DO YOU KEEP IT ANYWHERE, OR DO YOU JUST
10 DISCARD IT AFTER YOU'VE LOOKED AT IT?
11    A    I DON'T BELIEVE I KEEP IT.
12    Q    WHEN YOU SAY YOU DON'T BELIEVE YOU KEEP
13 IT, IS THE ANSWER YOU DO OR YOU DON'T KEEP IT?
14    A    WELL, I PERSONALLY DON'T KEEP IT, BUT I
15 AM NOT RESPONSIBLE FOR THE SERVERS OR HOW LONG NUMBERS
16 SAY UP. THAT'S NOT HANDLED BY MY DEPARTMENT.
17    Q    YOU MENTIONED OUTSIDE AGENCIES.
18         WHAT OUTSIDE AGENCIES DO YOU SOMETIMES
19 RELY UPON AS SOURCE?
20    A    I BELIEVE IT'S MEDIA METRICS OR RELEVANT
21 KNOWLEDGE.
22    Q    ANY OTHERS?
23    A    NOT TO MY KNOWLEDGE.
24    Q    WHAT SERVICES DO THOSE TWO PROVIDE?
25    A    I BELIEVE THEY PROVIDE -- I MEAN, I USE

Page 34

1 THEM TO SEE WHERE WE RANK VERSUS OUR COMPETITORS IN
2 OUR FIELD. BUT THEIR NUMBERS ARE COMPOSED, AND I
3 DON'T ENTIRELY UNDERSTAND THEM SOMETIMES OF REACH AND
4 DOMAINS. I DON'T KNOW HOW IT COMPARES IN TERMS OF
5 TRAFFIC.
6    Q    SO YOU'RE ABLE TO TELL WHAT OTHER ONLINE,
7 I GUESS, DEPARTMENTS IN OTHER ENTERTAINMENT FIELDS,
8 HOW THEY RANK WITH YOU?
9    A    YES.
10    Q    SO YOU CAN SEE WHAT OTHER, I GUESS,
11 COMPETITORS, IF THAT'S THE CORRECT WORD, WHAT THEY'VE
12 DONE OVER A GIVEN PERIOD OF TIME?
13    A    YES.
14    Q    WHAT NUMBERS DO THESE OUTSIDE AGENCIES
15 PROVIDE TO YOU? WHAT TYPE OF NUMBERS?
16    A    AGAIN, I'M NOT THAT FAMILIAR WITH ALL OF
17 THOSE REPORTS.
18    Q    WHAT DO YOU DO WITH THE REPORTS?
19    A    I LOOK AT THEM VERY BRIEFLY TO SEE WHERE
20 WE LINE UP, AFTER OTHER PEOPLE HAVE DIGESTED ALL THE
21 NUMBERS.
22    Q    AND THEN THROW THEM AWAY?
23    A    YES, I DO.
24    Q    YOU DON'T KNOW IF ANYBODY AT WARNER
25 BROTHERS ONLINE OR AT WARNER BROTHERS KEEPS ANY OF

Page 35

1 THESE FIGURES ANYWHERE?
2    A    I'M SORRY. I DON'T KNOW IF ANYONE DOES.
3    Q    OKAY.
4    A    THIS IS VERY MUCH A DAY AND DATE KIND OF
5 PLATFORM.
6    Q    WHO ELSE RECEIVES THE NUMBERS?
7    A    I COULDN'T GIVE YOU SPECIFIC NAMES.
8    Q    CAN YOU GIVE ME ANY NAMES?
9    A    JIM MOLOSHOK, JIM BANNISTER.
10    Q    WHAT IS MR. BANNISTER'S POSITION?
11    A    HE'S VICE PRESIDENT AND GENERAL MANAGER.
12    Q    ALL RIGHT. I WANT YOU TO LOOK AT WHAT
13 HAS BEEN MARKED AS EXHIBIT 2, PAGE 5.
14         MR. STEWART: LOOK AT THE ORIGINAL EXHIBIT.
15         THE WITNESS: OKAY.
16 BY MR. TURNER:
17    Q    DO YOU SEE WHERE IT'S GOT YOUR NAME,
18 ELIZABETH SHERMAN?
19    A    I DO.
20    Q    LOOK DOWN ABOUT THE FIST LINE WHERE IT
21 SAYS "CONTRIBUTION" UNDER "C." WOULD YOU READ THAT TO
22 YOURSELF?
23         (WITNESS REVIEWING DOCUMENT.)
24    MR. TURNER: JUST TELL ME WHEN YOU'RE FINISHED.
25    THE WITNESS: I'M FINISHED.

Page 36

1 BY MR. TURNER:
2    Q    OKAY. I FIGURED YOU WERE.
3         IS THAT A TRUE AND CORRECT STATEMENT?
4    A    YES, IT IS.
5    Q    WHAT INVOLVEMENT DID YOU HAVE THAT A TOUT
6 FOR "MIDNIGHT IN THE GARDEN OF GOOD AND EVIL" SHOULD
7 APPEAR ON THE WARNER BROTHERS ONLINE HOME PAGE?
8    A    EXACTLY WHAT'S STATED.
9    Q    THAT DOESN'T TELL ME ANYTHING.
10    A    I WAS INVOLVED IN THE DECISION.
11    Q    WHAT INVOLVEMENT DID YOU HAVE?
12    A    I ASKED THAT A TOUT BE CREATED FOR
13 "MIDNIGHT IN THE GARDEN OF GOOD AND EVIL" TO PROMOTE
14 THE FEATURE ON OUR HOME PAGE.
15    Q    ALL RIGHT. FOR WHAT REASON DID YOU
16 DECIDE THAT A TOUT SHOULD APPEAR ON THE HOME PAGE FOR
17 "MIDNIGHT IN THE GARDEN OF GOOD AND EVIL"?
18    A    I BELIEVE THE FILM WAS OPENING OR HAD
19 JUST OPENED.
20    Q    ALL RIGHT. AND WHO ELSE WAS INVOLVED IN
21 THAT DECISION?
22    A    I DON'T RECALL.
23    Q    TO YOUR KNOWLEDGE WERE YOU THE ONLY ONE
24 INVOLVED IN THAT DECISION, AS YOU SIT HERE TODAY?
25    A    AS I STATED, I DON'T RECALL.

Page 37

1    Q    AND THE SOLE REASON WHY YOU WANTED A TOUT
2 WAS BECAUSE THE MOVIE HAD JUST OPENED?
3    A    WAS EITHER ABOUT TO OPEN OR HAD JUST
4 OPENED?
5    Q    DO YOU RECALL WHAT TOUT YOU ELIMINATED BY
6 PUTTING A "MIDNIGHT" TOUT ON THE HOME PAGE?
7    A    NO. I'M SORRY. I DON'T.
8    Q    LET ME ASK YOU. OTHER THAN KEEPING
9 COPIES OF THE HOME PAGE, IS THERE ANY OTHER WAY TO
10 DETERMINE WHAT APPEARED ON THE HOME PAGE ON ANY GIVEN
11 DATE?
12    A    NO. I DON'T BELIEVE THERE IS.
13    Q    ALL RIGHT. AS A RESULT OF THIS DECISION
14 THAT THERE WOULD BE A TOUT FOR "MIDNIGHT IN THE GARDEN
15 OF GOOD AND EVIL," WHAT DID YOU DO?
16    A    I'M SORRY?
17    Q    AS A RESULT OF YOUR DECISION, WHETHER IT
18 WAS ALONE OR WITH OTHERS, THAT THERE BE A TOUT FOR THE
19 THEATRICAL SITE "MIDNIGHT IN THE GARDEN OF GOOD AND
20 EVIL," WHAT DID YOU DO?
21    A    I REQUESTED THAT AN ICON BE MADE.
22    Q    OKAY. AND WHO DID YOU REQUEST THAT OF?
23    A    ANDREW LLOYD.
24    Q    ALL RIGHT. NOW, I WOULD IMAGINE THAT, IN
25 ORDER FOR YOU TO MAKE A DECISION THAT THERE BE A TOUT,

Page 38

1    A    I'M SURE SOMEONE BORROWED IT AND NEVER
2 RETURNED IT.
3    Q    ARE YOU FAMILIAR WITH THE COVER OF THAT
4 BOOK?
5    A    YES, I AM.
6    Q    AND WOULD THAT HAVE BEEN BEFORE NOVEMBER
7 OF 1997?
8    A    YES, IT WAS.
9    Q    AND YOU'RE AWARE OF THE PHOTOGRAPH, THE
10 IMAGE, THAT APPEARS ON THE COVER OF THE BOOK?
11    A    YES; I RECALL IT.
12    Q    AND THAT WOULD HAVE BEEN BEFORE NOVEMBER
13 OF 1997?
14    A    YES.
15    Q    ALL RIGHT. WHEN YOU MADE A DECISION THAT
16 THERE BE A TOUT FOR "MIDNIGHT" AND YOU TALKED TO
17 MR. LLOYD, DID YOU GIVE HIM ANY DIRECTIONS ON WHAT THE
18 CONTENT OF THE TOUT MIGHT LOOK LIKE?
19    A    NO, I DID NOT.
20    Q    WHAT DID YOU TELL HIM, AS YOU RECALL?
21    A    I DON'T RECALL SPECIFICALLY, BUT I
22 PROBABLY WOULD HAVE SAID, "ANDREW, LET'S GET AN ICON
23 FOR 'MIDNIGHT IN THE GARDEN OF GOOD AND EVIL'."
24    Q    ALL RIGHT. AND WOULD THAT HAVE BEEN SOME
25 TIME AROUND THE TIME AT WHICH THE MOVIE WAS OPENING?

Page 40

1 YOU MUST HAVE BEEN AWARE THAT THERE WAS A WEB PAGE.
2    A    THERE WAS A WEB SITE.
3    Q    WEB SITE.
4         WOULD THAT BE A TRUE STATEMENT?
5    A    YES.
6    Q    OKAY. WOULD YOU HAVE REVIEWED THE WEB
7 SITE?
8    A    NOT NECESSARILY.
9    Q    OKAY. YOU JUST WOULD HAVE BEEN AWARE
10 THERE WAS ONE?
11    A    YES.
12    Q    HAVE YOU EVER READ THE BOOK "MIDNIGHT IN
13 THE GARDEN OF GOOD AND EVIL"?
14    A    YES, I HAVE.
15    Q    WHEN DID YOU READ IT?
16    A    WHEN IT FIRST CAME OUT.
17    Q    THAT WOULD HAVE BEEN BEFORE THE MOVIE?
18    A    WELL BEFORE.
19    Q    DO YOU HAVE A COPY OF THAT BOOK?
20    A    NO, I DO NOT.
21    Q    WHERE DID YOU -- HOW DID YOU READ IT IF
22 YOU DIDN'T HAVE A COPY OF THE BOOK?
23    A    I BOUGHT THE BOOK, BUT I NO LONGER HAVE A
24 COPY OF THE BOOK.
25    Q    WHAT HAPPENED TO THE COPY?

Page 39

1    A    YES, IT WAS.
2    Q    AND WOULD YOU HAVE WANTED TO GO AHEAD AND
3 PUT THE TOUT ON AS SOON AS POSSIBLE?
4    A    I DON'T REALLY RECALL.
5    Q    WHAT IS YOUR RECOLLECTION OF WHAT THE
6 NORMAL TURN-AROUND IS WHEN YOU REQUEST A TOUT AND THE
7 TIME THAT YOU GET IT BACK TO BE PLACED ON THE HOME
8 PAGE?
9    A    AGAIN, IT DEPENDS. IT DEPENDS WHAT DAY
10 WE'RE TRYING TO CHANGE THE HOME PAGE.
11    Q    ANYTHING ELSE?
12    A    PROBABLY NOT.
13    Q    OKAY. I WANT YOU TO LOOK AT EXHIBIT 3.
14         MR. STEWART: IS EXHIBIT 3 THE DOCUMENT, THE
15 REQUEST FOR DOCUMENTS? I THINK WE MAY HAVE TWO
16 DOCUMENTS MARKED 2.
17         THE WITNESS: I HAVE TWO 2'S.
18         MR. TURNER: WHAT'S THAT?
19         MR. STEWART: WELL, WE'VE GOT TWO 2'S, AND WE'RE
20 STILL LOOKING FOR EXHIBIT 3.
21         MR. TURNER: WHAT ARE THE TWO 2'S?
22         MR. STEWART: THEY ARE BOTH THE -- WE'VE GOT
23 TWO COPIES OF THE INTERROGATORY RESPONSES MARKED.
24         THE REPORTER: THIS IS THE ONE THAT WAS FAXED.
25         MR. STEWART: THAT'S RIGHT. BART, WE HAD ONE

Page 41




Deck The
Halls At
Warner
Bros.!


Your #1
Source For
Music!


December
Holiday
Recipes!


Vote Now
At The
People's
Court!


Play Prime
Time
Trivia!


Tour
Savannah
At
"Midnight!"


Chat With
Aaron
Jackson!


Celebrity
Holiday
Cards!


Rosie's
Holiday
Favorites!


Check Out
Cornershop's
Latest!

## There's So Much More To See - Step Into The World Of WB!

  

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF GEORGIA
SAVANNAH DIVISION

JACK LEIGH,                              )    CIVIL ACTION
                                         )    NO. CV 497-340
                    PLAINTIFF,           )
                                         )
          VS.                            )
                                         )
WARNER BROTHERS INC., A DIVISION)
OF TIME WARNER ENTERTAINMENT             )
COMPANY, L.P.                            )
                                         )
                    DEFENDANT.           )
_____)

DEPOSITION OF
ANDREW MICHAEL LLOYD

SEPTEMBER 15, 1998

**REPORTED BY**

KARLA M. BARRON
C.S.R. NO. 2842

CAROL BRENNAN & ASSOCIATES
CERTIFIED SHORTHAND REPORTERS
4444 RIVERSIDE DRIVE, SUITE 104
BURBANK, CALIFORNIA 91505
TELEPHONE (818) 846-3844
FAX (818) 846-8179

**JOB NO.**

98-754

BY MR. DEVEAU:

2    Q    AND WHEN YOU MADE A COPY OF THE HOME

3 PAGE, WHEN THERE WAS A SUBSTANTIAL CHANGE IN THE

4 CONTENT, WAS THERE ANY DATE THAT YOU HAD PLACED ON THE

5 PAGE, EITHER BY COMPUTER OR BY HAND?

6    A    YES, THERE WAS.

7    Q    WHICH WAS IT?  WAS IT BY COMPUTER OR BY

8 HAND OR BOTH?

9    A    IT WAS BY HAND.

10    Q    WOULD YOU TAKE A LOOK AT A DOCUMENT THAT

11 WE PREVIOUSLY HAD MARKED AS EXHIBIT 8?  HOPEFULLY

12 THAT'S OUT ON THE TABLE FOR YOUR REFERENCE.

13    MR. STEWART:  IT IS.

14    THE WITNESS:  I SEE IT.

15 BY MR. DEVEAU:

16    Q    DO YOU HAVE IT IN FRONT OF YOU?

17    A    YES, I DO.

18    Q    OKAY.  ATTACHED TO THE FIRST PAGE, WHICH

19 IS A MEMORANDUM FROM MR. STEWART TO MYSELF, THERE ARE

20 THREE PAGES.

21    DO YOU SEE THOSE?

22    MR. STEWART:  ACTUALLY THE EXHIBIT DOES NOT

23 INCLUDE A MEMORANDUM.  IT'S JUST WB0001, WB0002 AND

24 WB0006.

25    MR. DEVEAU:  ALL RIGHT.  I'M NOT SURE THAT'S

Page 14

---

1    Q    AND WHAT IS THAT DATE?

2    A    DECEMBER 12TH, 1997.

3    Q    AND WHAT IS THE SIGNIFICANCE OF THAT DATE

4 TO YOU?

5    A    IT'S MIDWAY THROUGH DECEMBER.

6    Q    I'M SORRY.  I DIDN'T PICK THAT UP FROM

7 THE SPEAKER PHONE.  WOULD YOU MIND REPEATING IT?

8    A    THE ONLY SIGNIFICANCE FOR ME IS THAT IT'S

9 MIDWAY THROUGH DECEMBER.  THERE'S NO PARTICULAR

10 SIGNIFICANCE.

11    Q    NOW, DO I UNDERSTAND CORRECTLY THAT YOU

12 WROTE THAT DATE ON WB00001 OF EXHIBIT 8?

13    A    THAT'S CORRECT.

14    Q    AND WHY DID YOU WRITE THAT DATE ON THAT

15 PAGE?

16    A    TO DENOTE THE CHANGES ON THE WARNER

17 BROTHERS HOME PAGE THAT WERE REFLECTED IN THE COPY.

18    Q    AND IF YOU TAKE A LOOK AT THE SECOND

19 PAGE, WHICH HAS A STAMP AT THE BOTTOM WB00002 OF

20 EXHIBIT 8, THERE'S ALSO – THERE ARE TWO DATES IN THE

21 UPPER RIGHT-HAND CORNER.

22    A    THAT'S RIGHT.

23    Q    WHAT IS THE SIGNIFICANCE OF THOSE DATES?

24    A    THEY REPRESENT THE PERIOD DURING WHICH

25 THIS CONTENT WAS LIVE ON THE WARNER BROTHERS HOME

Page 16

---

1 CLEAR FROM THE PRIOR DEPOSITIONS.  IF THAT'S UNCLEAR,

2 CAN WE STIPULATE THAT WE CAN CLARIFY THAT, DAVID?

3    MR. STEWART:  THAT'S FINE.

4 BY MR. DEVEAU:

5    Q    WITH THAT UNDERSTANDING, MR. LLOYD, WOULD

6 YOU TAKE A LOOK AT EXHIBIT 8 AND ASK IF YOU RECOGNIZE

7 THOSE THREE PAGES?

8    A    YES, I DO.

9    Q    AND HOW IS IT YOU RECOGNIZE THEM?

10    A    BECAUSE IT'S THE WARNER BROTHERS HOME

11 PAGE, AND IT IS CONTENT THAT I MANAGED WHILE I WAS

12 HERE.  I MEAN, THESE ARE PRINTOUTS THAT I MADE.  THIS

13 IS MY HANDWRITING ON THE DATE.

14    Q    THE DATE IS IN YOUR HANDWRITING?

15    A    THAT'S CORRECT.

16    Q    I NOTICE AT LEAST TWO OF THE PAGES APPEAR

17 TO HAVE PHOTOCOPIES OF HOLES.

18    ARE THESE PAGES THAT WERE PLACED IN THE

19 BINDER BY YOURSELF?

20    A    PRESUMABLY.  I CAN'T SAY FOR SURE, BUT

21 YES.

22    Q    AND LOOKING AT THE FIRST PAGE OF EXHIBIT

23 8, WB00001, THERE'S A DATE IN THE UPPER RIGHT-HAND

24 CORNER THAT'S HANDWRITTEN.  IS THAT CORRECT?

25    A    THAT'S RIGHT.

Page 15

---

1 PAGE.

2    Q    AND AM I CORRECT IN UNDERSTANDING THAT

3 THOSE DATES ARE IN YOUR HANDWRITING?

4    A    THAT'S CORRECT.

5    Q    AND LET'S LOOK AT THE LAST PAGE, WHICH

6 HAS THE STAMP AT THE BOTTOM WB00006.  THAT ALSO HAS A

7 DATE.  IS THAT CORRECT?

8    A    THAT'S CORRECT.

9    Q    AND IS THAT IN YOUR HANDWRITING?

10    A    YES, IT IS.

11    Q    WHAT DATE IS THAT?

12    A    THAT'S DECEMBER 5TH.

13    Q    IS THERE A YEAR?

14    A    IT WOULD BE 1997.

15    Q    AND WHAT'S THE SIGNIFICANCE OF THE

16 DECEMBER 5TH DATE ON THIS THIRD PAGE?

17    A    THAT IS THE DATE THAT THIS CONTENT WENT

18 LIVE ON THE INTERNET.

19    Q    IF YOU GO BACK TO THE FIRST PAGE OF

20 EXHIBIT 8, WHICH HAS A DECEMBER 12 DATE --

21    A    RIGHT.

22    Q    -- WHAT DOES THAT TELL US IN RELATION TO

23 THE THIRD PAGE OF EXHIBIT 8?

24    A    IT TELLS US THAT THE CONTENT BETWEEN

25 DECEMBER 5TH AND DECEMBER 12TH – THE CONTENT HAD

Page 17

1 SHIFTED TO WHAT WAS NOW REPRESENTED ON THE FIRST PAGE.
2   Q   AND DO I UNDERSTAND IT CORRECTLY, THEN,
3 THAT THE FIRST PAGE, DATED DECEMBER 12, 1997, WOULD
4 REFLECT THE FIRST DAY THAT THE CONTENT OF WB00001 WENT
5 LIVE ON THE HOME PAGE?
6   A   THAT'S CORRECT.
7   Q   AND WHAT WAS YOUR INVOLVEMENT WITH THIS
8 HOME PAGE THAT'S REPRESENTED BY THESE THREE PAGES OF
9 EXHIBIT 8?
10   A   I PRODUCE -- I PERSONALLY PRODUCED THE
11 CHANGES IN THE WARNER BROTHERS HOME PAGE. AND I ALSO
12 SUPERVISED THE PRODUCTION OF ARTWORK AND DESIGN WORK
13 FOR THE PAGE.
14   Q   DID YOU HAVE ANY INVOLVEMENT IN ACTUALLY
15 INSTALLING THE CHANGES FOR NEW ICONS?
16   A   YES, I DID. I PERSONALLY DID IT.
17   Q   WHEN YOU PERSONALLY MADE A CHANGE OR
18 INSTALLED A NEW ICON, DID YOU KEEP ANY RECORDS TO
19 REFLECT WHAT DAY THAT YOU DID THAT, OTHER THAN, I
20 ASSUME, MAKING THESE PHOTOCOPIES?
21   A   NO, I DID NOT.
22   Q   AM I CORRECT, THEN, IN UNDERSTANDING THAT
23 BY YOUR MAKING THESE PHOTOCOPIES OF EXHIBIT 8 AND
24 HANDWRITING THE DATE, THAT WAS YOUR WAY OF REFLECTING
25 WHEN YOU MADE A -- WHAT YOU CONSIDERED TO BE A

Page 18

1   A   SHE'S THE ART DIRECTOR.
2   Q   AND WHEN YOU SENT SOME -- OR FOLLOWED UP
3 YOUR COMMUNICATIONS BY E-MAIL, DID YOU KEEP ANY RECORD
4 OF THE E-MAILS THAT YOU HAD SENT?
5   A   NO.
6   Q   AND WHEN THE WORK WAS PREPARED THAT YOU
7 HAD REQUESTED, HOW WOULD YOU GET IT BACK? IN WHAT
8 FORM?
9   A   AS A FILE ATTACHMENT TO A CC MAIL.
10   Q   AND WHAT WOULD YOU DO WITH THAT CC MAIL
11 AND THE FILE ATTACHMENT WHEN YOU RECEIVED IT BACK?
12   A   I WOULD DOWNLOAD THE FILE ATTACHMENT --
13 WELL, I WOULD VIEW THE ARTWORK FIRST, TO BE SURE THAT
14 IT LOOKED ACCEPTABLE. AND I WOULD DOWNLOAD IT TO MY
15 DESK TOP, COPY IT OVER TO THE SERVERS AND ALTER THE
16 CODE ON THE WARNER BROTHERS HOME PAGE AND SEND IT
17 LIVE.
18   Q   DID YOU KEEP ANY FILES OF THESE E-MAILS
19 THAT YOU RECEIVED BACK WITH THEIR ATTACHMENTS?
20   A   NO.
21   Q   I'M SORRY. THE SPEAKER PHONE CUT OUT, SO
22 I DIDN'T CATCH YOUR ANSWER.
23   A   NO, I DID NOT.
24   Q   NOW, IN THE TECHNICAL DEPARTMENT, DID
25 THEY HAVE ANY POLICY CONCERNING THE HANDLING OF

Page 20

1 SUBSTANTIVE CHANGE TO THE HOME PAGE? IS THAT CORRECT?
2   A   THAT'S CORRECT.
3   Q   NOW, WHEN YOU WANTED TO HAVE A CHANGE IN
4 THE CONTENT OF THE HOME PAGE, SUCH AS REFLECTED ON THE
5 THREE PAGES OF EXHIBIT 8, GENERALLY HOW DID YOU GO
6 ABOUT DOING THAT?
7   A   I WOULD ASK SUZANNE ABRAMSON, THE
8 DIRECTOR OF ART PRODUCTION, EITHER VERBALLY OR THROUGH
9 E-MAIL, TO PRODUCE ME AN ICON.
10       SHE WOULD, IN TURN, ASK A DESIGNER TO
11 MAKE ONE FOR ME TO THE SPECIFICATIONS THAT I'D ASKED
12 FOR. AND THEN THEY WOULD SEND IT ON TO ME, AND I
13 WOULD EXECUTE THE CHANGE. I WOULD ALTER THE CODE.
14   Q   AND WHEN YOU WOULD REQUEST THIS WORK, HOW
15 WOULD YOU GO ABOUT DOING IT?
16       IN OTHER WORDS, DID YOU DO IT BY E-MAIL,
17 CC MAIL, BY PHONE OR HOW?
18   A   I WOULD GENERALLY CALL SUZANNE BY
19 TELEPHONE, ASK HER FOR IT, AND THEN I WOULD SEND A
20 FOLLOW-UP CC MAIL.
21   Q   AND BY "SUZANNE" ARE YOU REFERRING TO
22 MS. ABRAMSON?
23   A   YES, I AM.
24   Q   WHAT WAS HER POSITION AT WARNER BROTHERS
25 ONLINE DURING THE TIME THAT YOU WERE THERE?

Page 19

1 E-MAILS?
2   A   WHAT KIND OF A POLICY DO YOU MEAN?
3   Q   ANY TYPE OF POLICY AS TO HOW THEY WERE
4 SENT, HOW THEY WERE HANDLED, WHETHER THERE WAS ANY
5 ARCHIVING OR BACKING UP OF E-MAIL?
6   A   THE STUDIO RETAINS CC MAIL FOR SEVERAL --
7 SEVERAL MONTHS. IT STAYS IN THE DATABASE. YOU CAN
8 RETRIEVE YOUR CC MAIL FOR FIVE OR SIX MONTHS AFTER IT
9 WAS SENT. MAYBE IT'S THREE OR FOUR. I DON'T KNOW.
10   Q   AND IS THERE ANY PARTICULAR PERSON IN THE
11 TECHNICAL DEPARTMENT THAT IS IN CHARGE OF SAVING THOSE
12 E-MAILS?
13   A   NO; NOT AT WARN -- NOT WITHIN WARNER
14 BROTHERS ONLINE.
15   Q   NOW, WHEN YOU WOULD REQUEST SOME ARTWORK
16 TO BE CREATED AND YOU WOULD -- YOU WOULD GET IT BACK,
17 WAS THERE ANY POLICY, WHILE YOU WERE AT WARNER
18 BROTHERS ONLINE, CONCERNING REVIEW OF THAT ARTWORK FOR
19 CLEARANCE?
20   A   YES, THERE WAS.
21   Q   AND WHAT WAS THAT POLICY?
22   A   SUZANNE ABRAMSON WAS ULTIMATELY
23 RESPONSIBLE FOR THE ARTWORK. IF -- IT WAS -- IT WAS
24 UNDERSTOOD THAT BY THE TIME THE ARTWORK GOT TO ME, IT
25 HAD BEEN APPROVED BY SUZANNE, ALTHOUGH THAT WAS NOT IN

Page 21

1 BY MR. DEVEAU:
2    Q   I WANT TO REFER YOU IN PARTICULAR TO WHAT
3 IS PROBABLY THE THIRD PAGE OF EXHIBIT 4. IT HAS A
4 PRODUCTION STAMP IN THE LOWER RIGHT-HAND CORNER
5 WB00003.
6    A   OKAY.
7    Q   DO YOU HAVE THAT IN FRONT OF YOU?
8    A   YES, I DO.
9    Q   DO YOU RECOGNIZE THAT DOCUMENT?
10   A   YES, I DO.
11   Q   WHAT IS IT?
12   A   IT'S A COPY OF A CC MAIL THAT I WROTE TO
13 SUZANNE.
14   Q   AND WHAT WAS THE PURPOSE OF THIS CC MAIL
15 ON WB00003 THAT YOU SENT TO SUZANNE ABRAMSON?
16   A   TO REQUEST ARTWORK FOR A "MIDNIGHT IN THE
17 GARDEN OF GOOD AND EVIL" OPENING.
18   Q   IS THERE A DATE ON THIS DOCUMENT?
19   A   YES, THERE IS.
20   Q   WHAT IS THAT?
21   A   NOVEMBER 24TH, 1997.
22   Q   WOULD I BE CORRECT IN ASSUMING THAT THAT
23 DATE IS THE DATE THAT YOU SENT THIS E-MAIL MESSAGE TO
24 MS. ABRAMSON?
25   A   THAT'S CORRECT.
                                          Page 26

1    Q   LOOKING AT THE DOCUMENT, IT LOOKS LIKE
2 YOU'RE ASKING FOR -- WELL, LET ME STRIKE THAT.
3        LET ME ASK YOU TO TELL US WHAT YOU'RE
4 ASKING FOR FROM HER.
5    A   I'M ASKING HER FOR A HOME PAGE TOUT WITH
6 ARTWORK FOR "MIDNIGHT IN THE GARDEN OF GOOD AND EVIL,"
7 AND I'M ASKING FOR IT HOPEFULLY TODAY -- TO HAVE IT ON
8 THAT DAY.
9    Q   AND BY THE USE OF THE TERM "TOUT," IS
10 THAT ALSO THE SAME THING OR SOMETIMES REFERRED TO AS
11 AN "ICON"?
12   A   YES.
13   Q   AND WHAT WAS THE REASON FOR YOUR ASKING
14 FOR THIS TOUT OR ICON TODAY IN THIS DOCUMENT?
15   A   I DON'T RECALL.
16   Q   AND HOW SOON WAS IT BEFORE YOU RECEIVED
17 THE TOUT OR ICON THAT YOU REQUESTED IN THIS DOCUMENT,
18 THIS CC MAIL?
19   A   I DON'T RECALL.
20   Q   DID YOU HAVE OTHER INSTANCES WHERE YOU
21 REQUESTED ARTWORK FOR A TOUT OR AN ICON FOR A
22 THEATRICAL RELEASE, WHILE YOU WERE AT WARNER BROTHERS
23 ONLINE?
24   A   YES.
25   Q   AND GENERALLY HOW LONG WOULD IT BE BEFORE
                                          Page 27

1 YOU WOULD RECEIVE THE ARTWORK BACK OR THE ICON BACK?
2    A   THERE WAS A GREAT VARIANCE. IT'S --
3 THERE IS NO GENERAL -- THERE WAS NO GENERAL TURN-
4 AROUND TIME.
5    Q   NOW, EARLIER, IF I RECALL YOUR TESTIMONY,
6 YOU MENTIONED THAT YOU WOULD PROVIDE SPECIFICATIONS
7 FOR THE ARTWORK THAT YOU WOULD REQUEST. IS THAT
8 CORRECT?
9    A   THAT'S CORRECT.
10   Q   WHAT SPECIFICATIONS DID YOU PROVIDE
11 CONCERNING THE ICON FOR "MIDNIGHT IN THE GARDEN OF
12 GOOD AND EVIL" THAT YOU WERE REQUESTING IN WB00003?
13   A   NONE.
14   Q   AND WHY IS THAT?
15   A   BECAUSE IN THIS INSTANCE THERE WAS A
16 STANDARD OPERATING — I WOULD ONLY REQUEST
17 SPECIFICATIONS IF THERE WERE ANY QUESTION ABOUT HOW
18 THEY SHOULD GO ABOUT DOING IT.
19       THERE WAS NO QUESTION AS TO THE SIZE,
20 BECAUSE THERE WAS A STANDARD SIZE FOR HOME PAGE ICONS.
21 AND THERE WAS NO QUESTION AS TO THE PROCEDURE FOR HOW
22 TO MAKE IT, BECAUSE I'M NOT AN ARTIST. THEY KNEW
23 EXACTLY WHAT TO DO.
24   Q   NOW, WHEN YOU REFER TO THE PROCEDURE FOR
25 HOW TO MAKE IT, WHAT ARE YOU REFERRING TO?
                                          Page 28

1    A   THE PRACTICE OF FINDING ARTWORK ON THE
2 WARNER BROTHERS MOVIE SITE FOR THE GIVEN MOVIE AND
3 TAKING SOME ARTWORK FROM THAT SITE, RESIZING IT AND
4 MAKING IT INTO A HOME PAGE ICON.
5    Q   AND WHEN YOU REFER TO -- DID I
6 UNDERSTAND YOU CORRECTLY? -- THE WARNER BROTHERS MOVIE
7 SITE?
8    A   RIGHT.
9    Q   IF YOU WOULD LOOK BACK AT EXHIBIT 8, ON
10 THE FIRST PAGE, IS THERE ANY PART OF THAT PAGE THAT
11 REFLECTS THE WARNER BROTHERS MOVIE SITE?
12   A   "THE POSTMAN" WOULD HAVE POINTED TO THE
13 WARNER BROTHERS MOVIE SITE.
14   Q   IS THE WARNER BROTHERS MOVIE SITE A SITE
15 GENERALLY ABOUT THEATRICAL RELEASES, OR IS IT SPECIFIC
16 AS TO A GIVEN THEATRICAL RELEASE?
17   A   I'M SORRY. CAN YOU RESTATE YOUR
18 QUESTION?
19   Q   YES. THE WARNER BROTHERS MOVIE SITE, IS
20 IT A GENERAL SITE AS TO THEATRICAL RELEASES, OR IS IT
21 SPECIFIC TO A SINGLE THEATRICAL RELEASE?
22   A   IT'S A GENERAL SITE FOR WARNER BROTHERS
23 THEATRICAL RELEASES.
24   Q   NOW, I NOTE AT THE TOP OF THE FIRST PAGE
25 OF EXHIBIT 8 -- DO YOU SEE THE WARNER BROTHERS LOGO
                                          Page 29

1 OR SHIELD?
2    A   YES, I DO.
3    Q   AND UNDERNEATH THAT THERE ARE ABOUT SEVEN
4 LITTLE --
5    A   BUTTONS.
6    Q   -- BUTTONS. YEAH.
7        AND THE SECOND ONE FROM THE LEFT SAYS
8 "MOVIES"?
9    A   YES. THAT'S RIGHT.
10   Q   WHAT DOES THAT DO?
11   A   THAT WOULD BE ANOTHER NAVIGABLE BUTTON TO
12 THE WARNER BROTHERS MOVIE SITE.
13   Q   AND WHEN YOU REFER TO THE PRACTICE OF
14 TAKING -- DID I UNDERSTAND CORRECTLY? -- TAKING
15 ARTWORK FROM THE WARNER BROTHERS MOVIE SITE TO CREATE
16 THE ICON? DID I UNDERSTAND THAT CORRECTLY?
17   A   THAT'S CORRECT.
18   Q   WAS THAT THE USUAL PRACTICE, WHILE YOU
19 WERE AT WARNER BROTHERS ONLINE?
20   A   YES, IT WAS.
21   Q   AND WHO WAS IN CHARGE OF THE CONTENT THAT
22 WAS POSTED ON THE WARNER BROTHERS MOVIE SITE?
23   A   HIS FIRST NAME IS DON.
24   Q   BUCKLEY?
25   A   YES; DON BUCKLEY.

Page 30

1    Q   WHERE IS HE LOCATED?
2    A   NEW YORK CITY.
3    Q   WHAT'S HIS POSITION?
4    A   HE WORKS FOR THEATRICAL PUBLICITY, AND HE
5 ALSO RUNS THE WARNER BROTHERS MOVIE WEB SITE.
6    Q   IS THAT A PARTICULAR DEPARTMENT WITHIN
7 WARNER BROTHERS ONLINE?
8    A   YES, IT IS.
9    Q   AND HOW DOES THAT DEPARTMENT RELATE TO
10 THE DEPARTMENTS THAT YOU'RE FAMILIAR WITH IN BURBANK?
11 FOR EXAMPLE, MS. SHERMAN'S DEPARTMENT.
12   A   DON BUCKLEY WAS -- DON BUCKLEY OVERSAW
13 PROGRAMMING, PRODUCTION, CONTENT, PUBLICITY,
14 EVERYTHING HAVING TO DO WITH WARNER BROTHERS' MOVIE
15 SITE. AND HE REPORTED TO JIM -- HE REPORTED TO JIM
16 MOLOSHOK ONLY, AS FAR AS I KNOW. THAT WAS A REPORTING
17 STRUCTURE THAT I NEVER FULLY UNDERSTOOD.
18   Q   AND WHO, TO YOUR UNDERSTANDING, IS JIM
19 MOLOSHOK?
20   A   HE'S THE SENIOR VICE PRESIDENT OF WARNER
21 BROTHERS ONLINE. HE RUNS THE COMPANY.
22   Q   WHILE YOU WERE AT WARNER BROTHERS ONLINE,
23 WAS THERE ANY CONTENT ON THE WARNER BROTHERS' MOVIE
24 SITE THAT RELATED TO THE MOVIE OR THEATRICAL RELEASE
25 "MIDNIGHT IN THE GARDEN OF GOOD AND EVIL"?

Page 31

1    A   YES, THERE WAS.
2    Q   AND WHO PREPARED THAT CONTENT FOR -- IN
3 REGARDS TO THE THEATRICAL RELEASE, "MIDNIGHT IN THE
4 GARDEN OF GOOD AND EVIL"?
5    A   DON BUCKLEY'S STAFF DID.
6    Q   DID YOU HAVE ANY INVOLVEMENT OR
7 CORRESPONDENCE WITH HIS STAFF CONCERNING THE CONTENT
8 FOR THE "MIDNIGHT" MOVIE ON THE WARNER BROTHERS MOVIE
9 SITE?
10   A   NO, I DID NOT.
11   Q   NOW, GOING BACK TO YOUR CC MAIL TO
12 MS. ABRAMSON REQUESTING THE ICON FOR THE MOVIE
13 "MIDNIGHT IN THE GARDEN OF GOOD AND EVIL" --
14   A   OKAY.
15   Q   -- WHAT WAS THE REASON FOR YOUR
16 REQUESTING THIS ICON?
17       IN OTHER WORDS, WHAT WERE YOU GOING TO DO
18 WITH IT?
19   A   I WAS GOING TO PUT IT UP ON THE WARNER
20 BROTHERS HOME PAGE.
21   Q   AND WHY DID YOU WANT TO PUT IT UP ON THE
22 WARNER BROTHERS HOME PAGE?
23   A   BECAUSE OF THE PENDING RELEASE OF THE
24 MOVIE, SO THAT I COULD PROMOTE AND PUBLICIZE THE
25 "MIDNIGHT IN THE GARDEN OF GOOD AND EVIL" WEB SITE.

Page 32

1    Q   AND WHAT ADVANTAGE DID YOU SEE THAT THAT
2 WOULD HAVE FOR PROMOTING THE MOVIE?
3    A   IT WOULD DIVERT TRAFFIC TO THE WEB SITE
4 AND PROMOTE AWARENESS OF THE MOVIE.
5    Q   AND BY PROMOTING AWARENESS OF THE MOVIE,
6 WERE YOU HOPING TO SELL MORE TICKETS AND GAIN MORE BOX
7 OFFICE RECEIPTS FOR THE MOVIE?
8    A   THAT'S CORRECT.
9    Q   ANY OTHER REASONS?
10   A   NOT THAT I CAN THINK OF; NO.
11   Q   WHO ON MS. ABRAMSON'S STAFF DEVELOPED THE
12 ARTWORK FOR THE ICON OR TOUT FOR THE MOVIE "MIDNIGHT
13 IN THE GARDEN OF GOOD AND EVIL"?
14   A   SARA LARKINS DID.
15   Q   DID YOU TALK WITH MS. LARKINS ABOUT THE
16 DEVELOPMENT OF THIS ICON THAT YOU REQUESTED?
17   A   NO.
18   Q   DID MS. LARKINS EVENTUALLY SEND YOU
19 ARTWORK FOR THE ICON THAT YOU REQUESTED?
20   A   YES.
21   Q   DID SHE SEND IT TO YOU DIRECTLY, OR DID
22 IT COME INDIRECTLY?
23   A   I DON'T RECALL.
24   Q   AND WOULD I BE CORRECT IN UNDERSTANDING
25 THAT IT WAS SENT TO YOU BY E-MAIL?

Page 33

1    A    YES, YOU WOULD.
2    Q    AND WHAT INFORMATION DO YOU UNDERSTAND
3  SHE USED, OR ARTWORK DID SHE USE, TO CREATE THE ICON
4  FOR THE "MIDNIGHT IN THE GARDEN OF GOOD AND EVIL" ICON
5  THAT WAS -- THAT YOU INSTALLED?
6    A    I DON'T KNOW.  PRESUMABLY IT WAS
7  SOMETHING FROM THE WARNER BROTHERS MOVIE SITE.
8    Q    WHEN YOU RECEIVED THE ARTWORK THAT SHE
9  PREPARED FOR THE ICON FOR "MIDNIGHT IN THE GARDEN OF
10  GOOD AND EVIL," WHAT WAS YOUR REACTION?
11    A    I WAS GRATEFUL THAT I'D RECEIVED IT.
12    Q    AND OTHER THAN BEING GRATEFUL THAT YOU
13  HAD RECEIVED IT, DID YOU HAVE ANY -- WHAT WAS YOUR
14  REACTION CONCERNING THE APPEARANCE OF THE ICON?
15    A    I DON'T RECALL.
16    Q    SO I UNDERSTAND YOUR TESTIMONY CORRECTLY
17  TO SAY THAT YOU PERSONALLY, THEN, WOULD HAVE BEEN THE
18  ONE WHO INSTALLED THE ICON ARTWORK THAT YOU RECEIVED
19  FROM MS. LARKINS ON TO THE WARNER BROTHERS ONLINE HOME
20  PAGE?
21    A    THAT'S CORRECT; YES.
22    Q    AND THAT'S THE ICON THAT WOULD APPEAR ON
23  THE THIRD PAGE OF EXHIBIT 8.  IS THAT CORRECT?
24    A    YES; IT IS CORRECT.
25    Q    AND IF YOU WOULD TAKE A LOOK AT EXHIBIT

Page 34

1  4, THERE IS ANOTHER PAGE WITH THE STAMP WB00007.
2    A    OKAY.
3    Q    IT JUST HAS ONE PIECE OF ARTWORK ON IT?
4    A    I SEE IT.
5    Q    IS THAT THE ICON THAT YOU RECEIVED FROM
6  MS. LARKINS AND INSTALLED?
7    A    YES, IT IS.
8    Q    DID YOU EVER SAVE ANY ARTWORK FROM
9  MS. LARKINS CONCERNING THE ICON THAT YOU WANTED TO
10  INSTALL FOR THE MOVIE "MIDNIGHT IN THE GARDEN OF GOOD
11  AND EVIL"?
12    A    NO.  WELL, ACTUALLY --
13    Q    WHEN YOU RECEIVED THE ARTWORK FROM
14  MS. LARKINS, DID YOU HAVE ANY QUESTION CONCERNING THE
15  APPEARANCE OR THE CONTENT OR SUBJECT MATTER OF THE
16  ICON FOR THE --
17      MR. STEWART:  TODD, YOU CUT OFF THE WITNESS.  HE
18  WANTED TO CLARIFY HIS RESPONSE TO THE PREVIOUS
19  QUESTION.
20  BY MR. DEVEAU:
21    Q    I'M SORRY.  PLEASE GO AHEAD.
22    A    IT'S POSSIBLE THAT I RECEIVED MORE THAN
23  ONE ICON.  I DON'T REMEMBER SPECIFICALLY.
24      IT'S HAPPENED IN THE PAST, IN OTHER
25  INSTANCES, WHERE I'LL BE SENT DIFFERENT VERSIONS, AND

Page 35

1  I WILL CHOOSE AMONGST THEM.  AND I DON'T -- I DON'T
2  RECALL SPECIFICALLY WHETHER THIS WAS ONE OF THOSE
3  INSTANCES OR NOT.
4    Q    AND THEN CONTINUING, WHAT WAS YOUR
5  REACTION TO THE APPEARANCE OF THE ICON OR THE CONTENT
6  OF THE ARTWORK OF THE ICON WHEN YOU RECEIVED IT FROM
7  MS. LARKINS?
8    A    I DON'T RECALL WHAT MY REACTION WAS.
9    Q    DID YOU CONSIDER THAT THE ARTWORK WAS
10  APPROPRIATE FOR YOUR PURPOSES THAT YOU DESCRIBED FOR
11  WANTING TO INSTALL THE ICON?
12    A    YES.  I WAS SATISFIED THAT IT WAS GOOD
13  ENOUGH TO GO UP ON THE HOME PAGE.
14    Q    AND WHY WAS THAT?
15    A    WHY WAS THAT?  WELL, BECAUSE IT HAD
16  BEEN -- IT HAD BEEN SENT TO ME AND THUS PRESUMABLY
17  APPROVED BY SUZANNE, AND I HAD NO SPECIFIC OBJECTION
18  TO IT ON AN ESTHETIC BASIS.
19    Q    WHEN YOU INSTALL AN ICON FOR THE
20  PROMOTIONAL PURPOSES THAT YOU PREVIOUSLY DESCRIBED,
21  WHAT TIE-IN DO YOU HOPE THE VIEWING PUBLIC WILL MAKE
22  WITH THE ICON IN RELATION TO THE MOVIE?
23    A    WHAT'S THE QUESTION?
24    Q    WHEN YOU INSTALL AN ICON FOR THE
25  PROMOTIONAL PURPOSES THAT YOU DESCRIBED FOR THEATRICAL

Page 36

1  RELEASE --
2    A    OKAY.
3    Q    -- WHAT VISUAL LINK DO YOU HOPE THE
4  CONSUMING PUBLIC WILL MAKE WITH RESPECT TO THE ICON TO
5  THE MOVIE?
6      MR. STEWART:  OBJECT; ASSUMES FACTS NOT IN
7  EVIDENCE.  BUT THE WITNESS CAN ANSWER IF HE CAN.
8      THE WITNESS:  I MEAN, IT'S -- IT JUST SEEMS
9  SELF-EVIDENT.
10      IT IS SUPPOSED TO REPRESENT A NAVIGABLE
11  LINK TO THE "MIDNIGHT IN THE GARDEN OF GOOD AND EVIL"
12  WEB SITE.  THEY'RE SUPPOSED TO PRESUMABLY -- IF
13  THEY'VE SEEN IT OUTSIDE, THEN THEY'LL RECOGNIZE IT.
14  IT WILL BE FAMILIAR WITH THEM.
15  BY MR. DEVEAU:
16    Q    AND WHEN YOU REFER TO "SEEING IT
17  OUTSIDE," SEEING IT OUTSIDE IN WHAT FORM OR CAPACITY?
18    A    IN OTHER FORMS OF MEDIA, IN PRINT OR
19  OTHERWISE, OR ON TELEVISION.
20    Q    NOW, PRIOR TO THE INSTALLATION BY YOU OF
21  THIS ICON OF WB00007, HAD YOU -- DID YOU HAVE A COPY
22  OF THE BOOK "MIDNIGHT IN THE GARDEN OF GOOD AND EVIL"?
23    A    NO, I DIDN'T.
24    Q    HAD YOU READ IT?
25    A    NO.

Page 37

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF GEORGIA
SAVANNAH DIVISION


JACK LEIGH,                          )   CIVIL ACTION
                                     )   NO. CV 497-340
                   PLAINTIFF,        )
                                     )
          VS.                        )
                                     )
WARNER BROTHERS INC., A DIVISION)
OF TIME WARNER ENTERTAINMENT         )
COMPANY, L.P.                        )
                                     )
                   DEFENDANT.        )
_____)


DEPOSITION OF
SUZANNE ABRAMSON


SEPTEMBER 15, 1998


**REPORTED BY**

KARLA M. BARRON           CAROL BRENNAN & ASSOCIATES
C.S.R. NO. 2842           CERTIFIED SHORTHAND REPORTERS
                          4444 RIVERSIDE DRIVE, SUITE 104
                          BURBANK, CALIFORNIA 91505
**JOB NO.**               TELEPHONE (818) 846-3844
                          FAX (818) 846-8179
          98-754

**Page 26**

1    A    YES.
2    Q    DO YOU START WITH -- WELL, LET ME
3 SCRATCH THAT, BACK UP.
4         AT THAT STAGE, WHEN YOU FIND OUT WHO IS
5 AVAILABLE, YOU'RE TALKING ABOUT AN ARTIST, NOT A
6 DESIGNER. IS THAT RIGHT?
7    A    NOT ALWAYS.
8    Q    OKAY. TELL ME WHAT WOULD MAKE THE
9 DIFFERENCE OF WHY YOU WOULD SOMETIMES GO TO A DESIGNER
10 AS OPPOSED TO AN ARTIST FOR A THEATRICAL SITE ICON?
11    A    AVAILABILITY.
12    Q    OKAY. ALL RIGHT. ALL RIGHT.
13         SO SAY THAT EVERYONE IS AVAILABLE --
14 JUST TO FIND OUT YOUR THOUGHT PROCESSES AND SELECTION,
15 IF ALL ARTISTS AND DESIGNERS ARE AVAILABLE, WHICH I
16 DOUBT THAT FREQUENTLY HAPPENS, DO YOU HAVE A CHOICE OF
17 WHETHER YOU -- FOR A THEATRICAL SITE ICON, YOU WOULD
18 RATHER GO WITH A DESIGNER OVER AN ARTIST?
19    A    NOT REALLY.
20    Q    OKAY. CAN MOST OF YOUR -- CAN THE
21 DESIGNERS WHO YOU'VE IDENTIFIED BEFORE ALSO DO THE
22 SAME THING AS AN ARTIST CAN?
23    A    YES.
24    Q    DO THEY HAVE THE SKILL, IS WHAT I'M
25 SAYING.

Page 26

**Page 27**

1    A    YES.
2    Q    ALL OF YOUR DESIGNERS HAVE THE SAME SKILL
3 AS YOUR ARTISTS WOULD HAVE?
4    A    YES.
5    Q    EVEN THOUGH SOME MAY BE MORE SKILLFUL
6 THAN OTHERS?
7    A    YES.
8    Q    ALL RIGHT. AND CAN YOU RECALL THAT THIS
9 PROCESS HAS EVER BEEN DIFFERENT IN THE LAST YEAR,
10 WHEREIN YOU DIDN'T RECEIVE AN E-MAIL OR A CALL FROM
11 ELIZABETH SHERMAN BUT YOU RECEIVED A CALL OR E-MAIL
12 FROM SOMEBODY ELSE THAT THEY NEEDED AN ICON FOR A
13 THEATRICAL SITE?
14    A    YES.
15    Q    OKAY. AND OTHER THAN ELIZABETH SHERMAN,
16 WHO HAS CALLED YOU IN THE PAST?
17    A    SOMEONE FROM HER OFFICE.
18    Q    THAT WOULD BE SOMEONE WHO SHE IS OVER?
19    A    YES.
20    Q    LET ME ASK YOU. WHO IS ANDREW LLOYD?
21    A    ANDREW LLOYD WAS AN EMPLOYEE HERE AT
22 WARNER BROTHERS.
23    Q    DO YOU KNOW WHEN HE LEFT WARNER BROTHERS?
24    A    I'M NOT SURE OF THE EXACT DATE.
25    Q    HOW ABOUT THE MONTH?

Page 27

**Page 28**

1    A    I'M NOT SURE.
2    Q    OKAY. IS HE STILL WITH WARNER BROTHERS?
3    A    NO.
4    Q    OKAY. WHEN DID YOU FIND OUT HE WAS NO
5 LONGER THERE?
6    A    WHEN HE QUIT.
7    Q    OKAY. AND YOU DON'T RECALL WHEN THAT WAS
8 THAT HE QUIT?
9         MR. STEWART: OBJECTION; ASKED AND ANSWERED.
10 BY MR. TURNER:
11    Q    DO YOU RECALL WHEN THAT WAS THAT HE QUIT?
12         MR. STEWART: YOU CAN GO AHEAD AND ANSWER.
13         THE WITNESS: NO.
14 BY MR. TURNER:
15    Q    ALL RIGHT. DO YOU KNOW WHY HE QUIT?
16    A    NO.
17    Q    DID YOU KNOW ANDREW LLOYD VERY WELL,
18 PRIOR TO HIM LEAVING WARNER BROTHERS?
19    A    WELL ENOUGH.
20    Q    DID YOU WORK WITH HIM ON OCCASION?
21    A    YES.
22    Q    OKAY. ALL RIGHT.
23         DO YOU KNOW WHERE HE IS TODAY?
24    A    NO.
25    Q    YOU HAVE NO IDEA WHERE HE WORKS?

Page 28

**Page 29**

1    A    I BELIEVE HERE IN BURBANK.
2    Q    BUT YOU HAVE NO IDEA?
3    A    NO. I DON'T KNOW THE COMPANY.
4    Q    ALL RIGHT. ALL RIGHT.
5         SO YOU GET A DIRECTIVE FROM ELIZABETH
6 SHERMAN OR HER OFFICE THAT YOU NEED A THEATRICAL --
7 I'M SORRY -- AN ICON FOR A THEATRICAL WEB SITE. AND
8 THEN YOU CONTACT EITHER A DESIGNER OR AN ARTIST.
9         AND WE TALKED ABOUT HOW THEN WHAT
10 NORMALLY HAPPENS IS THE DESIGNER OR ARTIST, IN
11 CREATING THE ICON, GOES TO THE WEB PAGE. IS THAT
12 CORRECT?
13    A    YES.
14    Q    AND LOOKS FOR SOMETHING THAT WILL TIE IN
15 THE WEB PAGE -- THE ICON TO THE WEB PAGE. IS THAT
16 CORRECT?
17    A    YES.
18    Q    ARE THEY LOOKING FOR SOMETHING VISUAL TO
19 TIE IN?
20    A    YES.
21    Q    OKAY. AND THEN THEY CREATE THE ICON FROM
22 SOMETHING WITHIN THE EXISTING WEB PAGE?
23    A    USUALLY.
24    Q    ALL RIGHT. NOW, YOU TALKED ABOUT
25 PHOTOSHOP AND I THINK SOME OTHER METHODS IN WHICH THAT

Page 29

Page 26 - Page 29

1    A    SAME AS AN ICON.
2    Q    OKAY. THANK YOU.
3    MR. STEWART: ARE YOU DONE WITH EXHIBIT 2?
4    MR. TURNER: YES, I AM. THANK YOU.
5    MR. STEWART: WE NOW HAVE THE DOCUMENTS FROM FED
6 EX.
7    MR. TURNER: DO YOU MIND IF WE TAKE A MOMENT TO
8 GO AHEAD AND MARK THEM, AND I'LL OVER THE TELEPHONE
9 JUST TELL THE COURT REPORTER HOW TO MARK THEM?
10    MR. STEWART: THAT'S FINE.
11    (SHORT BREAK HELD.)
12    (PLAINTIFF'S EXHIBITS 3-7 MARKED FOR
13    IDENTIFICATION.)
14 BY MR. TURNER:
15    Q    MS. ABRAMSON, WHAT I'M GOING TO ASK YOU
16 IS I'M GOING TO ASK YOU TO TRY TO REFLECT, USING YOUR
17 BEST RECOLLECTION.
18    DO YOU RECALL RECEIVING ANY REQUEST FROM
19 ANYONE FOR YOUR DEPARTMENT TO CREATE A TOUT OR ICON
20 FOR THE MOTION PICTURE "MIDNIGHT IN THE GARDEN OF GOOD
21 AND EVIL" THEATRICAL SITE?
22    A    VAGUELY; YES.
23    Q    TELL ME WHAT YOU RECALL.
24    A    AN E-MAIL.
25    Q    ALL RIGHT. WHO WAS THAT FROM?
                                                    Page 46

1    A    PROBABLY WOULD HAVE BEEN FROM ANDREW
2 LLOYD.
3    Q    ALL RIGHT. AND ANDREW LLOYD, IS HE IN
4 MRS. SHERMAN'S OFFICE?
5    MR. STEWART: YOU MEAN RIGHT NOW?
6    MR. TURNER: NO; AT THE TIME.
7    Q    WAS HE IN MS. SHERMAN'S OFFICE? IN OTHER
8 WORDS, DID HE WORK IN THE SAME DEPARTMENT OR OFFICE
9 THAT SHE DID?
10    A    YES.
11    Q    WHAT WAS HIS RELATIONSHIP, AS FAR AS JOB
12 RESPONSIBILITIES TO HER, TO YOUR KNOWLEDGE?
13    A    I BELIEVE HE WAS MANAGER OF PROMOTIONS.
14    Q    OKAY. WOULD HE HAVE WORKED -- SHE WOULD
15 HAVE BEEN HIS SUPERVISOR, EITHER DIRECTLY OR
16 INDIRECTLY?
17    A    YES.
18    Q    YOU HAD WORKED WITH MR. WEBBER BEFORE?
19    A    MR. LLOYD.
20    Q    I'M SORRY.
21    MR. STEWART: HE'D PROBABLY APPRECIATE THAT
22 REFERENCE.
23 BY MR. TURNER:
24    Q    YOU HAD WORKED WITH MR. LLOYD BEFORE?
25    A    YES.
                                                    Page 47

1    Q    AND WHAT TYPE OF SCENARIO HAD YOU WORKED
2 WITH HIM BEFORE?
3    A    IN A LOT OF ISSUES REGARDING
4 PRODUCTION -- I MEAN PROMOTIONS.
5    Q    WOULD IT BE NORMAL FOR MR. LLOYD TO MAKE
6 REQUESTS REGARDING -- REQUESTING YOUR DEPARTMENT TO
7 REQUEST A TOUT FOR A THEATRICAL SITE?
8    A    YES.
9    Q    OKAY. AND HE HAD DONE THAT IN THE PAST?
10    A    YES.
11    Q    ALL RIGHT. I WANT YOU TO LOOK AT EXHIBIT
12 4 -- I'M SORRY -- EXHIBIT NUMBER 3. AND THE VERY
13 LAST DOCUMENT ATTACHED TO EXHIBIT NUMBER 3 SHOULD BE
14 AN ITEM THAT'S MARKED AS WARNER BROTHERS PAGE 3 OR
15 BATES STAMPED 3.
16    A    YES.
17    Q    "MAIL FOR ANDREW LLOYD" AT THE TOP.
18    A    YES.
19    Q    IS THAT THE E-MAIL YOU'RE TALKING ABOUT?
20    A    YES.
21    Q    OKAY. AND DO YOU RECALL WHEN YOU
22 RECEIVED IT?
23    A    BY THE DATE IT SAYS HERE.
24    Q    OKAY. I JUST WANT TO MAKE SURE.
25    NOVEMBER 24TH, 1997?
                                                    Page 48

1    A    YES.
2    Q    AND YOU DO HAVE SOME RECOLLECTION OF
3 RECEIVING THIS DOCUMENT?
4    A    VAGUELY.
5    Q    OKAY. IS THIS THE FIRST REQUEST,
6 COMMUNICATION OR DISCUSSION YOU HAD WITH ANYBODY AT
7 WARNER BROTHERS REGARDING A TOUT FOR THE THEATRICAL
8 SITE FOR "MIDNIGHT IN THE GARDEN OF GOOD AND EVIL"?
9    A    I DON'T REMEMBER.
10    Q    SO AS YOU SIT HERE TODAY, YOU COULD HAVE
11 HAD AN EARLIER DISCUSSION THAT PRECIPITATED THIS
12 E-MAIL?
13    A    IT'S POSSIBLE.
14    Q    BUT YOU DON'T RECALL ONE?
15    A    NO.
16    Q    ALL RIGHT. WHEN YOU RECEIVED THIS
17 E-MAIL, WHAT DID YOU DO?
18    A    I BELIEVE I SPOKE WITH SARA ABOUT
19 CREATING IT.
20    Q    ALL RIGHT. DID YOU TALK TO MR. LLOYD
21 BEFORE YOU TALKED TO SARA?
22    A    I DON'T REMEMBER.
23    Q    DO YOU RECALL HAVING ANY CONVERSATIONS
24 WITH MR. LLOYD ABOUT THE TOUT FOR "MIDNIGHT IN THE
25 GARDEN OF GOOD AND EVIL" AFTER RECEIVING THE E-MAIL?
                                                    Page 49

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF GEORGIA
SAVANNAH DIVISION


JACK LEIGH,                                    )   CIVIL ACTION
                                               )   NO. CV 497-340
                    PLAINTIFF,                 )
                                               )
          VS.                                  )
                                               )
WARNER BROTHERS INC., A DIVISION)
OF TIME WARNER ENTERTAINMENT                   )
COMPANY, L.P.                                  )
                                               )
                    DEFENDANT.                 )
_____)


DEPOSITION OF
SARA JANE LARKINS


SEPTEMBER 15, 1998


**REPORTED BY**

KARLA M. BARRON
C.S.R. NO. 2842

**JOB NO.**

98-754

CAROL BRENNAN & ASSOCIATES
CERTIFIED SHORTHAND REPORTERS
4444 RIVERSIDE DRIVE, SUITE 104
BURBANK, CALIFORNIA 91505
TELEPHONE (818) 846-3844
FAX (818) 846-8179

| | |
|---|---|
| 1   A   SHE SAW IT. WHETHER I HAD HER COME TO MY | 1   A   I'M SORRY. CAN YOU REPHRASE IT? I DON'T |
| 2 COMPUTER OR WHETHER I SENT IT TO HER, I DON'T RECALL. | 2 QUITE UNDERSTAND. |
| 3   Q   AND HOW LONG DID IT TAKE YOU TO CREATE | 3   Q   SURE. WHAT DID YOU UNDERSTAND YOU WERE |
| 4 THIS ICON? | 4 SUPPOSED TO DO IN CREATING THIS ICON? |
| 5   A   I DON'T REMEMBER EXACTLY HOW LONG, BUT I | 5   A   I WAS SUPPOSED TO MAKE THE ICON. |
| 6 DID TRY TO DO IT QUICKLY. | 6   Q   AND WHAT CONTENT DID YOU UNDERSTAND THAT |
| 7   Q   AND WHY DID YOU TRY TO DO IT QUICKLY? | 7 YOU SHOULD INCLUDE IN THE ICON? |
| 8   A   BECAUSE IT'S CUSTOMARY HERE THAT THINGS | 8   A   CONTENT THAT WOULD INFORM PEOPLE THAT |
| 9 NEED TO BE DONE QUICKLY. | 9 WHEN THEY PUSHED ON THIS ICON, THAT THAT'S WHERE THEY |
| 10   Q   HOW LONG DOES IT NORMALLY TAKE YOU TO | 10 WERE GOING. |
| 11 CREATE AN ICON OF THIS TYPE? | 11   Q   WHO WAS INVOLVED IN THE SELECTION OF THE |
| 12   A   IT SOMETIMES CAN BE REALLY DIFFICULT AND | 12 ARTWORK FOR THIS ICON? |
| 13 TAKE QUITE SOME TIME. | 13   A   I WAS. |
| 14   Q   AND HOW LONG DID IT TAKE YOU TO CREATE | 14   Q   ANYONE ELSE? |
| 15 THIS ONE? | 15   A   NO. |
| 16   A   I DON'T KNOW. | 16   Q   AND HOW DID YOU GO ABOUT SELECTING THE |
| 17   Q   WHAT DISCUSSIONS DID YOU HAVE WITH | 17 CONTENT OF THE ARTWORK FOR THIS ICON? |
| 18 MS. ABRAMSON WHEN YOU SHOWED HER THE ICON AFTER YOU | 18   A   I WENT TO THE WARNER BROTHERS MOVIES |
| 19 CREATED IT? | 19 AREA. |
| 20   A   I BELIEVE THAT WE DISCUSSED THE | 20   Q   AND WHAT AREA IS THAT? |
| 21 READABILITY OF MY TYPED TREATMENT. | 21   A   THE WARNER BROTHERS MOVIES AREA. |
| 22   Q   AND WHEN YOU REFER TO THE "TYPED | 22   Q   AND IS THAT AN AREA ON WARNER -- ON |
| 23 TREATMENT," WHAT PART OF THE DESIGN OR OF THE ICON ARE | 23 WB.COM, OR IS THAT IN ANOTHER LOCATION? |
| 24 YOU REFERRING TO? | 24   A   THAT'S ON OUR -- IT LINKS OFF OUR HOME |
| 25   A   THE TYPE. | 25 PAGE. |
| Page 22 | Page 24 |
| 1   Q   BY THE "TYPE," ARE YOU REFERRING TO THE | 1   Q   WHERE DOES IT LINK TO? |
| 2 TITLE OF THE MOVIE THAT'S ON THE -- | 2   A   THE WARNER BROTHERS MOVIES AREA. |
| 3   A   WHATEVER IS TYPED TENDS TO BE CHALLENGING | 3   Q   WHO MAINTAINS THE WARNER BROTHERS MOVIES |
| 4 TO READ AT SUCH A SMALL SIZE, SO THAT IS A CUSTOMARY | 4 AREA? |
| 5 CHALLENGE. | 5   A   I DON'T KNOW. |
| 6   Q   DID YOU HAVE ANY OTHER DISCUSSIONS ABOUT | 6   Q   WHO CREATES THE CONTENT FOR THAT AREA? |
| 7 THIS ICON WITH MS. ABRAMSON AT THIS TIME THAT WE'RE | 7   A   I DON'T KNOW. |
| 8 TALKING ABOUT? | 8   Q   WHAT'S THE ADDRESS FOR THAT AREA? |
| 9   A   NOT THAT I RECALL. | 9   A   I BELIEVE IT'S WARNER BROTHERS MOVIES. I |
| 10   Q   AND WHAT WAS THE RESULT OF YOUR | 10 USUALLY GO TO THE MOVIE SHIELD OFF OUR HOME PAGE. I |
| 11 DISCUSSIONS WITH MS. ABRAMSON? | 11 DON'T TYPICALLY TYPE IN A URL. |
| 12   A   THE PIECE WAS MADE SATISFACTORY FOR | 12   Q   IF YOU WOULD REFER AGAIN TO THE PAGE THAT |
| 13 APPROVAL. | 13 HAS THE PRODUCTION NUMBER WB00006, THE TOP OF THAT |
| 14   Q   WAS IT SATISFACTORY INITIALLY, OR DID YOU | 14 PAGE UNDER THE W.B. SHIELD, DO YOU SEE SOME AREAS THAT |
| 15 HAVE TO GO BACK AND MAKE SOME CHANGES? | 15 SAY "TV," "MOVIES," "HOME VIDEO"? |
| 16   A   AS I SAID, I BELIEVE I HAD TO TWEAK THE | 16   A   YES. |
| 17 TYPE. BUT BEYOND THAT, I DON'T REMEMBER HAVING TO DO | 17   Q   WHEN YOU REFER TO THE "MOVIES" AREA, IS |
| 18 ANYTHING ELSE. | 18 THAT THE ONE THAT YOU'RE REFERRING TO, THE ONE THAT'S |
| 19   Q   DID YOU HAVE ANY DISCUSSIONS WITH ANYONE | 19 LABELED "MOVIES"? |
| 20 ELSE AFTER THIS DISCUSSION WITH MS. ABRAMSON | 20   A   YES. |
| 21 CONCERNING THE ICON THAT YOU'D CREATED? | 21   Q   WHERE DOES THAT LINK TO IF YOU CLICK ON |
| 22   A   NO. | 22 IT? |
| 23   Q   AND WHAT DID YOU UNDERSTAND TO BE YOUR | 23   A   WARNER BROTHERS MOVIES AREA. |
| 24 TASK IN CREATING THIS ICON THAT'S LABELED "MIDNIGHT IN | 24   Q   WHAT TYPE OF INFORMATION IS MAINTAINED ON |
| 25 THE GARDEN OF GOOD AND EVIL"? | 25 THAT AREA? |
| Page 23 | Page 25 |

BY MR. DEVEAU:

2 Q NO. THE IMAGE THAT YOU SAY YOU USED TO
3 CREATE THE ICON.
4 A DO YOU WANT ME TO DESCRIBE IT?
5 Q YES, PLEASE.
6 A IT'S A DIGITAL IMAGE OF A STATUE.
7 Q AND WHAT DID THE IMAGE LOOK LIKE?
8 A IT LOOKS LIKE A WOMAN HOLDING TWO BOWLS.
9 Q AND DID IT LOOK LIKE A BOOK COVER?
10 MR. STEWART: FOR CLARIFICATION, I'M NOT SURE
11 YOU AND THE WITNESS ARE ON THE SAME PAGE. I BELIEVE
12 THE WITNESS MAY BE ANSWERING AS TO WHAT'S IN FRONT OF
13 HER ON WBO7.
14 ARE YOU ASKING, TODD, ABOUT WHAT THE
15 IMAGE LOOKED LIKE THAT SHE TOOK FROM THE SITE WHEN SHE
16 TOOK IT?
17 MR. DEVEAU: YES.
18 THE WITNESS: OH. I DON'T KNOW -- I DON'T
19 REALLY REMEMBER WHERE IT WAS IN THERE, IN THE WARNER
20 BROTHERS MOVIE SITE.
21 BY MR. DEVEAU:
22 Q I BELIEVE MY QUESTION WAS: WOULD YOU
23 DESCRIBE THIS IMAGE FOR US, NOT NECESSARILY WHERE IT
24 WAS LOCATED.
25 A WOULD I DESCRIBE IT FOR YOU.

Page 30

1 MR. STEWART: AS IT APPEARED -- TODD, CORRECT
2 ME IF I'M WRONG, BUT I BELIEVE YOUR QUESTION IS AS IT
3 APPEARED, WHERE YOU TOOK THE PHOTO FROM.
4 MR. DEVEAU: CORRECT.
5 THE WITNESS: AS IT APPEARED -- I'M STILL
6 CONFUSED. SORRY. WILL YOU TRY THAT AGAIN? I'M
7 SORRY. I'M STILL CONFUSED.
8 BY MR. DEVEAU:
9 Q YES. AS I UNDERSTAND YOUR TESTIMONY, YOU
10 SAID YOU WENT TO THIS WARNER BROTHERS MOVIE SITE, AND
11 YOU FOUND AN IMAGE THERE THAT YOU USED TO CREATE THE
12 ICON THAT WE'RE TALKING ABOUT. IS THAT CORRECT?
13 A YES.
14 Q OKAY. WHAT I WOULD LIKE YOU TO DO IS
15 DESCRIBE THE IMAGE THAT YOU FOUND THAT YOU USED TO
16 CREATE THIS ICON.
17 A I DON'T REMEMBER WHAT THE IMAGE LOOKED
18 LIKE ON THE AREA. I'M ASSUMING, SINCE IT'S ON THE
19 ICON, IT LOOKED LIKE THAT.
20 Q WHEN YOU SAY IT LOOKED LIKE THAT, YOU
21 MEAN IT LOOKED LIKE WHAT'S NOW IN THE ICON?
22 A YES.
23 Q WHEN YOU FOUND THIS IMAGE, DID YOU MAKE
24 ANY CHANGES OR ALTERATIONS TO THE IMAGE TO CREATE THE
25 ICON?

Page 31

1 A IT LOOKS TO ME LIKE I CHANGED THE MODE OF
2 THE LAYER.
3 Q WHEN YOU REFER TO THE "MODE OF THE
4 LAYER," WHAT ARE YOU REFERRING TO?
5 A REFERRING TO THE IMAGES ON A LAYER IN MY
6 SOFTWARE PROGRAM. AND I CHANGED THE MODE OF THAT
7 LAYER, SO THAT IT WOULD ABSORB SOME OF THE BLUE COLOR
8 ON THE LAYER BELOW IT.
9 Q ANY OTHER CHANGES?
10 A OH, IT WAS PROBABLY CUT UP. PROBABLY PUT
11 THE WRITING ON THERE. I REALLY DON'T RECOLLECT THE
12 ACTUAL STEPS.
13 Q AND WHAT SOFTWARE DID YOU USE TO CREATE
14 THE ICON?
15 A I'M SORRY.
16 Q WHAT SOFTWARE DID YOU USE TO CREATE THIS
17 ICON?
18 A ADOBE PHOTOSHOP.
19 Q AM I CORRECT IN UNDERSTANDING THAT THE
20 PHOTOSHOP SOFTWARE WILL RESULT IN LAYERS OF ELEMENTS
21 THAT ARE MERGED TOGETHER TO MAKE THE FINAL ICON?
22 A YES.
23 Q AND WHAT LAYERS WERE INVOLVED IN YOUR
24 CREATING THIS ICON THAT WERE MERGED TOGETHER INTO THE
25 FINAL FORM?

Page 32

1 A I DON'T KNOW.
2 Q OKAY. CAN WE FIND THAT OUT FROM THE
3 DISKETTE OF THIS IMAGE IF WE HAVE THE PROPER SOFTWARE?
4 A NOT NECESSARILY. I COULD HAVE
5 ORIGINALLY -- IT'S CUSTOMARY THAT YOU MERGE A LOT OF
6 LAYERS, AND THERE'S NO WAY OF KNOWING WHETHER THEY
7 CAME IN AS SEPARATE LAYERS OR WHETHER THEY WERE MERGED
8 LAYERS.
9 Q THIS ICON HAS THE TITLE "MIDNIGHT IN THE
10 GARDEN OF GOOD AND EVIL" OVER IT -- IS THAT
11 CORRECT? -- OVER THE ARTWORK?
12 A YES.
13 Q I'M SORRY. I DID NOT HEAR A RESPONSE.
14 A YES.
15 Q WHERE DID THAT -- WHERE DID THE FONTS
16 FOR THE TITLE COME FROM?
17 A I DON'T KNOW. I DON'T KNOW.
18 MR. STEWART: DID YOU GET THAT RESPONSE, TODD?
19 MR. DEVEAU: YES. I UNDERSTOOD THE RESPONSE
20 SAYING I DON'T KNOW.
21 Q IS THAT CORRECT?
22 A YES. THAT'S CORRECT.
23 Q BEFORE YOU CREATED THE ICON OF THE PAGE
24 WB00007, HAD YOU READ OR SEEN THE BOOK ENTITLED
25 "MIDNIGHT IN THE GARDEN OF GOOD AND EVIL"?

Page 33

1     A   I DID NOT READ THE BOOK; I HAVE SEEN THE
2 BOOK.
3     Q   AND HAD YOU SEEN IT BEFORE YOU CREATED
4 THE ICON?
5     A   I THINK I SAW THE POSTER, THE MOVIE
6 POSTER. I DON'T THINK I SAW THE BOOK.
7     Q   DID I UNDERSTAND YOUR TESTIMONY TO SAY
8 YOU DON'T RECALL IF YOU READ THE BOOK?
9     A   NO; I DEFINITELY DID NOT READ THE BOOK.
10 I BELIEVE I DID NOT SEE THE BOOK, BUT I BELIEVE I SAW
11 THE POSTER FOR THE MOVIE.
12    Q   DID YOU HAVE ANY DISCUSSIONS WITH
13 MR. LLOYD ABOUT THIS ICON FOR THE MOVIE "MIDNIGHT IN
14 THE GARDEN OF GOOD AND EVIL" THAT WE'RE TALKING ABOUT?
15    A   I DON'T BELIEVE SO.
16    Q   DID YOU HAVE ANY DISCUSSIONS -- AND THIS
17 IS IN REGARDS TO CREATING THE ICON -- WITH ANYONE ELSE
18 OTHER THAN MS. ABRAMSON?
19    A   NO.
20    Q   I'D LIKE YOU TO TAKE A LOOK AGAIN AT
21 EXHIBIT 4, THE PAGE MARKED WB00004.
22        DO YOU HAVE THAT BEFORE YOU?
23    MR. STEWART:  THIS ONE HERE.
24    THE WITNESS:  YES.
25 ///

Page 34

1     THE WITNESS:  I'VE GOT IT.
2 BY MR. DEVEAU:
3     Q   JUST FOR CLARIFICATION, DOES THIS EXHIBIT
4 SHOW TWO IMAGES SIDE BY SIDE?
5     A   YES, IT DOES.
6     Q   IS THE IMAGE ON THE RIGHT THE ICON IMAGE
7 THAT YOU CREATED?
8     A   IT APPEARS TO BE SO.
9     Q   AND DO YOU HAVE AN UNDERSTANDING OF WHAT
10 THE IMAGE ON THE LEFT IS?
11    A   IT LOOKS TO BE THE BOOK COVER.
12    Q   AND TO YOUR UNDERSTANDING, DO YOU SEE ANY
13 SUBSTANTIAL SIMILARITIES BETWEEN THE BOOK COVER AND
14 THE ICON THAT YOU CREATED?
15    MR. STEWART:  I OBJECT TO THE EXTENT
16 FOR A LEGAL CONCLUSION FROM THE WITNESS, E
17 ALLOW THE WITNESS TO ANSWER.
18    THE WITNESS:  IT LOOKS SIMILAR.
19 BY MR. DEVEAU:
20    Q   AND IN WHAT REGARDS DOES IT LO
21    A   THEY BOTH HAVE THE STATUE OI
22    Q   ANY OTHER AREAS OR SIMILARITIE
23    MR. STEWART:  I'M GOING TO OBJECT A
24 THESE QUESTIONS TO THE EXTENT IT CALLS FOI
25 CONCLUSION.  YOU WANT TO JUST HAVE A STAN

1 BY MR. DEVEAU:
2     Q   DO YOU RECOGNIZE THAT?
3     A   NO.
4     Q   DO YOU HAVE AN UNDERSTANDING WHAT
5 AMAZONLINK.GIF REFERS TO?
6     A   NO.
7     Q   WHO, TO YOUR UNDERSTANDING, WAS INVOLVED
8 IN THE DECISION TO PLACE THE ICON THAT YOU CREATED ON
9 THE WARNER BROTHERS ONLINE HOME SITE?
10    A   I DON'T KNOW.
11    Q   WAS THE ICON EVENTUALLY REMOVED?
12    A   I DON'T KNOW.  IT'S NOT UP THERE NOW, SO
13 IT CAME DOWN SOME TIME.
14    Q   DO YOU HAVE AN UNDERSTANDING AS TO WHEN
15 IT CAME DOWN?
16    A   NO.
17    Q   DO YOU HAVE AN UNDERSTANDING AS TO WHY IT
18 CAME DOWN?
19    A   NO.
20    Q   MS. LARKINS, IF YOU WOULD TAKE A LOOK AT
21 THE DOCUMENT I THINK WE'VE LABELED AS EXHIBIT 6.  IT
22 SHOULD BE A ONE-PAGE DOCUMENT THAT HAS TWO IMAGES SIDE
23 BY SIDE.
24    MR. STEWART:  HANG ON JUST A MINUTE, TODD.
25 OKAY.

Page 35

1 OBJECTION ON THAT, TODD?
2     MR. DEVEAU:  THAT'S FINE.
3     MR. STEWART:  YOU CAN ANSWER.
4     THE WITNESS:  I'M SORRY.  WHAT WAS THE ʼ
5 AGAIN?
6 BY MR. DEVEAU:
7     Q   DO YOU SEE ANY OTHER SIMILARITIES BESIDES
8 THE STATUE APPEARING IN BOTH?
9     A   NO.
10    Q   THE IMAGE ON THE LEFT, DOES THAT LOOK
11 SIMILAR TO THE IMAGE THAT YOU SAW ON THE WARNER
12 BROTHERS MOVIE SITE THAT YOU FOUND AND USED TO CREATE
13 THE ICON THAT YOU CREATED?
14    A   I DON'T REALLY REMEMBER.
15    Q   WHEN YOU FOUND THE IMAGE THAT YOU
16 REFERRED TO ON THE WARNER BROTHERS MOVIE SITE THAT YOU
17 USED TO CREATE THE "MIDNIGHT IN THE GARDEN OF GOOD AND
18 EVIL" ICON, PHYSICALLY WHAT DID YOU DO WITH THAT IMAGE
19 TO USE IT OR INCORPORATE IT INTO THE ICON?
20    A   I DON'T RECALL.
21    Q   WOULD YOU HAVE COPIED OR SAVED THAT
22 IMAGE?
23    MR. STEWART:  ASKED AND ANSWERED.  I'LL ALLOW
24 THE WITNESS TO ANSWER.
25    THE WITNESS:  I DON'T REMEMBER.

Page 37

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF GEORGIA
SAVANNAH DIVISION
---------------------------------------------x

JACK LEIGH,                                            :

                          Plaintiff,                   :
                                           Civil Action No.
                  -against-               CV-497-340     :

WARNER BROTHERS, INC., a Division of                   :
TIME WARNER ENTERTAINMENT COMPANY, L.P.,

                                                       :
                          Defendant.
                                                       :
---------------------------------------------x


          TELEPHONE DEPOSITION of the Defendant,

WARNER BROTHERS, INC., by DONALD BUCKLEY, taken

by the Plaintiff, pursuant to dated October 2,

1998, held at the offices of Donald Buckley,

1325 Sixth Avenue, New York, New York, on

October 21, 1998, at 1:00 p.m., before a Notary

Public of the State of New York.


**************************************************
          BARRISTER REPORTING SERVICE, INC.
                    120 Broadway
               New York, N.Y. 10271
                   212-732-8066

24

1                     Buckley

2     The Garden of Good and Evil" was on the web

3     page?

4     A.     Because I objected to its presence

5     almost immediately after seeing it.

6     Q.     The reason you don't know -- well, let

7     me ask you this:  How often do you review the

8     content of the various web pages which you

9     are overseeing?

10    A.     Varies, but it's not unusual for me to

11    review sites several times a day over several

12    days from time to time.

13    Q.     Why did the book cover appear on the

14    web page?

15    A.     Why?

16    Q.     Yes.

17    A.     It was part of an advertising -- it

18    appeared as a piece of advertising on the

19    site.

20    Q.     Do you know how many days it appeared

21    on the site?

22    A.     As far as I remember, it was on for a

23    day, if that.

24    Q.     You're certain of that?

25    A.     Not to the hour, but I'd be surprised

1                           Buckley

2      if it was more than 36 hours.

3      Q.      Who put it on the website?

4      A.      The ad, as I remember, was served --

5      the ad tag, the code written within the page

6      to indicate the presence of the ad was

7      inserted here in New York, but the visual

8      itself which was called up as a consequence

9      of that code insertion resided on a server

10     designed to serve up advertising on websites

11     located in Burbank.

12     Q.      That would be from a Warner Brothers

13     Online site?

14     A.      From an online server, a Warner

15     Brothers Online server.

16     Q.      It was done by someone with Warner

17     Brothers?

18     A.      Yes.

19     Q.      Why did you object to it?

20     A.      I did not like the way it looked.

21     Q.      Why not?

22     A.      Well, it was -- you know, these pages

23     are carefully designed, and they're designed

24     with one chief goal in mind, which is to

25     promote motion pictures.

1                        Buckley

2              The appearance was esthetically

3        offensive to me.  I did not care for the way

4        it sort of hung there.  It was just kind --

5        it did not really work with the rest of the

6        site as it appeared.

7        Q.   Okay, but the purpose that the book

8        cover was on the website was to promote the

9        motion picture?

10       A.   No.

11       Q.   No?

12       A.   No.

13       Q.   Why was it, then?

14       A.        The book cover was a visual link to

15       the Amazon.com website.  It was there to

16       promote the sale of the book.

17       Q.   Who gave permission for the book cover

18       to appear on the website?

19       A.   I don't know.

20       Q.   Did you try to find out?

21       A.   No, I did not.

22       Q.   Have you tried to find out up to

23       today's date?

24       A.   No.

25       Q.   Do you care?





CONDENSED TRANSCRIPT

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF GEORGIA
SAVANNAH DIVISION

JACK LEIGH,                          )   CIVIL ACTION
                                     )   NO. CV 497-340
                    PLAINTIFF,       )
                                     )
          VS.                        )
                                     )
WARNER BROTHERS INC., A DIVISION)
OF TIME WARNER ENTERTAINMENT         )
COMPANY, L.P.                        )
                                     )
                    DEFENDANT.       )
_____)

DEPOSITION OF
CLYDE CHARLES MC DANIELS

NOVEMBER 2, 1998

REPORTED BY

KARLA M. BARRON CAROL BRENNAN & ASSOCIATES
C.S.R. NO. 2842    CERTIFIED SHORTHAND REPORTERS
                   4444 RIVERSIDE DRIVE, SUITE 104
                   BURBANK, CALIFORNIA 91505
JOB NO.            TELEPHONE (818) 846-3844
        98-880     FAX (818) 846-8179

Multi-Page™

1 IT'S BASED ON WHEN THE DEVICE WHERE THEY RESIDE BEGINS
2 TO GET FULL.
3        RIGHT NOW WE HAVE LOGS GOING BACK TO THE
4 EARLY PART OF THE YEAR, SO... OUR GOAL WAS ALWAYS TO
5 HAVE AT LEAST A YEAR'S WORTH OF LOGS. WE DIDN'T HAVE
6 THAT BIG OF A DEVICE UNTIL FAIRLY RECENTLY, THOUGH.
7    Q   ALL RIGHT. DO YOU STILL HAVE THE LOGS
8 FOR DECEMBER 5TH THROUGH 12TH, 1997?
9    A   NO, WE DO NOT.
10   Q   DO YOU HAVE ANY IDEA WHEN YOU NORMALLY
11 WOULD HAVE DESTROYED SOMETHING LIKE THAT?
12   A   PRIOR TO OUR HAVING THE LARGER STORAGE
13 DEVICE, WE ONLY KEPT ABOUT THREE MONTHS OF THE LOGS
14 ONLINE.
15   Q   OKAY. SO THEY PROBABLY WOULD HAVE BEEN
16 DESTROYED SOME TIME EARLY 1998?
17   A   YES. I WOULD SAY THAT'S PROBABLY TRUE.
18   Q   SO THERE IS NOW NO LONGER A WAY IN WHICH
19 SOMEONE COULD GO BACK TO CHECK THE ACCURACY OF THE
20 NUMBERS WHICH YOU RECORDED BACK IN DECEMBER OF 1997?
21   A   IN REGARD TO – THAT THE LOGS NO LONGER
22 EXIST, NO; THE REPORTS CANNOT BE RERUN TO VERIFY
23 ANYTHING.
24   Q   SO NOW THAT'S ALL IN EXISTENCE IS THE
25 STATISTICS THAT YOU RECORDED FOR THE GIVEN DATES
Page 14

1 BETWEEN DECEMBER 5TH, 1997, AND DECEMBER 12TH, 1997?
2    A   THAT'S CORRECT.
3    Q   AND TELL ME HOW YOU RECORD THOSE
4 STATISTICS. AND I WANT TO TALK SPECIFICALLY ABOUT THE
5 NUMBER OF PAGES VIEWED FOR THE THEATRICAL SITE
6 "MIDNIGHT IN THE GARDEN OF GOOD AND EVIL."
7    A   I GUESS – IN WHAT LEVEL OF DETAIL WOULD
8 YOU LIKE THAT ANSWER?
9    Q   WELL, LET'S JUST TAKE AN EXAMPLE, SUCH AS
10 HOW MANY PEOPLE VIEWED A PARTICULAR PAGE.
11        HOW DID YOU RECORD THAT BACK IN DECEMBER
12 OF 1997?
13   A   OKAY. THE PROGRAM WE USE, ANALOG, IS A
14 PROGRAM THAT WE ACTUALLY RUN AGAINST THE WEB SERVER
15 LOG FILES. AND PART OF ITS FUNCTION IS TO COUNT
16 PARTICULAR PAGES AND ALL OF THOSE OTHER ITEMS I
17 MENTIONED A LITTLE EARLIER.
18   Q   OKAY. BUT THEN DO YOU NOT HAVE TO
19 RERECORD IT YOURSELF SOMEWHERE ELSE SO THAT IT'S
20 STORED?
21   A   NO. ACTUALLY, THE PROGRAM ITSELF
22 GENERATES AN ELECTRONIC OUTPUT THAT'S ACTUALLY AN HTML
23 FILE THAT I DON'T HAVE TO MANIPULATE IN ANY WAY.
24   Q   AND THAT FILE FOR DECEMBER 5TH THROUGH
25 DECEMBER 12TH OF 1997, IT IS STILL IN EXISTENCE FOR
Page 15

1 THE THEATRICAL SITE "MIDNIGHT IN THE GARDEN OF GOOD
2 AND EVIL"?
3    A   YES, IT IS.
4    Q   HOW ABOUT RECORDING THE NUMBER OF TIMES
5 SOMEONE VIEWED YOUR HOME PAGE FOR DECEMBER 5TH THROUGH
6 DECEMBER 12TH, 1997? HOW WOULD YOU RECORD THAT?
7    A   USING THE SAME PROGRAM TO RUN -- TO
8 ANALYZE THE LOG FILES, AND THEN IT GENERATES THE HTML
9 FILE THAT CONTAINS THE REPORT.
10   Q   AND AS I UNDERSTAND, I HAVE BEEN INFORMED
11 THROUGH WARNER BROTHERS COUNSEL THAT YOU -- WELL, THAT
12 THE NUMBER OF ACCESS TO THE HOME PAGE FOR WARNER
13 BROTHERS, DECEMBER 5TH, 1997, THROUGH DECEMBER 12TH,
14 1997, IS APPROXIMATELY 118,035?
15       MR. STEWART: BART, DO YOU MEAN THE WARNER
16 BROTHERS ONLINE HOME PAGE?
17       MR. TURNER: RIGHT.
18       THE WITNESS: THE NUMBER OF UNIQUE IP ADDRESSES
19 THAT VISITED THE SITE DURING THAT WEEK, THAT DOES
20 SOUND CORRECT.
21 BY MR. TURNER:
22   Q   NOW, WHEN YOU SAY "UNIQUE," WHAT DO YOU
23 MEAN? IT SOUNDS LIKE SOME KIND OF A --
24       DO YOU DIFFERENTIATE "UNIQUE" FROM
25 "NORMAL"? WHAT'S THE DIFFERENCE?
Page 16

1    A   THE WAY THAT JUST THE NAVIGATION ON THE
2 WORLD WIDE WEB OPERATES IS THAT A PERSON FROM THEIR
3 COMPUTER CAN VISIT THE SAME -- THE SAME SITE MORE THAN
4 ONCE DURING A PARTICULAR PERIOD, LIKE SAY A PARTICULAR
5 24-HOUR PERIOD. AND BY "UNIQUE" I JUST MEAN THAT IF
6 THEY VISIT OUR -- IF AN I.P. ADDRESS VISITED OUR SITE
7 TEN TIMES DURING A PARTICULAR PERIOD, WE WOULD ONLY
8 COUNT IT ONCE.
9    Q   BUT WOULD YOU KNOW THE EXACT NUMBER,
10 THOUGH, OF THOSE OTHER TEN TIMES?
11   A   THIS SOFTWARE ACTUALLY DOES NOT
12 SPECIFICALLY TELL US BY IP ADDRESS HOW MANY TIMES A
13 VISIT WAS MADE. WE DO COUNT THE NUMBER OF PAGES,
14 THOUGH, THAT WERE VIEWED.
15   Q   OKAY.
16   A   AND SO LIKE IF THEY VISITED -- AN I.P.
17 ADDRESS VISITED OUR SITE TEN TIMES AND VIEWED A TOTAL
18 OF 30 PAGES, WE WOULD KNOW THAT THEY COUNT -- WE WOULD
19 COUNT 30 PAGES. BUT WE WOULD NOT SPECIFICALLY KNOW
20 THAT THAT IP ADDRESS HAD GENERATED THOSE 30.
21   Q   SO YOU'RE TELLING ME THAT THE 118,035,
22 SOME OF THOSE COULD BE THE SAME INDIVIDUAL?
23   A   IT'S POSSIBLE.
24   Q   OKAY. ARE YOU TELLING ME THAT OF THOSE
25 118,035, MORE THAN LIKELY NONE OF THE SAME INDIVIDUALS
Page 17

1 IN THE NUMBER WOULD BE GREATER IF YOU WERE COUNTING
2 THE SAME INDIVIDUAL?
3    A   I'M NOT SURE IF I QUITE UNDERSTAND THE
4 QUESTION.
5    Q   LET ME SEE IF I CAN GET DOWN TO MY LEVEL.
6    A   OKAY.
7    Q   AND YOU HELP ME OUT, MR. MC DANIELS. ALL
8 RIGHT?
9    A   ALL RIGHT.
10   Q   IS THIS A GROSS NUMBER, OR IS THIS
11 SOMEHOW LIMITED TO ONLY ONE VISIT PER PERSON, THE 118?
12   A   IT'S NOT LIMITED BY -- YOU KNOW, TO ONE
13 VISIT PER PERSON.
14   Q   OKAY.
15   A   WE REALLY DON'T HAVE ANY WAY OF COUNTING
16 THAT.
17   Q   ALL RIGHT. NOW, I ALSO UNDERSTAND THAT
18 YOU HAVE NUMBERS AS TO THE NUMBER OF TIMES THAT THE
19 INTERNET ICON FOR THE MOVIE "MIDNIGHT IN THE GARDEN OF
20 GOOD AND EVIL" WAS CLICKED ON DURING THAT SAME WEEK,
21 WHICH I'M INFORMED IS 19.
22       CAN YOU EXPLAIN WHAT STATISTICS YOU HAVE
23 FOR THAT QUESTION?
24       MR. STEWART: I'M SORRY. I COULDN'T HEAR THAT
25 QUESTION. WHAT STATISTICS YOU HAVE?
Page 18

1 BY MR. TURNER:
2    Q   DO YOU KNOW HOW MANY PEOPLE YOU HIT THE
3 "MIDNIGHT" ICON ON YOUR WARNER BROTHERS ONLINE HOME
4 PAGE BETWEEN DECEMBER 5TH, 1997, AND DECEMBER 12TH,
5 1997?
6        (WITNESS REVIEWING DOCUMENTS.)
7        THE WITNESS: YES. I DO HAVE -- I DO HAVE
8 STATISTICS FOR THAT.
9 BY MR. TURNER:
10   Q   OKAY. AND WHAT IS THAT?
11   A   FROM THE REPORTS THAT WE RUN ON THE
12 "MIDNIGHT IN THE GARDEN OF GOOD AND EVIL" SITE AND
13 UNDER THE REFERRER REPORT, I CAN LOOK FOR -- WHAT I
14 DID IS I LOOKED FOR THE REFERENCE INDICATING A LINK
15 FROM THE MAIN WARNER BROTHERS SITE. AND IT SHOWS UP
16 AS WARNERBROS.COM/TOC.HTML. THAT'S THE PAGE THAT
17 ACTUALLY HAD THE ICON.
18   Q   SO YOU'RE BACKTRACKING. YOU'RE GOING
19 FROM THE WARNER BROTHERS -- YOU'RE GOING FROM THE
20 THEATRICAL SITE FOR "MIDNIGHT" BACKWARDS TO SEE
21 ANYTHING THAT CAME FROM THE HOME PAGE?
22   A   THAT'S CORRECT. AND THAT'S BECAUSE OF
23 THE -- FOR THE REASON THAT I MENTIONED EARLIER.
24       WHEN SOMEONE CLICKS ON A LINK TO GO
25 SOMEWHERE ELSE, THAT INFORMATION IS NOT RECORDED AT
Page 19

**Page 20**

1 THE SOURCE, YOU KNOW, THE SERVER THEY'RE LINKING FROM;
2 IT'S RECORDED AT THE DESTINATION. SO THE ONLY WAY I
3 COULD FIND OUT HOW MANY TIMES PEOPLE CLICK ON A LINK
4 FROM ONE SITE TO ANOTHER WOULD BE TO GO TO THE
5 DESTINATION SITE AND SEE HOW MANY TIMES IT SAID I HAD
6 LINKS THAT CAME FROM, YOU KNOW, THE ORIGIN SITE.
7          DOES THAT MAKE SENSE?
8     Q   I THINK I UNDERSTAND.
9     A   OKAY.
10    Q   ALL RIGHT.
11    A   THE NUMBER 19, THAT IS -- THAT WAS
12 CORRECT. THAT WAS THE COUNT THAT WE GOT BY LOOKING AT
13 THE REPORTS FOR THAT TIME PERIOD FOR THE "MIDNIGHT IN
14 THE GARDEN OF GOOD AND EVIL" SITE.
15    Q   NOW, HAVE YOU GONE THROUGH TO MAKE A
16 DETERMINATION OF HOW MANY TIMES THE OTHER ICONS WERE
17 USED?
18    MR. STEWART: DURING THAT SAME WEEK?
19    MR. TURNER: YES.
20    THE WITNESS: NO; NOT IN THE SAME LEVEL OF
21 DETAIL.
22 BY MR. TURNER:
23    Q   BUT YOU COULD DO THAT, COULDN'T YOU?
24        YOU WOULD JUST GO TO WHEREVER THE
25 DESTINATION FOR THOSE ICONS WERE AND THEN BACKTRACK?

**Page 21**

1     A   THAT'S CORRECT. I COULD DO THAT.
2     Q   AND FIND OUT HOW MANY CLICKS CAME FROM
3 THE HOME PAGE TO GET TO THAT DESTINATION SITE.
4     A   YES; THAT'S CORRECT. I WOULD BE ABLE TO
5 DO THE SAME -- THE SAME PROCESS WITH ANY OF THE OTHER
6 LINKS ON THE MAIN HOME PAGE DURING THAT TIME.
7     Q   HOW DIFFICULT IS THAT TO DO?
8         HOW DIFFICULT WAS IT TO DETERMINE HOW
9 MANY LINKS CAME FROM THE ICON FOR "MIDNIGHT"?
10    A   IT WASN'T THAT DIFFICULT, BECAUSE IT'S
11 PART OF THE REPORTS THAT WE REGULARLY RUN. IT'S JUST
12 A MATTER OF GOING AND COLLECTING THE INFORMATION.
13    Q   HAVE YOU TRIED TO MAKE A DETERMINATION OF
14 HOW MANY LINKS YOU HAVE FROM THE "MIDNIGHT" ICON FOR
15 ANY OTHER WEEKS, OTHER THAN DECEMBER 5TH THROUGH THE
16 12TH?
17    A   YOU MEAN HAVE I DONE KIND OF THE SAME
18 PROCESS FOR ANY OTHER TIME PERIOD BUT THE WEEK OF
19 THE --
20    Q   RIGHT. IN WHICH THE "MIDNIGHT" ICON
21 APPEARED ON THE HOME PAGE.
22    MR. STEWART: I OBJECT TO THE QUESTION. IT
23 ASSUMES FACTS NOT IN EVIDENCE.
24    MR. TURNER: I ASKED HIM IF HE HAS.
25    MR. STEWART: YOU ASKED HIM IF HE HAS FOR OTHER

**Page 22**

1 WEEKS THAT THE ICON APPEARED.
2    MR. TURNER: RIGHT.
3    MR. STEWART: THERE'S NO TESTIMONY THAT THE ICON
4 APPEARED ANY OTHER WEEKS.
5    MR. TURNER: NO, NO, NO. I'M SORRY. LET ME
6 BACK UP.
7    Q   HAVE YOU MADE A DETERMINATION IF THERE
8 WAS AN ICON FOR "MIDNIGHT IN THE GARDEN OF GOOD AND
9 EVIL" FOR ANY OTHER WEEKS OTHER THAN 5 -- DECEMBER 5TH
10 OF 1997 THROUGH DECEMBER 12TH OF 1997?
11    A   NO, I HAVEN'T. BUT THAT'S -- IT'S NOT
12 REALLY PART OF MY NORMAL JOB FUNCTION TO MONITOR WHAT
13 IS IN THE CONTENT.
14    Q   WELL, IS WHAT YOU'RE DOING TODAY PART OF
15 YOUR NORMAL JOB FUNCTION, GIVING A DEPOSITION?
16    A   NO. I DON'T THINK I NORMALLY HAVE
17 DEPOSITIONS.
18    Q   OR RETRIEVING INFORMATION FOR A SPECIFIC
19 CASE IN LITIGATION, IS THAT PART OF YOUR NORMAL JOB
20 FUNCTION?
21    A   PROVIDING SITE STATISTICS, YOU KNOW, FOR
22 THE PURPOSE THAT I'M DIRECTED TO IS PART OF MY JOB
23 FUNCTION.
24    Q   SO IF SOMEONE HAD ASKED YOU TO LOOK AT
25 OTHER WEEKS, THEN THAT WOULD BE PART OF YOUR JOB

**Page 23**

1 FUNCTION?
2     A   YES; I SUPPOSE IT WOULD BE.
3     Q   OKAY. BUT NO ONE HAS DONE THAT?
4     A   NO.
5     MR. TURNER: ALL RIGHT. LET ME SEE.
6         DAVID, THERE WERE SOME DOCUMENTS THAT
7 WERE PRODUCED. DOES HE HAVE THOSE WITH HIM?
8     MR. STEWART: I DON'T KNOW. GIVE ME.
9     MR. TURNER: IN OTHER WORDS, THEY WERE SUPPOSED
10 TO BE GIVEN TO THE COURT REPORTER, BUT I DON'T KNOW IF
11 HE DID OR NOT.
12    MR. STEWART: WE PRODUCED DOCUMENTS THAT I THINK
13 HE'S TALKING ABOUT, TWO SETS OF REPORTS. THEY'RE WEB
14 SERVER STATISTICS THAT BEAR OUR BATES NUMBERS 25
15 THROUGH 32, AND THEN A REFERRER REPORT WHICH BEARS OUR
16 BATES NUMBER 33 THROUGH 45.
17        ARE THOSE WHAT YOU'RE TALKING ABOUT?
18    MR. TURNER: YES. CAN HE AUTHENTICATE ANY OF
19 THOSE DOCUMENTS?
20    MR. STEWART: I BELIEVE HE CAN.
21        MR. MC DANIELS, DO YOU HAVE THOSE
22 DOCUMENTS WITH YOU?
23    THE WITNESS: YES, I DO. I HAVE THEM RIGHT
24 HERE.
25    MR. TURNER: OKAY. LET ME JUST HOLD FOR A

**Page 24**

1 SECOND. TODD WAS PULLING ME A COPY ALSO. I'LL GET
2 RIGHT BACK ON IN A SECOND.
3    (DISCUSSION HELD OFF THE RECORD.)
4    MR. STEWART: DO YOU HAVE THE SAME BATES
5 NUMBERS, STEVE, THAT I JUST GAVE YOU?
6    MR. PENA: YES. HE'S GOT THE ONES THAT ARE
7 BATES NUMBERED, TOO.
8    MR. STEWART: WOULD YOU TAKE A LOOK AT THOSE AND
9 CONFIRM THAT WE'RE LOOKING AT THE SAME THING?
10    THE WITNESS: THE NUMBER IS 25 THROUGH 45,
11 WB0OO25 --
12    MR. STEWART: THAT'S CORRECT.
13    (WITNESS REVIEWING DOCUMENTS.)
14    THE WITNESS: YES. I DO HAVE THOSE RIGHT HERE
15 IN FRONT OF ME.
16    MR. STEWART: OKAY.
17    MR. TURNER: DAVID?
18    MR. STEWART: YES.
19    MR. TURNER: OKAY. I WANT HIM TO JUST IDENTIFY
20 WHAT THESE DOCUMENTS ARE. I'M NOT GOING TO ATTACH
21 THEM TO THE RECORD; I'M JUST GOING TO REFER TO THEM
22 WITH YOUR BATES STAMP NUMBER. IS THAT ALL RIGHT?
23    MR. STEWART: THAT'S FINE. WE WILL STIPULATE TO
24 THEIR AUTHENTICITY, IF YOU WOULD LIKE US TO DO THAT AS
25 WELL.

**Page 25**

1    MR. TURNER: I JUST WANTED TO KIND OF GET THE
2 LAY OF THE LAND AS TO WHAT THESE MEAN.
3    MR. STEWART: OKAY. THAT'S FINE.
4    MR. TURNER: AND HE --
5    MR. STEWART: WOULD YOU -- I'M SORRY, BART.
6 WOULD YOU REFER TO THE DOCUMENTS -- WHEN YOU TALK
7 ABOUT THEM, WOULD YOU REFER TO THEM BY THE BATES
8 NUMBERS THAT I KNOW --
9    MR. TURNER: ABSOLUTELY.
10    MR. STEWART: -- SO THAT I KNOW WHICH PAGE IN
11 THE DOCUMENTS YOU'RE TALKING ABOUT?
12    MR. TURNER: THAT'S WHAT I'M GOING TO DO.
13    Q   ALL RIGHT. MR. MC DANIELS?
14    A   YES.
15    Q   OKAY. THERE IS A NUMBER FOR EACH OF
16 THESE DOCUMENTS IN THE LOWER RIGHT-HAND CORNER. IT
17 STARTS WITH A WB AND IS PRECEDED BY THREE ZEROES, AND
18 THEN IT HAS A NUMERAL.
19        WE'LL START WITH THE FIRST ONE, 25.
20    A   OKAY. I HAVE THAT RIGHT HERE.
21    Q   OKAY. COULD YOU TELL ME WHAT THAT IS?
22    A   IT'S THE FIRST PAGE OF OUR DAILY SITE
23 STATISTICS REPORT FOR THE MAIN WARNER BROTHERS SITE
24 FOR DECEMBER 5TH, 1997.
25    Q   OKAY. THE MAIN WARNER BROTHERS SITE.

```
0001
 1            UNITED STATES DISTRICT COURT
              SOUTHERN DISTRICT OF GEORGIA
 2                 SAVANNAH DIVISION
 3
    CIVIL ACTION NO. CV497-340
 4  - - - - - - - - - - - - - - - - - - - - - - X
    JACK LEIGH,
 5                              Plaintiff
 6              versus
 7  WARNER BROTHERS, INC. A DIVISION OF TIME
    WARNER ENTERTAINMENT COMPANY, L.P.,
 8                              Defendants
    - - - - - - - - - - - - - - - - - - - - - - X
 9
10
11            D E P O S I T I O N
12       The deposition of JANE S. KINNE was taken
13  pursuant to Notice at the offices of Day, Berry &
14  Howard, One Canterbury Green, Stamford,
15  Connecticut, before Viktoria V. Stockmal, a
16  Notary Public in and for the State of
17  Connecticut, on Tuesday, December 1, 1998, at
18  9:19 a.m.
19
20
21
22
23
24
25
```

```
0002
 1  A P P E A R A N C E S:
 2
 3       ATTORNEYS FOR THE PLAINTIFF
 4            DEVEAU, COLTON & MARQUIS
              Two Midtown Plaza, Suite 1400
              1360 Peachtree Street, N.E.
 5            Atlanta, GA  30309-3209
              (404) 875-3555
 6
 7       BY:  TODD DEVEAU, ESQ.

    AND VIA TELEPHONE
 8
 9            SAVAGE, HERNDON & TURNER, P.C.
              304 East Bay Street
              P.O. Box 8969
10            Savannah, GA  31412-8969
              (912) 231-1140
11
12       BY:  ROBERT BARTLEY TURNER, ESQ.
13
         ATTORNEYS FOR THE DEFENDANT
14
              ALSTON & BIRD
15            One Atlantic Center
              1201 West Peachtree Street
16            Atlanta, GA  30309-3424
              (404) 881-7000
17
18       BY:  DAVID J. STEWART, ESQ.
19
20  ALSO PRESENT
21            VIA TELEPHONE, JACK LEIGH
22
23
24
25
```

Page 33
(1) cases whether he was actually successful in
(2) reaching settlement with the other side?
(3) A I know that the cases were settled.
(4) Whether he did or the lawyer did and exactly how
(5) it came about, I do not know.
(6) Q So you don't know what the settlement
(7) amount was?
(8) A That is correct.
(9) Q I believe you said this is an industry
(10) standard; is that right?
(11) A It's an industry custom and practice I
(12) think would be a better way of putting it.
(13) Q What industry are we talking about?
(14) A The stock photo industry.
(15) Q How does the industry decide what
(16) gets three times and what gets ten times or
(17) anything in between?
(18) A Again, I think everybody is using
(19) their own understanding of how much time it takes
(20) to reach an agreement, how much time and actual
(21) money has gone into effecting the settlement.
(22) Q By money, are we talking about court
(23) costs?
(24) A Court costs, lawyers fees, transcripts
(25) if necessary.

Page 34
(1) Q So if there's not much money invested
(2) in the case, it would be three times; is that
(3) right?
(4) A The industry basically feels the three
(5) times is applicable to those clients who find
(6) they have a problem and step forward and
(7) immediately settle the matter. I suspect that
(8) there are some who would let it go a little
(9) longer than immediately. But that's an
(10) individual call. I mean you know how much time
(11) and effort you've put into something.
(12) Q The three times, if somebody steps
(13) forward immediately, then there really isn't any
(14) time or cost involved at that point; is that
(15) right?
(16) A Except possibly a few phone calls.
(17) Q What's the purpose of the three times
(18) multiplier in that context?
(19) A The basic feeling that the industry
(20) operates on the granting of licenses prior to
(21) publication and payment prior to publication.
(22) And that anyone who fails to do that does not get
(23) the same rate that all of the people who did it
(24) the right way do.
(25) Q So it's intended to punish them?

Page 35
(1) A It's intended to be a remainder that
(2) this is not the way it's done.
(3) Q So it's intended to punish them?
(4) A If that's the definition of
(5) punishment, yes.
(6) Q And is it also done to deter image
(7) buyers from doing the same thing again in the
(8) future?
(9) A Making mistakes, yes. Trying to
(10) discourage the making of mistakes.
(11) Q Same thing true with the ten times
(12) multiplier?
(13) A I think that speaks more to making the
(14) photographer and the agent whole from any
(15) expenses that they have incurred in trying to
(16) reach the settlement.
(17) Q Why would you use a multiplier? Why
(18) wouldn't you just figure out what the attorneys
(19) fees are and court costs are and other applicable
(20) costs and just tack that on to the license fee?
(21) A That probably is a very good
(22) negotiating court proposal.
(23) Q Isn't that in fact all of what these
(24) stock agencies do?
(25) A That refers to actual court judgments,

Page 36
(1) I believe.
(2) Q Here I'm referring at this point to
(3) the delivery memos marked Defendant's Exhibits 4
(4) through 7. But there's probably some part of
(5) this multiplier even after a lawsuit's filed that
(6) is intended to try to keep photo buyers from
(7) forcing stock agencies to litigation again in the
(8) future; isn't that--
(9) A Our interest in a retroactive license
(10) is to avoid litigation.
(11) Q That doesn't really answer the
(12) question, though. The purpose of this three to
(13) ten times multiplier, even after litigation is
(14) filed, that's really at least intended in part,
(15) isn't it, to try to let people know-- deter them
(16) from making unauthorized use and forcing stock
(17) houses from going to litigation in the future?
(18) A In part, yes.
(19) Q Have you ever seen a delivery memo
(20) that included a ten times multiplier?
(21) A I don't recall that I have.
(22) Q Have you ever seen any industry
(23) publication that included a reference to the ten
(24) times multiplier?
(25) A I believe that there have been

Page 37
(1) discussions in the pack of Picture Agency Council
(2) reviews and updates, not in the legal handbook.
(3) Q Do you have any of those reviews and
(4) updates?
(5) A I probably do not at this point in
(6) time.
(7) Q Have you looked to see whether you
(8) have them?
(9) A No, I haven't.
(10) Q Might you have them?
(11) A I only keep about two months worth.
(12) These come out weekly. And I basically tend to
(13) discard them after about eight weeks.
(14) Q These are printed documents?
(15) A They come either by fax or e-mail,
(16) yeah.
(17) Q So you have a hard copy of them?
(18) A Yes.
(19) Q If you had retained them?
(20) A If they are within the last eight
(21) weeks or so.
(22) Q But you haven't looked to see if you
(23) have anything in the last eight weeks?
(24) A No, I have not.
(25) Q Why not?

Page 38
(1) A Because basically anything that has
(2) been agreed upon and standard gets reflected in
(3) the handbook. And I wouldn't look to the update
(4) necessarily for a memorialization of it.
(5) Q Ms. Kinne, let me ask you to take a
(6) look at the document request set forth in my
(7) subpoena to you. This is Defendant's Exhibit 1.
(8) Look at document number 7 which requests
(9) documents from or approved by the Picture Agency
(10) Council of America, it lists some other
(11) associations, which relate in any manner to
(12) recommended fees for the licensing of
(13) photographs. Wouldn't you agree that documents
(14) related to the ten times multiplier is responsive
(15) to that document request?
(16) A I would now that you phrased it that
(17) way. I read it originally and I was thinking of
(18) reproduction fees per se.
(19) Q But a ten times multiplier is a
(20) retroactive license?
(21) A It's a method of arriving at.
(22) Q So it is a license fee?
(23) A Now that you described it that way, I
(24) would agree with you.
(25) Q Can we have an agreement that you will

(1) it would be if it were just a puzzle you can buy at
(2) Toys R Us?
(3) **A** Well I think for one thing, you are
(4) selecting. Toys R Us sort of sounds like here come
(5) the masses. I don't know that it-- I would not if it
(6) were me.
(7) **Q** Because you would be concerned that it
(8) would lessen the value of the photograph?
(9) **A** Well maybe I have such a-- Yes. Because I
(10) have a feeling, a very deep feeling that if very,
(11) very carefully handled, this image could be
(12) incredibly valuable and have a reputation.
(13) But part of that, you know, is already—
(14) it's been an icon. I mean that's happened. So there
(15) are decisions to be made and fortunately they are not
(16) mine, so I don't have to worry about it.
(17) **Q** An unauthorized icon that was only on the
(18) Internet for a week, that's not really going to take
(19) away from Mr. Leigh's market that much, is it?
(20) **A** I think it's done something rather serious
(21) to it. But that's my opinion.
(22) **Q** What has it done that's rather serious?
(23) **A** I think that that tiny piece of that
(24) picture, even if it only sat there for a week for
(25) 700,000 people or whatever it was, definitely

Page 238
(1) impacted it.
(2) **Q** What if the number of accesses were
(3) 100,000?
(4) **A** Again, you know, it's sort of like saying
(5) what if it was only 50,000. It's still-- it still
(6) has impacted the picture-- and especially to me the
(7) minuscule part thereof. I think that is partly
(8) what's offensive to me.
(9) **Q** Why is that?
(10) **A** It just doesn't convey what that picture
(11) is. And I think it's wrong. That's all I can say.
(12) **Q** You said the little part, we are still
(13) talking about my client's Internet icon?
(14) **A** The icon.
(15) (Defendant's Exhibit 14 was marked for
(16) identification: Color copy of web site
(17) screen.)
(18) BY MR. STEWART:
(19) **Q** Ms. Kinne, I'm handing you a document
(20) which has been marked as Defendant's Exhibit 14. I
(21) will represent to you this is a document that was
(22) produced to us by Mr. Leigh's counsel. Do you
(23) recognize this document?
(24) **A** Yes, I do.
(25) **Q** And the "Midnight in the Garden of Good

Page 239
(1) and Evil" icon on page 1 of this document, is this
(2) the icon you're talking about?
(3) **A** Yes.
(4) MR. STEWART: Could I have you read
(5) back the witness's answer before I had you mark
(6) this exhibit.
(7) (Whereby, the following questions and
(8) answers were read:
(9) "QUESTION: What if the number of
(10) accesses were 100,000?
(11) "ANSWER: Again, you know, it's sort
(12) of like saying what if it was only 50,000.
(13) It's still-- it still has impacted the
(14) picture-- and especially to me the
(15) minuscule part thereof. I think that is
(16) partly what's offensive to me.
(17) "QUESTION: Why is that?
(18) "ANSWER: It just doesn't convey what
(19) that picture is. And I think it's wrong.
(20) That's all I can say.
(21) "QUESTION: You said the little part,
(22) we are still talking about my client's
(23) Internet icon?
(24) "ANSWER: The icon.")
(25) BY MR. STEWART:

Page 240

(1) **Q** It's your opinion the portion of
(2) Mr. Leigh's photograph used in this icon does not
(3) convey the meaning of this photograph?
(4) **A** It doesn't. The disproportionate emphasis
(5) on the lettering and the small size and the instinct
(6) nature now I will admit-- this is a copy. And some
(7) of what's bothering me may be inherent in the copies.
(8) But I doubt it. I think it is the reduced size and
(9) the greater emphasis on the type.
(10) **Q** We produced an electronic-- we being
(11) Warner Brothers-- produced an electronic copy of this
(12) icon to Mr. Leigh in discovery in this case. Have
(13) you seen that?
(14) **A** No, I have not.
(15) **Q** You testified this photograph doesn't
(16) convey the meaning. It doesn't convey the mood
(17) either I take it?
(18) **A** That's correct. The lights and darks are
(19) almost indistiguishable here.
(20) **Q** It's hard to tell this is even Mr. Leigh's
(21) photograph, isn't it?
(22) **A** I think it looks like Mr. Leigh's
(23) photograph that has been badly reproduced.
(24) **Q** How does-- again, getting back to the
(25) place we started going down this road, how does this

Page 241
(1) impact the value of the photograph?
(2) **A** The same way that a bad copy of anything
(3) impacts it. It cheapens it.
(4) **Q** Do you know if Mr. Leigh's gotten any less
(5) for the licensing of his photograph since this use of
(6) his photograph by my client?
(7) **A** I do not know.
(8) **Q** Do you think this use has a monetary
(9) impact on the value of the photograph?
(10) **A** It may. I think we're going to be a while
(11) before we find that out.
(12) **Q** That's just speculation on your part at
(13) this point, though, isn't it?
(14) **A** It's speculation based on other types of
(15) experience.
(16) **Q** Well have you had other experience where
(17) photographs were used? As you said, a minuscule part
(18) was used in an Internet icon.
(19) **A** Not on an Internet icon, but other very
(20) small reproductions.
(21) **Q** Minuscule reproductions?
(22) **A** Yes. I would say minuscule compared to
(23) the original, yes.
(24) **Q** And how is it used?
(25) **A** The one that I think of in particular is a

Page 242
(1) very small little collector's card that was made of a
(2) very beautiful print.
(3) **Q** Who was-- was that a painting as opposed
(4) to a photograph?
(5) **A** No, it was a photograph.
(6) **Q** Who was the photographer?
(7) **A** The photographer was a man name Henri
(8) Lartigue.
(9) **Q** What's the photograph of?
(10) **A** It's an 1870 to -90s shot of a little
(11) girl.
(12) **Q** Was it taken in the 1870s to 1890s?
(13) **A** Yes.
(14) **Q** When was it put on the collector's card?
(15) **A** The late 1980s.
(16) **Q** Let me make sure I'm clear on this. The
(17) photograph itself was taken in 1870 to 1890, in that
(18) time frame?
(19) **A** Yes.
(20) **Q** You're familiar with the term copyright
(21) under the copyright law as I see from your expert
(22) witness report. This photograph isn't even protected
(23) by copyright?
(24) **A** This photograph is protected under French
(25) law and has a longer copyright than we are accustomed

Page 243

(1) **Q** I don't see reflected in this list the
(2) subject matter of the photograph. Is that a factor?
(3) **A** I think-- I think I have said it, and
(4) based not only on the image itself, but the whole
(5) paragraph starts with photo-- Midnight in the
(6) Garden-- "Midnight in Bonaventure Cemetery, Savannah,
(7) Georgia" photograph by Jack Leigh are based not only
(8) on the image. That means the subject matter, the
(9) treatment, the image as it exists.
(10) **Q** Let's say we are in the context of using
(11) these factors in arriving at a license for editorial
(12) use. Assuming two quality photographs, would it make
(13) any difference whether the photograph was of a
(14) mountain or of a sports scene?
(15) **A** Depending on what facts are being conveyed
(16) by the editorial piece, I would assume it would make
(17) a difference.
(18) **Q** Would that impact the price assuming
(19) generally the same type-- same quality of photograph,
(20) general availability of images?
(21) **A** Not normally, although you can always find
(22) instances if you make these big general statements if
(23) it were Mount St. Helen's before the explosion, yeah,
(24) it would make a difference.
(25) **Q** Yeah, I'm not talking about that.

Page 268

(1) **A** Yeah. But in general the subject matter
(2) of the photo as long as it is appropriate to the
(3) usage doesn't send the picture-- the price up or down
(4) when you are dealing in stock.
(5) **Q** How about if you had the same photograph
(6) and it's of interest to two different consumer
(7) magazines, one directed at senior citizens issues and
(8) the other directed at automotive repair, assuming
(9) comparable circumstance, would the nature of the
(10) publication that the photograph is being licensed
(11) for, would that impact the licensing fee?
(12) **A** I think that depends on the career goals
(13) of the photographer involved. If he has a reason for
(14) wishing to be more closely allied to the automotive,
(15) maybe he wants to be a photographer of race cars,
(16) here's a chance to make it. If he wants nothing
(17) whatsoever to do with that world and wants to be
(18) known as a great human-- involved in all the human
(19) aspects, etc., he would want to go the other way.
(20) **Q** Let's assume this is a pure commercial
(21) enterprise for the photographer and no special
(22) interests like that. Would favoring licensing one or
(23) the other, would it make any difference the subject
(24) matter of the publication itself? Assuming same type
(25) of use of the photograph, same size, same

Page 269

(1) circulation.
(2) **A** As long as he has no severe aversions, and
(3) believe me photographers will give you a list of I
(4) don't want to be involved in any political cause, I
(5) don't care what they offer you for money. Many of
(6) them will not be involved with oil companies because
(7) they feel environmentally that's wrong. There are
(8) all of these-- this is one thing that makes being a
(9) very good and faithful agent difficult.
(10) **Q** Do you know of any types of uses that
(11) Mr. Leigh won't license his photographs for?
(12) **A** I don't know of specific subjects. I
(13) think there is a feeling in what he is doing of
(14) wanting the integrity of the image to be preserved.
(15) **Q** The integrity of the image is preserved in
(16) the nature of the using, you don't know for a fact
(17) whether there are any particular restrictions?
(18) **A** I never asked him whether he is
(19) particularly averse to any of these particular areas.
(20) **Q** Let's go over each of these factors that
(21) you have in paragraph 32 of page 3 of your report.
(22) The first is the image itself. I believe we've
(23) spoken about that probably already, haven't we?
(24) **A** I think we've covered that very well.
(25) **Q** The type or types of reproductions to be

Page 270

(1) made. What do you mean by that?
(2) **A** Is it a cover or is it an inside use. Is
(3) it going to be prominent, well displayed, or is it
(4) going to be insignificant. Which may be covered in
(5) some of the others. Is this something that you take
(6) home and almost immediately discard, or do you keep
(7) it around for a while?
(8) **Q** Importance of the image to the item on
(9) which it is reproduced. Does that mean anything more
(10) than what it says?
(11) **A** No. It's one reason why covers for
(12) instance command greater prices than interior.
(13) **Q** I will skip down to the photographer
(14) credit, the second to the last line. Whether the
(15) photographer will receive a prominent credit. How
(16) does that factor into the licensing of the
(17) photograph?
(18) **A** If the photographer is going to be
(19) obviously credited every time somebody looks at the
(20) image, that is an advertising value. It really has
(21) nothing to do with these other factors. Depending on
(22) the photographer, some of them feel that's dreadfully
(23) important, others who have been around a while
(24) probably feel I put out my own advertising pieces and
(25) so on, I like credits when I can get them, but don't

Page 271

(1) let it throw you. Don't let it influence matters too
(2) much.
(3) **Q** So the value of a credit is factored into
(4) the license fee?
(5) **A** Certainly in many situations, yes.
(6) **Q** When would it not be factored in?
(7) **A** I think we have all come to be more
(8) concerned about this overall than we used to. For
(9) instance, for years everybody said look, you get paid
(10) more for commercial usage, forget about credits.
(11) They are not going to happen. Well they do happen
(12) now. And you can very definitely negotiate for the
(13) inclusion of a credit.
(14) **Q** So now pretty much the credit issue is
(15) addressed with the fee that you pay for a photograph?
(16) **A** Yeah. Unless like a textbook, it's a
(17) given. They do not use pictures without credits. So
(18) you don't bother talking about it very much.
(19) **Q** The next factor is the previous earning
(20) history of the image. Does that just mean what the
(21) photographer's made from licensing that photograph in
(22) the past?
(23) **A** Yeah. If it's frequently selling at very
(24) substantial prices, whoever is about to buy it again
(25) better realize it and realize they are not going to

Page 272

(1) get one of these generic prices. That means there
(2) are a zillion of these around that aren't selling.
(3) **Q** How about the last factor, the degree of
(4) difficulty in obtaining the image. We talked about
(5) that a little bit. But tell me what you mean by that
(6) when you use that expression?
(7) **A** Exactly to what lengths, meaning possibly
(8) travel, possibly personal risk, did the photographer
(9) have to go to be able to get this image on film. Now
(10) a real easy example for me that you probably have
(11) seen these images, but the pictures of the Statue of
(12) Liberty where you are looking her straight in the eye
(13) and you are up close, believe me, there was a degree
(14) of personal risk that I still maintain that
(15) photographer was out of his mind because he was
(16) climbing and hanging off of virtually nothing to get
(17) it.
(18) **Q** One of the issues I've read about in some
(19) material in the photography field is the nature of
(20) the use. And I've seen a variety of folks refer to a
(21) breakdown of three different types of uses of a
(22) photograph: Advertising, corporate and editorial.
(23) **A** That's common. You sound like you've
(24) been reading Mr. Pickerell.
(25) **Q** I've not read Mr. Pickerell, but I have

Page 273

**LEIGH VS. WARNER BROTHERS, INC.**                                    **DECEMBER 1, 1998**

(1) was handled immediately and perhaps only a double fee
(2) was paid. I can't pinpoint them, but that is, from
(3) general discussions within these seminars about how
(4) to handle disputes, etc. I feel quite confident that
(5) there are those that have been settled via
(6) negotiation for somewhere in the neighborhood of
(7) double.
(8) Q Are you aware of any situations where what
(9) was paid was the pre-unauthorized use license fee?
(10) If the user pays that fee, are you aware of any
(11) situations where it settled on that basis?
(12) A I am not aware of what.
(13) Q Never heard of that?
(14) A I have not.
(15) Q Have you been involved in any disputes
(16) yourself where three times multiplier has been
(17) applied to settle the matter?
(18) A I have where it was done very promptly,
(19) the minute the-- the Harcourt one was done. The
(20) impression given is please tell us what we have to do
(21) to get out of this mess and that's it.
(22) Q Any others?
(23) A That I personally have done?
(24) Q You personally have done.
(25) A There are others. Boy, at the moment let

Page 292
(1) me consider what they were. I think I've handled one
(2) or two that were brochure usages, advertising usages
(3) of smaller consequence, brochure type, where things
(4) do get out of control sometimes. Some of that goes
(5) back to my actual Comstock days. That's where it
(6) first began to appear.
(7) Q So just a couple times in your own
(8) personal experience?
(9) A That I personally handled, yes.
(10) Q How many disputes have you been involved
(11) in where you personally handled the dispute over the
(12) unauthorized use of a photograph?
(13) A Certainly not in the last five years. I'm
(14) always consulting and the folks at Geographic have to
(15) do the final--
(16) Q But are you aware of what gets paid to
(17) settle those?
(18) A Yes, in some cases. Not all.
(19) Q Going back to your Comstock days, you
(20) would have had control, wouldn't you, over what was
(21) paid?
(22) A I would have had very important input into
(23) it.
(24) Q You would have known what was paid?
(25) A I would have seen the invoice at some

Page 293
(1) point.
(2) Q How many disputes have you been involved
(3) in involving unauthorized use of photographs?
(4) A Across board?
(5) Q I want to broaden this question, I don't
(6) mean just disputes. I mean instances where someone's
(7) made unauthorized use of the photograph that you had
(8) involvement with.
(9) A Oh, in the last couple of years at
(10) Comstock, there must have been several hundred of
(11) them.
(12) Q Only a couple of those times there was a
(13) three times multiplier settlement?
(14) A A number of times there were. And I
(15) wouldn't want to guess what the number was. Because
(16) once the parties were talking and I said they really
(17) mean to get rid of this, you know what the parameters
(18) are, do it and let me see the invoice.
(19) Q Do you know what the percentage of those
(20) cases would be three times?
(21) A Boy, that's hard. I would say half or
(22) slightly more.
(23) Q How about the other half?
(24) A They may have been clients who bought 400
(25) photographs and skip, missed one or two in which case

Page 294

(1) we undoubtedly would have accepted a double fee.
(2) Q So there are other important factors that
(3) weigh into the settlement?
(4) A As in any negotiation in any difficulty,
(5) there are other mitigating circumstances.
(6) Q So the three times multiplier, you don't
(7) intend to mean by that, that that's just an
(8) out-of-pocket, it applies without exception?
(9) A No. But it's a good guideline.
(10) Q Do the four A's agree that there's an
(11) applicable three times multiplier?
(12) A I don't think they have ever agreed with
(13) the concept of a total set of terms and conditions
(14) let alone the three times. It's just-- just as we
(15) might not agree to every purchase order that is
(16) issued by an ad agency. It's just not in their
(17) interest to come out and agree to it.
(18) Q What percentage of the time does the stock
(19) agency's delivery memo get used as the ultimate
(20) agreement?
(21) A The delivery memo? No. The terms on the
(22) invoice would be the ultimate agreement. In many
(23) cases they are the same.
(24) Q Terms on the agreement, are they always
(25) the stock photo agency's terms?

Page 295
(1) A No, there are occasions where you will
(2) waive a clause.
(3) Q Including the three times multiplier?
(4) A I know of anywhere that has come
(5) into it. I know that there are cases where the
(6) credit line is sometimes waived. The holding period
(7) gets waived in writing quite frequently.
(8) Q Are there times where the buyer's terms
(9) get used?
(10) A I'm sure there are.
(11) Q Does that happen a lot?
(12) A Not where I have been working. By and
(13) large the terms on the invoice are the last set of
(14) things that go between the parties.
(15) Q The terms on whose invoice?
(16) A On the stock photo invoice. Certainly the
(17) buyer's not issuing an invoice.
(18) Q And the terms of that are those generally
(19) the PACA terms that we've looked at earlier?
(20) A The PACA or the ASMP terms which are very
(21) similar.
(22) Q Skipping ahead to the ten times multiplier
(23) that we talked about earlier. Again, I'm not going
(24) to spend a lot of time on this. The-- your report
(25) said--

Page 296
(1) (There was a brief interruption.)
(2) BY MR. STEWART:
(3) Q The second paragraph on page 4 of your
(4) expert witness report says, "The industry, when
(5) forced to wait and to file papers prior to a legal
(6) resolution of the matter uses a fee of up to ten
(7) times the normal fee." Does that mean that sometimes
(8) the fee is a less than ten times?
(9) A That depends on what stage of the
(10) proceeding. Basically, as I said this morning.
(11) Between three and ten gets determined by how much
(12) time and how much resources have been expended to get
(13) to the retroactive license.
(14) Q And you've applied a ten times figure
(15) here?
(16) A Yes, I have.
(17) Q Why is that?
(18) A Because I feel that we've expended a great
(19) deal of time and effort; and I think that is my basic
(20) reason.
(21) Q What do you know about the time and effort
(22) that's been expended?
(23) A I certainly know this has been discussed
(24) for months, a number of months. I know that there
(25) have been depositions other than my own. And that

Page 297

(1) was my judgment. That we had reached the ten times
(2) point.
(3) Q Was there a certain volume that triggers
(4) the ten times in your mind? A certain period of
(5) time? Why isn't the eight?
(6) A Mainly because I knew of no circumstance
(7) that would mitigate it. It seemed to me it was-- we
(8) were well into the action and certainly the time and
(9) effort had been expended.
(10) Q Now that paragraph, that sentence I just
(11) read says, "when forced to wait and file papers."
(12) Does that presume that there's first been attempt to
(13) work out the particular infringement?
(14) A Well in my case, yes. I would say that
(15) the three times offer could have held if the minute
(16) it had been discovered, if some sort of retroactive
(17) license had been arranged. I think in some of the
(18) delivery memos as I mentioned this morning, there is
(19) even a time frame. Not in all.
(20) Q But you also said there's no ten times in
(21) any delivery memo that you know of?
(22) A That, I do not believe there is.
(23) Q What would happen if a photographer just
(24) sued? Saw an unauthorized use and just sued. What
(25) fees would you-- what multiplier would you use?

Page 298
(1) A Quite frankly, that is one reason that I
(2) think the industry feels strongly about the three
(3) times. We shouldn't be out there just suing people.
(4) We should be trying to settle these matters.
(5) Q So ten times would not be an industry
(6) standard for a case where somebody just sued?
(7) A It depends on what they've got in their
(8) papers. Somebody-- I'm not sure. Do we mean an
(9) agency? I can't believe an agency just sues. It's
(10) too time consuming, too expensive. That is one
(11) reason for the acceptance of the three times because
(12) we feel it's in everybody's best interest to issue a
(13) retroactive license and get this thing straightened
(14) out.
(15) Q We've talked this morning about the FPG
(16) case and the ten times in that case. I just want to
(17) clarify, this is the only case that you know of for a
(18) fact where a ten times multiplier has been applied?
(19) MR. DEVEAU:  Asked and answered.
(20) BY THE WITNESS:
(21) A As I said this morning, I believe that
(22) Barbara Roberts in discussion in seminars has
(23) referred to other instances of using the same factor.
(24) Q You don't remember those-- you don't
(25) remember what the cases were?

Page 299
(1) MR. DEVEAU:  I think that's been asked
(2) and answered also.
(3) BY THE WITNESS:
(4) A I do not recall what they are. I said I
(5) felt certain that the information has been recorded
(6) somewhere.
(7) Q Does a photographer always get a credit?
(8) We talked about credits earlier. Do photographers
(9) always get credit for use of their photographs?
(10) A They always attempt, and it is part of the
(11) terms for editorial type usage and many, as I said,
(12) commercial usages now. It is one of the conditions
(13) that can be waived depending on the negotiation.
(14) Q The Warner Brothers use, we've already
(15) clarified that you don't believe this is editorial
(16) use. Would it be typical to have a photo credit in a
(17) use like this?
(18) A Not probably accompanying. But perhaps on
(19) the next screen there would be a screen of credits.
(20) Q Perhaps. But does that mean not always?
(21) A Again, if it had been negotiated and
(22) waived, of course not.
(23) Q Is it typical for Internet icon use to get
(24) photo credits?
(25) A Of icons, probably it is waived. Of other

Page 300

(1) Internet usages, it's very common to have credits.
(2) Q Have you ever been involved in a situation
(3) where a photographer, photo agency sued just over
(4) failure to give a credit?
(5) A There may have been an arbitration or two
(6) based on this. Sued, I doubt.
(7) Q Have you been involved in any of those
(8) cases?
(9) A No.
(10) MR. STEWART:  I think that may
(11) actually be all I have. Let me just review my
(12) notes for a minute.
(13) MR. DEVEAU:  Okay.
(14) (Whereby, a brief recess was taken.)
(15) MR. STEWART:  Ms. Kinne, I just have
(16) one more question for you.
(17) BY MR. STEWART:
(18) Q Does the report that you have given in
(19) this case set forth all of the items that you
(20) considered in rendering your opinion in this case?
(21) A Yes, it does.
(22) MR. STEWART:  I have no further
(23) questions.
(24) MR. DEVEAU:  Can you give us a
(25) moment?

Page 301
(1) (Whereby, a brief recess was taken.)
(2) CROSS-EXAMINATION BY MR. DEVEAU:
(3) Q Ms. Kinne, I would like to revisit your
(4) effort to look for documents to produce documents for
(5) Mr. Stewart as you requested. How many boxes of
(6) documents did you go through to try to find documents
(7) he requested?
(8) A I went through 33. I'm afraid we are
(9) misleading each other. They are cartons really.
(10) Q Thirty-three of these cartons.
(11) A Yes.
(12) Q And describe the size of these cartons.
(13) A Well they are about a little less than
(14) table height and they are square and they are between
(15) three and three and a half feet square I think. And
(16) there were 33 of these in various areas of our house.
(17) Q You mentioned there were some boxes that
(18) you did not go through; is that correct?
(19) A There are some--
(20) Q Where were these boxes? Where were the
(21) contents boxed up that went into these boxes that you
(22) did not go through?
(23) A The ones that I did not go through contain
(24) all of the items from the utility room, my-- largely
(25) the kitchen, many pots, pans, the dishes that

Page 302
(1) survived, some appliances that could be cleaned. And
(2) a few that contain partial contents in the dining
(3) room.
(4) Q Would you have expected to find any
(5) documents that were asked for in those boxes from the
(6) kitchen and dining room that you did not go through?
(7) A There is very little chance. Now that
(8) doesn't mean that a stray piece of paper here or
(9) there if it were on the top of the sideboard or a
(10) single folder or the two ASMP books which I had--
(11) MR. STEWART:  Todd, if it makes any
(12) difference, I'm not sure I'm all that interested
(13) in those boxes.
(14) BY MR. DEVEAU:
(15) Q You mentioned a report in the Purcell
(16) versus AOL case?
(17) A That is correct.
(18) Q Who provided that?
(19) A Let me-- at this hour, I must say that I--
(20) Yes. Number 8 on the so-called packing list. The
(21) expert's preliminary report in Ann and Carl Purcell
(22) versus America Online.
(23) MR. DEVEAU:  The only other-- it's not
(24) really a question I have. It's a comment. I
(25) would like the record to reflect the documents

Page 303

## IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF GEORGIA
## SAVANNAH DIVISION

| | |
|---|---|
| JACK LEIGH, | ) |
| Plaintiff, | ) |
| vs. | ) CIVIL ACTION NO. CV497-340 |
| | ) |
| WARNER BROTHERS, INC., a Division | ) |
| of TIME WARNER ENTERTAINMENT | ) |
| COMPANY, L.P. | ) |
| Defendant. | ) |

## PLAINTIFF'S RESPONSES TO
## DEFENDANT'S FIRST INTERROGATORIES

COMES NOW Jack Leigh, in the above-styled matter and pursuant to Rule 33

in the Fed. R. Civ. Proc., responds to Defendant Warner Brothers, a Division of Time

Warner Entertainment Company, L.P.'s First Interrogatories as follows:

## GENERAL OBJECTIONS

The Plaintiff objects to each instruction set out within the Defendant's First

Interrogatories to make claims of privilege to the extent that such attempts to place

requirements beyond those set forth under the Federal Rules of Civil Procedure.

The Plaintiff objects to each "Definition" set out within the Defendant's First

Interrogatories to the extent that such attempts to expand on the number of

Interrogatories are set forth or attempts to place requirements upon the Plaintiff

outside the Federal Rules of Civil Procedure.

The Plaintiff objects to the term "use" to the extent that it is ambiguous as set

out within Defendant's First Interrogatories.

Subject to the above objections and without waiver, as follows:

1.

**Identify all elements of your Photograph which you claim to be original to you.**

**RESPONSE:**

Background, lighting, positioning, appearance of objects, selection of subject

matter of the Photograph, including the sculpture known as "The Bird Girl",

mood, setting, camera angle, framing, visual impact, toning and expression.

2.

**Identify and describe in detail each use you have made of your Photograph**

**in any manner.**

**RESPONSE:**

(a)    Production of image as Fine Art Print for sale and promotion.

(b)    Identification and promotion of Southern Images Gallery.

(c)    Identification of career.

(d)    To Promote lectures.

(e)    To Promote exhibits.

3.

**Identify each and every third party licensed or otherwise authorized to use your**

**Photograph in any manner and describe in detail each such party's use of the**

**Photograph and the fee you charged for such use.**

**RESPONSE:**

>   Pursuant to Rule 33(d), Fed. R. Civ. P., Plaintiff will produce the documents
>   from which this information may be obtained.

4.

State the basis for your allegation in Paragraph 11 of the Complaint that "[b]y virtue of the inherent distinctiveness of the Photograph, the Photograph has acquired considerable value and has become extremely well-known and distinctive to the consuming public as identifying and distinguishing Plaintiff exclusively and uniquely as the source and artist of the Photograph."

**RESPONSE:**

>   Plaintiff objects to Interrogatory number 4 on the grounds that it does not
>   request any information that is relevant or reasonably calculated to lead to the
>   discovery of admissible evidence regarding the only remaining claim in this
>   case.

5.

State by month and year all revenue and profits you have derived from use of the Photograph in any manner by yourself or any third party.

**RESPONSE:**

>   Pursuant to Rule 33(d), Fed. R. Civ. P., Plaintiff will produce the documents
>   from which this information may be obtained.

6.

**State the amount of money you were paid by Random House for the use of your Photograph.**

**RESPONSE:**

Pursuant to Rule 33(d), Fed. R. Civ. P., Plaintiff will produce the documents from which this information may be obtained.

7.

**Identify all persons of whom you are aware who have purported to believe that the Internet Icon includes a copy or derivative of the Photograph.**

**RESPONSE:**

Plaintiff objects to this request in that it is overly broad, irrelevant and unduly burdensome. It is clear from comparison of the two (2) that any person viewing the icon and Mr. Leigh's image cannot in good faith deny that both are the same. The Plaintiff has listed to date the persons that they intend to testify as to expert witnesses at trial. If any additional individuals are intended to be used, such will be listed.

8.

**Identify and describe in detail "the customary license fee" to which you refer on p. 14 of your Memorandum in Reply to Defendant's Opposition to Plaintiff s Cross-Motion for Summary Judgment.**

**RESPONSE:**

Plaintiff incorporates the Report of Jane S. Kinne, which is attached to the Response to Request for Production of Documents.

9.

State all facts upon which you base your allegation in your Prayer for Relief that you are entitled to actual damages with regard to your claim that WB infringed your copyright in the Photograph through its alleged use of the Photograph as a part of the Internet Icon.

RESPONSE:

Plaintiff incorporates the Report of Jane S. Kinne, which is attached to the Response to Request for Production of Documents.

10.

Identify the damage amounts you are seeking with regard to your claim that WB infringed your copyright in the Photograph through its alleged use of the Photograph as a part of the Internet Icon and describe in detail the basis for your damage computation(s).

RESPONSE:

Plaintiff incorporates the Report of Jane S. Kinne, which is attached to the Response to Request for Production of Documents.

Plaintiff further responds that in the event it elects to receive statutory damages, it will seek them in the amount of $100,000.00.

11.

State all facts upon which you base your claim in your Prayer for Relief that WB's use of the Internet Icon has caused it to earn "profits attributable" to the infringement of your alleged copyright in the Photograph.

**RESPONSE:**

The facts necessary to ascertain the profits earned by the Defendant attributable to its infringing activity are solely in the possession of the Defendant. However, to the extent that Plaintiff is currently able to ascertain "profits attributable" to the Defendant's infringement of Plaintiff's photograph, it believes that Defendant earned increased revenue from the movie, movie soundtrack, and web page through its unauthorized use of Plaintiff's Photograph to promote its movie and its web site on the Internet. The additional revenue is in the form of, for example, increased box office receipts, increased soundtrack purchases, and increased advertising revenue generated by its web site.

12.

Identify and explain with particularity the ways in which the Internet Icon is damaging "Plaintiffs market," as alleged on p. 14 of Plaintiffs Memorandum in Reply to Defendant's Opposition to Plaintiffs Cross-Motion for Summary Judgment.

**RESPONSE:**

In addition to Plaintiff's loss of the value of Defendant's use of his Photograph, Plaintiff has suffered injury to the market value of his copyrighted work. The buyers of fine art photography, such as Plaintiff's Photograph, pay a premium for such works of art commensurate with the regard in which they are held in the artistic community. Any use which diminishes or trivializes the Photograph causes injury to the market value of that work by reducing the uniqueness and status as a piece of fine art photography. Defendant's use of a distorted

version of Plaintiff's work of photographic fine art as one (1) of ten (10)

"icons" on its web site minimized and trivialized the work itself, thereby

causing injury to the market value of Plaintiff's Photograph.

13.

Describe in detail the nature of your relationship with the Southern Images
Gallery and Jack Leigh Photography.

RESPONSE:

Jack Leigh is the President and sole owner of Southern Images, Inc. Southern

Images, Inc. does business under the name Southern Images Gallery and

presently does business under Jack Leigh Gallery. There is no entity by the

name of Jack Leigh Photography.

14.

State all facts upon which you base your allegation in your Prayer for Relief
that you are entitled to statutory damages under Section 504(c) of the Copyright Act.
RESPONSE:

Plaintiff objects to Interrogatory number 14 on the grounds that it is

vague and ambiguous. Plaintiff interprets this interrogatory as to asking only

for the basis on which Plaintiff claims it is entitled to statutory damages as a

measure of damages under 17 U.S.C. § 504(c). With this understanding,

Plaintiff responds as follows:

Plaintiff obtained Copyright Registration No. VA 826-961 prior to the

commencement of Defendant's infringing activities for the photograph,

"Midnight, Bonaventure Cemetery, Savannah, GA". Defendant had access to

and copied that photograph. On this basis, 17 U.S.C. § 504(c) provides an award of statutory damages as a measure of Plaintiff's damages.

15.

**State all facts upon which you base your allegation in your Prayer for Relief that you are entitled to attorney's fees pursuant to 17 U.S.C. § 505.**

**RESPONSE:**

Plaintiff objects to Interrogatory number 15 on the grounds that it is vague and ambiguous. Plaintiff interprets this interrogatory as to asking only for the basis on which Plaintiff claims it is entitled to an award of attorney's fees under 17 U.S.C. § 505. With this understanding, Plaintiff responds as follows:

Plaintiff obtained Copyright Registration No. VA 826-961 prior to the commencement of Defendant's infringing activities for the photograph, "Midnight, Bonaventure Cemetery, Savannah, GA". Defendant had access to and copied that photograph. On this basis, 17 U.S.C. § 505 provides an award of attorney's fees to the Plaintiff.

Plaintiff has to the best of his ability responded to the above interrogatories and reserves the right to supplement his response as discovery continues.

This 14th day of September, 1998.

ROBERT BARTLEY TURNER
Georgia Bar No. 006440

SAVAGE, HERNDON & TURNER, P.C.
304 East Bay Street
Post Office Box 8969
Savannah, Georgia 31412-8969
(912) 231-1140

## CERTIFICATE OF SERVICE

This is to certify that I have this day served a true and correct copy of

the above and foregoing document by causing same to be ___hand-delivered,

_X_ placed in the United States mail, postage prepaid, or ___sent via facsimile

transmission, to:

> David J. Stewart, Esquire
> Alston & Bird
> One Atlantic Center
> 1201 W. Peachtree Street
> Atlanta, Georgia 30309-3424
> Facsimile (404) 881-7777
>
> Steven E. Scheer, Esquire
> Lee, Black, Scheer & Hart
> 24 Drayton Street, 10th Floor
> Savannah, Georgia 31412
> Facsimile (912) 232-7344
>
> Todd Deveau, Esquire
> Deveau, Colton & Marquis
> 2 Midtown Plaza, Suite 1400
> 1360 Peachtree Street, N.E.
> Atlanta, Georgia 30309-3209
> Facsimile (404) 875-8505

This 14th day of September, 1998.

ROBERT BARTLEY TURNER
Georgia Bar No. 006440
R. SCOT KRAEUTER
Georgia Bar No. 428960

SAVAGE, HERNDON & TURNER, P.C.
Post Office Box 8969
Savannah, Georgia 31412-8969
(912) 231-1140

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF GEORGIA
SAVANNAH DIVISION

JACK LEIGH,                          )
            Plaintiff                )
                                     )
vs.                                  )          CIVIL ACTION NO.CV497-340
                                     )
WARNER BROS,INC.,a Division          )
of TIME WARNER ENTERTAIN-            )
MENT COMPANY, L.P.                   )
            Defendant                )

## EXPERT WITNESS REPORT OF JANE S. KINNE

   **COMES NOW**, Jack Leigh, pursuant to Federal Rules of Civil Procedures

26(a)(2)(b),of the Local Rule for the Southern District of Georgia and files this report as

follows:

   1.   **Identity of expert witness.**

   **RESPONSE:**  Jane S. Kinne
                 316 N. Wilton Rd
                 New Canaan CT  06840

   2.   **Complete Statement of all opinions to be expressed and the
basis and reasons therefore:**

   **RESPONSE:** I am familiar with the facts in this matter, and I know the

photographic work of Jack Leigh and his professional reputation as a first class

photographer, going back over nearly 20 years.

   Particularly impressive are the number of individual exhibits that have been

mounted featuring only the photographic work of Mr. Leigh. Such an honor is

bestowed on photographers possessing a high degree of creativity and a mastery of

all the technical skills required to render ideas and concepts with aesthetic appeal. As

with the image in question, the result makes a long-lasting impression on the viewer. It is this ability that leads a photographic artist to commercial success.

Top flight professional photographers such as Jack Leigh go to great lengths to protect their copyright and hence the ability to continue licensing each image for the life of the copyright (presently the life of the creator plus 50 years) This guarded granting of specific rights in each instance of reproduction is the very foundation on which their businesses rest.

An image with a successful track record like that of Mr. Leigh's creation of "Midnight in Bonaventure Cemetary, Savannah, Georgia" requires even greater than average vigilance. The creator has to be mindful of not overexposing or trivializing the work by allowing it to be used under less than optimum circumstances. Hence it would be prudent not to allow cropping of the image, not to allow it to appear as one of ten images in a single layout or screen.

It seems fairly obvious to me that Mr. Leigh might very well have refused to allow his "Midnight in Bonaventure Cemetary, Savannah, Georgia" image to be reproduced in the manner chosen by Warner Brothers, i.e, as one of the icons on their Website first page. Such an unauthorized use has prevented him from exercising normal control over the marketing of a highly successful money earning creative work. This can undermine a photographer's entire business.

However in this instance Mr. Leigh was denied the opportunity to refuse use of his image and the damage was done. In order to assess damages, one has to understand a few further fundamentals of the photo business.

The business operates under the United States Copyright Law wherein the photographer or executor controls all rights to and usage of the image for the life of the copyright. (presently the life of the creator plus 50 years)

In licensing the right to use the photos, the fee paid is determined not only by the photo itself but also the intended use. Thus a photo of a statue may be used one month as a magazine illustration for a fee of, say $300, and several months later the same photo may be licensed for a national ad for many thousands of dollars. This repeated licensing continues for the life of the photographer and eventually goes on as part of the photographer's estate.

Fees in connection with the use of an image such as the "Midnight in Bonaventure Cemetary, Savannah, Georgia" photo by Jack Leigh are based not only on the image itself, but as importantly on the type or types of reproductions to be made, the area or areas of the world where it may be viewed, the importance of the image to the item on which it is reproduced, the size it is being reproduced, the number of items being produced or the number of viewers seeing it, the length of time it will be distributed, whether the photographer will receive a prominent credit, the previous earning history of the image and the degree of difficulty in obtaining the image.

The industry has been dealing with usage on the Internet and the World Wide Web for about eight years. Although exact audience figures may be hard to come by, the industry has been successful in determining fees based on estimated exposure on a world-wide basis. This is akin to buying world-wide rights in print. In this instance a normal fee for this very recognizable portion of a well-known image would have been $2500, if paid for prior to use.

The accepted business practice of the photographic industry is that the permission to reproduce a photographer's image must be sought prior to publication and payment of the fees must be made in full prior to the image's appearance.

Failure to do so is unauthorized use at best and a copyright infringement at worst.

The stock photo industry recognizes that mistakes can and do occur which result in unauthorized uses. As a means of resolving such problems, the industry has a schedule of fees for the granting of retroactive licenses, thus avoiding the costly and protracted business of a federal copyright case. The user who discovers they have an unauthorized use on their hands and who wishes to rectify the situation immediately can do so for three times the normal fee, or had they done so in this instance for $7500.

The industry, when forced to wait and to file papers prior to a legal resolution of the matter uses a fee of up to ten times the normal fee to obtain a retroactive license, or as in this case a fee of $25,000.

The industry also uses a standard of double the normal fee for instances where a credit line is omitted or is erroneous, as is the case at hand. This results in an additional fee of $5,000 in this case.

Thus in this case the damages suffered by Mr. Leigh in regard to unauthorized use on the icon alone would total $30,000. In my expert opinion, these are figures that are fully supportable by industry standards and practice and represent a fair and reasonable statement of the damages suffered by Mr. Leigh.

## 3.    The data or any information by the witness in forming her opinion:

**RESPONSE:** The following items were considered in forming my opinion in this matter:

- Curriculum Vitae of Jack Leigh
- Complaint in Leigh v Warner Bros., Inc.
- First Amended Complaint in Leigh v Warner Bros., Inc.
- Plaintiff's Answers to Rule 26.3 Interrogatories
- Plaintiff's First Interrogatories to Defendant
- Plaintiff's First Request for Production of Documents
- Copies of Communications between Warner Bros. and Jack Leigh or his attorneys

- Copies of licenses for use of the photograph.
- Copy of the settlement agreement between Jack Leigh and John F. Blair Publishers
- Motion for Summary Judgement filed by Warner Bros
- Copy of Internet Page
- Letter from Alston & Bird
- Copy of Judge Nangle's Order granting Summary Judgement on Lanham Act Claim and Copyright Claims in the above-captioned action.

4.    **Any exhibit to be used as a summary of or in support of the opinions:**

**RESPONSE:**    None

5.    **The qualifications of the witness including a list of publications authored by the witness within the preceding ten (10) years:**

**RESPONSE:**    Ms. Kinne has been testifying as an expert in the business of and value of photography in court for 29 years.
Her Curriculum Vitae is attached hereto as Exhibit " A"

6.    **Compensation to be paid for the study and testimony:**

**RESPONSE:** Ms. Kinne charges $150 per hour for all time spent on any matter including preparation, travel, writing reports, deposition and/or time testifying in court plus reimbursement of all out of pocket expenses.

7.    **A listing of other cases the witness has testified as an expert witness at trial or deposition within the preceding four (4) years:**

**RESPONSE:**

LIST OF COURT CASES IN WHICH JANE S. KINNE HAS GIVEN DEPOSITION OR TESTIFIED DURING THE LAST SEVEN YEARS

1998        Gregg Mancuso v University of California. L.A. (California State)
Focus on Sports v Ernest Lawrence Group (NY Supreme)
Boris Raishevich v Charles Foster, an Officer of the NY State Police.
(Federal Court, NY)

1997        David Hundley v Net Assets Inc. (Washington State)
            Peter B. Kaplan v City of New York et al (NY Civil)
            Schneider v Kavanaugh (Missouri State)
            Thompson v Cole, Henderson, Drake (California State)
            Robert E. Meyer Photography v Montgomery Ward (Illinois State)
            Darryl Jones v Preferred Janitorial Service (Indiana State)
            David Phillips v Kidsoft (Federal Court, Baltimore)


1996 -      Shelly Katz  v  Black Star Publishing (Texas)
            Michael Sample v Kasper Photo (Montana)
            Alan Kaplan v Lily of France
            Mathew Atanian v Amoco Chemical Co. & Bender, Browning,
            Dolby & Sanderson (Illinois)
            Peter B. Thompson v Amerigas Inc. et al (Superior Court, CA)


1995 -      JoAnn Baker Paul et al  v  US West and Greeley Gas Co. (Colorado)
            Pat Singer  v  Citibank (Federal - Southern District of NY)
            Strang  v  Arizona Department of Transportation (Arizona)
            Bopp  v  Spot Design and Sony Music Entertainment (NY Supreme)


1994        Comstock Inc.  v  David Canepari, the Gatehouse Group et al
            (NY, Southern District, Rhode Island, Indiana)
            William Gasperini  v  the Center for the Humanities (NY Federal)
            Kathleen Jo Ryan  v  Aer Lingus (NY Federal)
            Stu West  v  T. Denny Sanford (Minnesota)

1993        Tony Roberts  v  Tom Fazio & Fazio Golf Course Designers Inc. (Arizona)

            John Carter  v  Comstock, Inc. (NY Supreme)

            John Morin  v  140 W 57th St. Corp. (NY Supreme)

            Maka  v  Maka (Massachusetts)

            Art Rogers  v  Jeff Koons and the Sonnabend Gallery, Inc. (NY-Federal)


1992        Bette Marshall  v  New Kids on the Block (NY-Federal)

            Hartnett  v  Hampton Inn & Wells Fargo (Texas)

            Fred Lindholm  v  Craig Johnson Construction (Idaho)

            Joanne Matuschka  v  Best Photo (NY Civil Ct)


### This 24th day of August 1998


Jane S. Kinne

## EXHIBIT A

**JANE S. KINNE**                     **316 N. Wilton Rd.**
**Vice President**                     **New Canaan CT   06840**
**RUSS KINNE INC.**                    **(203)  966-4900**
                                       **FAX (203) 966-7292**

B. A. History '47
College of William & Mary, Williamsburg VA

M. A. Audio Visual Education '50
Columbia University, New York City

## Post-Graduate Courses:

Film & Photography, New York University
Layout & Design, Photographics, University of Bridgeport
                                New Canaan CT
Photography and the Law, New York University
Basics of Media Law, Padgett-Thompson, American
                                Management Association
Your Picture on the Wall; How to Build a Career
in Fine Art Photography;  VISCOM '96

## Professional Career History:

| | |
|---|---|
| 1947-1950 | Audio Visual Librarian<br>Colonial Williamsburg<br>Williamsburg, VA |
| 1950-1957 | Head of Photo & Film Department<br>National Audubon Society<br>700 Broadway<br>New York, New York 10003 |
| 1958-1986 | Head of Natural History Department<br>Secretary of Corporation<br>President<br>Photo Researchers Inc.<br>60 East 56th St.<br>New York, New York 10022 |

1986-1993            Vice President
                     Comstock, Inc.
                     30 Irving Place
                     New York, New York 10003


1993-present         Vice President
                     Russ Kinne Inc.
                     New Canaan CT  06840

## Professional Affiliations:

Picture Agency Council of America (P. A. C. A.)
        President, 1978-1982
        Chairman of the Executive Committee, 1982-1987
        Member, Committee to write By-Laws, 1988
        Chairman of the Legal Committee, 1985-present
        Training sessions; Experts in Evaluation, 1996 to present

American Society of Picture Professionals (ASPP)
        Chairman  -  Legal Committee, 1990 to present
        President  -  National Organization, 1988-1992
        Speaker  -  Panels - Picture Rights & Permissions
        Member   -  Committee to Revise Code of Ethics

American Society of Media Photographers (ASMP)
        Sustaining Member
        Participant of Drafting Committee, Guide to Business Practices
                                          1973, 1978, 1982, 1986
        Consultant in the drafting and    Stock Photography Handbook
          production                       1984, 1990
        Speaker to various ASMP -          1980 to present
        Chapters on the business
        of stock photography, at
        least annually

North American Nature Photography Association (NANPA)
        Founding member        -          '93
        Member, Organization Board        '94
        Member of Board                   '95-'98
        President-Elect                   '95-'96
        President                         '96-'97
        Past President                    '98-'99
        Moderator - Forum on Nature Photography '93,'95,'96
        Speaker - ABC's of the Photography Business '96
             "    - ABC's of Visual Copyright  '98

Photographic Administrators Inc.
        Invited Member         -              1981 to present

## Panelist and Speaker

        Photo Expos         -              Photo '83'84'85'86'87'88'89'91
                           -              Photo West '89,'90
                           -              Photo Midwest '90,'92
        Multi Media Business Report  -  Publishers' Opportunities
                                            in Multi Media '93

        Roger Tory Peterson Institute - Nature Photography: A Focus
                                        on the Issues
                                        Member - 1992 to present
                                        Program Chairman  '93
        The Association of the Bar of the City of New York
                                        Appropriation Art and
                                        Copyright '94

## Maine Photographic Workshop

        Speaker and Panelist on Stock Photography for
        International Photographic Congress and Stock Photo Weekend
        '87, '88, '89, '90, '92, '93, '94, '95

## United States Copyright Office

        Member of Working Committee on Fair Use & the New Technologies
        1995, 1996, 1997, 1998

## Awards

        American Society of Picture Professionals
        April 1993 - Lifetime Achievement Award and
        Honorary Lifetime Membership

        Picture Agency Council of America
        May 1993 - Lifetime Service Award
        and Honorary Emeritus Membership

        North American Nature Photography Association
        February 1996 - Outstanding Service to the Nature Photo Industry Award

## Consultant

        National Geographic Society - Image Sales Division

1993 to present

## Nominating Committee

LIFE Magazine: Alfred E. Eisenstadt Annual Photographic Awards

## Expert Witness

Consulted in over 500 cases pending before the American
Arbitration Association and the State and Federal Courts
throughout the United States concerning copyright issues,
value of photographic images, reproduction rights and fees.
Appeared in 98 cases throughout the world as an expert.

## Appraiser

For estates of photographers, establishing value for tax
purposes and/or donations to institutions. Also for
establishing value following destruction of images by
fire or flood. Appraisals of photographic businesses for the purposes of
sale. Appraisals have been accepted by Southeby's, the Internal
Revenue Service of the United States, Wesleyan University, the
Cousteau Society and the courts of New York, CT and New Jersey.

## CERTIFICATE OF SERVICE

This is to certify that I have this day served a true and correct copy of the

above and foregoing document by causing same to be ___ hand-delivered,  _X_

placed in the United States mail, postage prepaid, or _____ sent via fax

transmission, to:

David J. Stewart, Esquire
Alston & Bird
One Atlantic Center
1201 W. Peachtree Street
Atlanta, Georgia  30309-3424

Steven E. Scheer, Esquire
Lee, Black, Scheer & Hart
24 Drayton Street, 10th Floor
Savannah, Georgia  31412

Todd Deveau, Esquire
Deveau, Colton & Marquis
2 Midtown Plaza, Suite 1400
1360 Peachtree Street, N.E.
Atlanta, Georgia  30309-3209

This 27th day of August, 1998.

ROBERT BARTLEY TURNER
Georgia Bar No.  006440
R. SCOT KRAEUTER
Georgia Bar No. 428960

SAVAGE, HERNDON & TURNER, P.C.
Post Office Box 8969
Savannah, Georgia  31412-8969
(912) 231-1140

| Citation | | Database | Mode |
|---|---|---|---|
| Not Reported in F.Supp. | FOUND DOCUMENT | DCT | Page |
| (Cite as: 1995 WL 248066 (N.D.Ill.)) | | | |

HOLABIRD AND ROOT ARCHITECTS ENGINEERS INTERIORS, an Illinois partnership,
Plaintiff,
v.
PHYSICIANS MANAGEMENT OF INDIANA, INC., an Indiana corporation, a/k/a
Physicians Management Corporation, and Dr. Vijay Gupta, Defendants.
94 C 1919.
United States District Court, N.D. Illinois, Eastern Division.
April 24, 1995.
MEMORANDUM OPINION AND ORDER

MAROVICH, District Judge.
 **\*1** Holabird and Root Architects Engineers Interiors ("Holabird") brings a
four count action against Physicians Management of Indiana, Inc. ("PMI")
stemming from the apparent disintegration of an alleged business relationship
in which PMI had hired Holabird to design a medical facility to be built in
Munster, Indiana. In a prior Memorandum Opinion and Order dated July 26, 1994,
this Court partially granted PMI's motion to dismiss the copyright infringement
claim pursuant to 17 U.S.C. s 412(1) which prohibits an award of statutory
damages or attorneys' fees for any infringement of copyright occurring in
relation to an unpublished work prior to the effective registration date of
that work. Thereafter, Holabird amended its Complaint, leaving PMI as a
Defendant and adding Dr. Vijay Gupta as a Defendant (collectively, "PMI").
[FN1] Subsequently, PMI filed this motion for partial summary judgment to limit
the damages recoverable by Holabird to an amount no greater than the amount of
damages sought by Holabird in its breach of contract claim. For the following
reasons, the Court grants PMI's motion in part and denies it in part.
FACTUAL BACKGROUND [FN2]
 On October 16, 1992, Dr. Gupta, president of PMI, and James Kuyper of PMI met
with Gerald Horn and other Holabird representatives to discuss PMI's plans to
build a surgery center in Munster, Indiana. Holabird submitted a proposal to
PMI breaking the project into six phases and outlining the services and
potential fee structures for the work Holabird would perform. PMI authorized
Holabird to proceed with the first of six proposed design stages with a fee not
to exceed $6800. Although it is unclear whether PMI had authorized any further
work, Holabird began working on the second stage after completing the first
"Programming and Functional Planning" stage.
 Although the parties apparently intended to enter into a written contract and
Holabird tendered a standard form contract largely in keeping with its
proposal, the parties never executed a written agreement. For present purposes,
the record does not permit the Court to determine whether or when the parties
entered into a contract and, if so, what terms are included in such an
agreement. Accordingly, we need not detail the communications between the
parties, nor need we decide the effect of these communications.
 In November 1992, PMI paid Holabird $6800 for the work performed on the first
phase of the project. After receiving invoices from Holabird seeking additional
amounts, PMI paid Holabird $10,000 in May 1993. PMI contends it paid the
$10,000 to avoid controversy even though it continues to claim Holabird did not
Copr. (C) West 1998 No Claim to Orig. U.S. Govt. Works

Not Reported in F.Supp.                                              PAGE   2
**(Cite as: 1995 WL 248066, \*1 (N.D.Ill.))**

have approval to perform any work beyond the initial phase of the project. On
July 31, 1993, Holabird requested a payment of $25,408 reflecting an alleged
outstanding balance due for services performed up to that point. In September
1993, Gerald Horn again requested payment of $25,408. The total amount billed
by Holabird was $42,208. At present, PMI has made no further payments to
Holabird.

   **\*2** In late summer of 1994, Holabird learned that the construction on the
medical facility was underway under a different architectural firm. This
medical building is alleged to be substantially similar to the building
Holabird had designed for PMI. Subsequent to this discovery, Holabird brought
this action seeking relief in four counts for copyright infringement, breach of
an oral contract, account stated, and quantum meruit. As stated above, PMI now
moves for a partial summary judgment to limit the damage for the alleged
copyright infringement to an amount no greater than the $25,408 sought by
Holabird in its breach of contract claim.

                              DISCUSSION

   A summary judgment motion should be granted only when "the pleadings,
depositions, answers to interrogatories, and admissions on file, together with
the affidavits if any, show that there is no genuine issue as to any material
fact and that the moving party is entitled to judgment as a matter of law."
Fed. R. Civ. Pro. 56(c). Summary judgment may be used to determine the
issues not in controversy even if the motion does not determine the entire
case. Fed. Rule of Civ. Pro. 56(d). Summary judgment is granted only when
the record reveals that no reasonable jury could find for the non-moving
party. Karazanos v. Navistar Int'l Transp. Corp., 948 F.2d 332, 335 (7th
Cir. 1991).

   In deciding a motion for summary judgment, the court must view the evidence in
the light most favorable to the party opposing the motion and determine whether
there are any genuine issues of material fact. Lohorn v. Michal, 913 F.2d
327, 331 (7th Cir. 1990). However, the nonmovant must make a showing sufficient
to establish any essential element for which it will bear the burden of proof
at trial. Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986). In the present
case, the Court must determine whether there are any genuine issues of material
fact concerning the damages available to Holabird under its copyright
infringement claim. In reality, the crucial aspect of the pending motion is the
identification of the proper legal standards for calculation of copyright
damages in the circumstances of this case.

                           Copyright Damages

   A copyright vests initially in the author or authors of a work from the moment
the work is "fixed in any tangible medium of expression." 17 U.S.C. s
201(a), s 408(a), s 411. Under the Copyright Act, when a copyright has
been infringed, there are two distinct types of damages available. 17
U.S.C. s 504(a). As explained in our prior opinion, "statutory damages" are
available under s 504(c), but only if the copyright is timely registered.
Deltak, Inc. v. Advanced Systems, Inc., 767 F.2d 357, 359 (7th Cir. 1984).
In the present case, we have previously determined that Holabird is not
entitled to statutory damages or attorneys' fees. The central dispute in the
present motion concerns the second approach to damages under the Copyright Act.
   Section 504(a) provides that the copyright owner may recover the "actual
damages and any additional profits of the infringer, as provided by subsection
                    Copr. (C) West 1998 No Claim to Orig. U.S. Govt. Works

Not Reported in F.Supp.                                                    PAGE    3
**(Cite as: 1995 WL 248066, \*2 (N.D.Ill.))**
  (b)." Subsection (b) states that:
    **\*3** The copyright owner is entitled to recover the actual damages suffered
by him or her as a result of the infringement, and any profits of the infringer
that are attributable to the infringement and are not taken into account in
computing the actual damages. In establishing the infringer's profits, the
copyright owner is required to present proof only of the infringer's gross
revenue, and the infringer is required to prove his or her deductible expenses
and the elements of profit attributable to factors other than the copyrighted
work.
    17 U.S.C. s 504(b). In keeping with this statutory scheme, we begin our
analysis with a discussion of "actual damages."
                              Actual Damages
    In its motion for summary judgment, PMI argues that because Holabird has set
the value of its services at $42,208 and $16,800 has been paid, the remaining
balance of $25,408 represents the upper limit on the actual damages due to any
asserted infringement of the architectural plans for the surgery center. While
PMI correctly states that the "value of use" test is a proper test in
estimating the actual damages due to copyright infringement, PMI fails to apply
this test properly. Under some circumstances, a copyright owner may not be able
to prove damages where an infringement results in neither a profit to the
infringer nor a quantifiable loss to the copyright owner, even if the infringer
acted willfully and deliberately. 3 Melville B. Nimmer, Nimmer On Copyright s
14.02[A], at 14-12 (1994). In an attempt to avoid such a result, this Circuit
has held that the value of an infringer's use is a permissible basis for
estimating actual damages. Deltak, 767 F.2d at 361-63.
    According to the Deltak court, the "value of use amounts to a determination
of what a willing buyer would have been reasonably required to pay to a willing
seller for plaintiff's work." Id. at 360-61. In Deltak, the Seventh
Circuit defined the fair market value of the infringed document, the value of
use, as the acquisition cost saved by infringement instead of purchase. Id.
[FN3] (emphasis added). [FN4] According to Deltak, the value of use to the
infringer in terms of saved acquisition costs is equal (except for marginal
production costs) to the copyright owner's lost profits from avoided sales to
the infringer. If there is uncertainty in this calculation, the court in
Deltak reminded the defendant infringer that it "cannot expect to pay the
same price in damages as it might have paid after freely negotiated bargaining,
or there would be no reason scrupulously to obey the copyright law." Deltak,
767 F.2d at 363 n.5 (quoting Iowa State Univ. Research Found., Inc. v.
American Broadcasting Cos., 475 F. Supp. 78, 83 (S.D.N.Y. 1979)).
    In Deltak, the Seventh Circuit relied upon some cases involving
architectural plans for its view that the fair market value or value of use is
a proper measure of actual damages for copyright infringement. Id. at 361;
see, e.g., Aitken, Hazen, Hoffman, Miller, P.C. v. Empire Construction Co.,
542 F. Supp. 252, 262-63 (D. Neb. 1982) (awarding fair market value as actual
damages for infringement of copyright in architectural plans); Nucor Corp.
v. Tennessee Forging Steel Serv., Inc., 513 F.2d 151, 152-53 (8th Cir. 1975)
(infringers of plaintiff's common law copyright in architectural plans liable
for fair market value of plans). Contrary to the suggestion in Deltak, PMI
in this case attempts to equate the damages for copyright infringement with
Holabird's requested damages for breach of an oral contract without analyzing
                              Copr. (C) West 1998 No Claim to Orig. U.S. Govt. Works

**(Cite as: 1995 WL 248066, \*3 (N.D.Ill.))**
the comparison. According to the Defendants, Holabird unilaterally valued its
services at $42,208. PMI further alleges that since the unpaid balance of
$25,408 is the alleged contract damage, that is the upper limit on damages
available under the copyright infringement claim.
  **\*4** While it may be true that the market value of the alleged contract
between Holabird and PMI represents the primary measure of Holabird's actual
damages, this Court must consider the Seventh Circuit's comments in Deltak
which indicate some distinctions between contract damages and copyright damages
but provides little further guidance on the subject. See also Paramount
Pictures Corp. v. Metro Program Network, Inc., 962 F.2d 775, 779 (8th Cir.
1992) (holding that separate awards of damages for breach of contract and for
copyright infringement is permissible as the two claims redress distinct
injuries). With these comments in mind, PMI may prevail in its motion for a
partial summary judgment only if it has shown under the proper legal standards
that there is no genuine dispute that the value assigned by Holabird to the
services it rendered represents the maximum amount it could recover for
copyright infringement. While this may ultimately prove to be true, the Court
is not yet satisfied that PMI has carried its burden to the extent that the
damages will be limited to the $25,408 allegedly due under the contract claim.
  Initially, the Court remains uncertain whether the $25,408 accurately reflects
the value of the alleged contract and the fair market value of the
architectural plans. For example, one of potential terms discussed by the
parties set Holabird's fee at 5 percent of the construction costs, an amount
quite likely greater than the $25,408. It further appears curious that Holabird
only seeks the unpaid amounts in its contract claim when contract damages
generally are designed to place the parties in the position they would have
occupied had the contract been performed. In this case, it would seem that
performance of the alleged contract would involve Holabird's participation
through completion of the project as a condition to the Defendants' use of the
plans. Under these circumstances, this Court is reluctant to limit the damages
available for infringement to a damage figure appearing in a contract claim
that, in turn, is subject to amendment and alteration based on the evidence not
yet presented in this case.
  Moreover, there can be no doubt that Holabird may establish infringement and
damages due to that infringement without prevailing on any of its other claims.
It appears at least somewhat premature to impose a limitation on copyright
damages without a fuller understanding of the nature of the alleged oral
contract that supposedly serves to limit damages. It may be that $42,208,
represents a fair assessment of market value of the architectural plans. It may
also be true that a willing buyer would have to pay more than this figure to
obtain use of the plans for purposes of constructing the surgery center. Indeed
the record contains evidence from which a fact-finder could conclude that
$42,208 represents the bill for services rendered up to the point the project
was placed on hold and does not represent complete payment entitling PMI to use
of the plans for construction. Neither the current motion nor the current
record, however, permit this Court to evaluate Holabird's claim for breach of
contract to the point where judgment as a matter of law is possible on the
issue of copyright damages.
  **\*5** With this said, however, Holabird should consider itself lucky to escape
summary judgment because it failed to present any evidence of actual damages.
                      Copr. (C) West 1998 No Claim to Orig. U.S. Govt. Works

Not Reported in F.Supp.                                           PAGE    5
**(Cite as: 1995 WL 248066, \*5 (N.D.Ill.))**

In fact, Holabird's response to PMI's motion and to the Local Rule 12(M)
statement improperly promises presentation of damage evidence at trial.
Obviously, Holabird cannot rely on such promises to avoid summary judgment.
This Court also need not be concerned that Holabird agreed to not take the
discovery it says it needs to prove a greater amount of actual damages.
Ordinarily such failures are costly and would result in entry of judgment if
the movant carries its initial burden under the proper legal standards. Because
we find PMI has not met this burden, Holabird's improper response to the motion
is not fatal on the issue of actual damages.

 To provide some guidance to the parties, the Court will outline the proper
standards for recovery of actual damages. According to Deltak, one estimate
of actual damages is the value of the use to the infringer. As noted above,
that calculation involves an estimate of the savings to the infringer due to
the infringement instead of purchase of the copyrighted work. With minor
corrections, this amount approximates the value of the lost sale of the right
to use the copyrighted work by asking what a willing buyer would pay a willing
seller for this right in the context of this case. In this case, we have found
that the record is not developed enough for the Court to rule as a matter of
law that this amount cannot exceed $42,208 less the amounts paid by PMI.

 Although the Court is not yet ready to reach a conclusion as a matter of law,
we do find one portion of Holabird's argument untenable. Holabird maintains
that its designs have an unspecified "intrinsic value" over and above the value
assigned to its plans in a contract. Holabird offers no evidence nor even a
possible calculation for this "intrinsic value." [FN5] As we explain further
below, we find such a figure, if it is quantifiable, is adequately considered
in the assessment of what a willing buyer would pay for use of the plans as
designed by Holabird. Holabird will have to do far better than its current
efforts to support any claim in excess of the amount of its alleged contract
with PMI.

 Indeed, Holabird recognizes that one measure of actual damages is the fair
market value of the architectural plans but still partially misses the focus of
Defendants' motion. See Eales v. Environmental Lifestyles, Inc., 958 F.2d
876, 880 (9th Cir. 1992) (holding that an architect's ordinary fee is a valid
measure of the lost fair market value of architectural plans). According to
Holabird, Defendants' motion is premised on the conclusion that Holabird can
show no evidence of actual damages due to the infringement. Defendants protest
that what they argue is that the damages Holabird can show, as measured by fair
market value, cannot exceed the value Holabird itself assigns to the contract
claim it asserts against them. Whether this argument will prevail remains to be
seen.

 **\*6** The Court does note the potential for confusion in that Defendants seek
to limit the copyright damages to an amount no greater than the remaining
unpaid balance under the contract claim. As such, Defendants do not appear to
acknowledge the holding in Paramount supporting an award of damages for
breach of contract in addition to an award of damages for copyright
infringement. Paramount Pictures Corp., 962 F.2d at 779. According to
Paramount, one must acknowledge the distinct nature of the protections
afforded an aggrieved party under contract and copyright law. See also
Joseph J. Legat Architects, P.C. v. United States Dev. Corp., No. 84 C
8803, 1991 WL 38714, at \*10 (N.D. Ill. Mar. 20, 1991). If the Paramount
                    Copr. (C) West 1998 No Claim to Orig. U.S. Govt. Works

Not Reported in F.Supp.

**(Cite as: 1995 WL 248066, \*6 (N.D.Ill.))**

reasoning applies to this case and Holabird prevails on both its contract and copyright claims, Holabird may be entitled to an award of at least $25,408 for breach of contract and perhaps $42,208 for copyright infringement. Since neither party has adequately addressed this potential issue and the question of the proper amount of damages remains undetermined, we will leave the matter for decision at a later time.

Profits

Under s 504(b) of the Copyright Act, a copyright owner is allowed to recover profits that are attributable to the infringement and which have not been taken into account in computing actual damages. 17 U.S.C. s 504(b). Holabird bears the threshold burden of establishing that Defendants' profits, if realized, were attributable to their infringement. Legat, 1991 WL 38714, at \*8. Holabird, however, has failed to present any evidence in response to the issues raised by Defendants who claim to have realized no profits attributable to their use of the allegedly infringing plans.

The Copyright Act provides that in establishing the infringer's profits, the copyright owner is required to present proof only of the infringer's gross revenue, and the infringer is required to prove his or her deductible expenses and the elements of profit attributable to factors other than the copyrighted work. 17 U.S.C. s 504(b). Because this case involves no sales of copyrighted material, the statute provides little or no guidance for a calculation of profits based on any other criteria. PMI argues that where there are no realized profits attributable to the alleged infringement, recovery should be limited to the actual damage. That assertion is true, but it does not advance our discussion.

PMI claims that there are no profits attributable to the alleged infringement because PMI has not sold any drawings or specifications prepared by Holabird to any third party. Holabird failed to produce any evidence contrary to PMI's claim that it derived no profit from the alleged infringement. Rather, in a reprise of its argument regarding actual damages, Holabird merely states that it "may well be able to demonstrate, after discovery, that the value of this project was enhanced using Plaintiff's designs." Holabird cannot resist a motion for summary judgement merely by promising to provide evidence of PMI's profit at trial. Legat, 1991 WL 38714, at \*8.

**\*7** Holabird's speculation about a possible increase in the property value of the medical facility due to the alleged use of a Holabird design is insufficient to create a genuine issue for trial. In May v. Watt, 822 F.2d 896, 901 (9th Cir. 1987), the Ninth Circuit characterized a similar claim by Cliff May, a well-known home designer, as a claim for "indirect profits." Assuming such profits are recoverable if ascertainable, the court found that May failed to present any evidence articulating either the amount of any such damages or even a method of calculating such damages. As a result of May's failure, he was not entitled to such damages.

We also note Judge Alesia's observations in Legat regarding the "intangible nature" of the harm due to misdesignation of authorship of architectural plans. In Legat, injunctive relief was the appropriate remedy to correct the public record as to reflect the actual author of the plans. We see no reason why similar relief would not be appropriate in this case should Holabird prevail.

In addition, the value of the Holabird name is obviously factored into the value the market places on the use of plans designed by Holabird. Holabird can

Copr. (C) West 1998 No Claim to Orig. U.S. Govt. Works

**(Cite as: 1995 WL 248066, \*7 (N.D.Ill.))**
and no doubt does charge more than a lesser known and less lauded architectural
firm with fewer resources. Because the value of the Holabird name is captured
in the fair market value of the architectural plans at issue in this case, we
see no need to consider it as an element of profit. As in Legat and May,
the Plaintiff's claim regarding this element of profit is too tenuous to
withstand a motion for summary judgment.
   To the extent Holabird suggests that it is entitled to recover the amount of
any savings PMI gained by their alleged infringement, we note that Judge Alesia
considered this element of damages adequately captured by the value of use test
for actual damages enunciated in Deltak. We likewise find that the fair
market value test fairly assesses the savings to PMI if it is shown to have
infringed Holabird's copyright.
   To review, the Court will enter partial summary judgment in favor of
Defendants only on those specific items of profit discussed in this opinion.
Despite Holabird's defective response, the Court agrees that Dr. Gupta's
conclusory statement that PMI made no profits is insufficient to support a
broader holding. We also note that the law of copyright grants plaintiffs
substantial liberality in proof of damages. Deltak, 767 F.2d at 363. In
keeping with this liberal approach, the Court will permit Holabird to educe any
additional evidence of profit or damages not taken into account in the actual
damage calculation and not affirmatively ruled upon in this opinion. Finally,
the Court finds the record insufficient to grant summary judgment to Defendants
on the issue of actual damages.
                                  CONCLUSION
   For the reasons set forth above, the Court grants Defendants' motion in part
and denies it in part.

      FN1.   For unknown reasons, Holabird dropped as Defendants the
      architectural firm and the contractor that Holabird initially alleged
      produced the infringing plans and began construction of the surgery center.

      FN2.   The Court bases its statement of the facts upon its review of the
      Local Rule 12(M) and 12(N) statements filed the parties. It is important to
      note that Holabird did not file a statement of additional facts as
      specified in Local Rule 12(N)(3)(b).

      FN3.   While Nimmer questions the validity of this approach and points out
      that other circuits have declined to follow Deltak, Nimmer also notes
      that the Deltak approach fosters the Congressional purpose of discouraging
      infringement and avoids the harsh result of right without a remedy. 3 M.
      Nimmer, Nimmer On Copyright s 14.01[A], at 14-16 n.48.1 & 14-17 n.49.3.

      FN4.   One commentator, Paul Goldstein, has explained the "willing buyer-
      willing seller" measure of damages as pivoting on the three alternatives
      available to a prospective user of a copyrighted work. First, the
      prospective user, PMI, can attempt to negotiate for use of the work, as the
      parties clearly did in this case. Second, PMI can forego use of the work
      and can create or negotiate for creation of a non-infringing work. Third,
      PMI can infringe the copyright. As Goldstein says, "[h]aving preempted
      negotiations by infringing, the infringer should bear the burden of proving
                       Copr. (C) West 1998 No Claim to Orig. U.S. Govt. Works

Not Reported in F.Supp.

**(Cite as: 1995 WL 248066, \*7 (N.D.Ill.))**

    that it could have bargained the copyright owner to a lower price." Paul
Goldstein, II Copyright s 12.1.1.1., at 318 (1994 Supp.).

   FN5.   Holabird spends a great deal of time explaining that its world-class
reputation is "bankable" and has value, but offers no factual support that
this value or good will was at all damaged by Defendants' alleged
infringement. Holabird argues vociferously that its plans are worth more
than an average architect's plans. We have no quarrel with the concept and
we suspect neither do the Defendants. Where Holabird falters and where
Defendants nearly prevail is in recognition of the obvious fact that the
price Holabird seeks in payment for its superior work product reflects and
encompasses an evaluation of the value of its bankable, award-winning
skills. We find Holabird's suggestion that its contracts do not reflect
this "intrinsic value" unpersuasive.

END OF DOCUMENT

Copr. (C) West 1998 No Claim to Orig. U.S. Govt. Works

Citation                                                  Database        Mode
Not Reported in F.Supp.           FOUND DOCUMENT          DCT             Page
(Cite as: 1991 WL 38714 (N.D.Ill.))

JOSEPH J. LEGAT ARCHITECTS, P.C., an Illinois Professional Corporation,
                              Plaintiff,
                                 v.
UNITED STATES DEVELOPMENT CORPORATION, an Illinois corporation, Esper A.
Peterson, an individual, Seth Pines, an individual, and Royal Oak Apartments
         Phase III, an Illinois Limited Partnership, Defendants.
                            No. 84 C 8803.
      United States District Court, N.D. Illinois, Eastern Division.
                            March 20, 1991.
                   MEMORANDUM OPINION AND ORDER

ALESIA, District Judge.
*1 Plaintiff, Joseph J. Legat Architects, P.C. ("Legat"), filed this action
against defendants, United States Development Corporation ("USDC"), Esper A.
Peterson ("Peterson"), Seth Pines ("Pines"), and Royal Oak Apartments Phase
III ("Royal Oak"). Legat's complaint, as amended, consists of fifteen counts
and alleges a variety of common law and statutory claims. Legat has asserted
claims for breach of contract (Counts I and II), unfair competition (Counts III
through VI), copyright infringement (Counts VII through X), violation of the
Lanham Act, 15 U.S.C. s 1125, as amended (Count XI), and violations of the
Illinois Consumer Fraud and Deceptive Business Practices Act, Ill.Rev.Stat.
ch. 121 1/2 , PP 261 et seq., which incorporates the provisions of the Illinois
Deceptive Trade Practices Act, Ill.Rev.Stat. ch. 121 1/2 , PP 311 et seq.
(Counts XII through XV).
Judge Aspen referred the breach of contract counts (I and II) to
arbitration. See Joseph J. Legat Architects, P.C. v. United States
Development Corp., 625 F.Supp. 293 (N.D.Ill.1985) ("Legat I" ). The
arbitrator concluded that USDC had breached its contract with Legat and ordered
USDC to pay Legat $30,000, representing the balance owed to Legat on the
contract, plus interest.
Legat then filed a motion for partial summary judgment as to liability on the
remaining counts of its complaint, Counts III through XV. This motion was
referred to Magistrate Judge Bucklo and she issued her Report and
Recommendation on the issue of liability on March 10, 1989. After this Report
and Recommendation was issued, defendants filed a motion for partial summary
judgment on the issue of damages. This motion was also referred to Magistrate
Judge Bucklo and she issued her Report and Recommendation on the issue of
damages on August 7, 1989. These motions, the Magistrate Judge's reports, and
Legat's objections are now before us for ruling. Because the Magistrate Judge
amply set forth the underlying facts in her first Report and Recommendation, we
find it unnecessary to recount them here.
I. Report and Recommendation on Legat's Motion for Partial Summary Judgment as
to Liability on Counts III through XV of the Second Amended Complaint
In her Report and Recommendation of March 10, 1989, the Magistrate Judge made
the following recommendations on the issue of liability: (1) to grant Legat's
motion for partial summary judgment as to Counts VII, VIII, IX, and X, based on
defendants' filing of altered plans with the United States Department of
Housing and Urban Development ("HUD") and sending those plans to subcontractors

Copr. (C) West 1998 No Claim to Orig. U.S. Govt. Works

the Seventh Circuit noted that the Illinois Deceptive Trade Practices Act is
"merely a codification of the Illinois common law of unfair competition."
Based on these conclusions, the Magistrate Judge recommended that Legat's
motion for partial summary judgment be denied as to liability on Counts III
through VI.

  **\*3** In its objections, Legat challenges both prongs of the Magistrate
Judge's analysis.  As to the preemption issue, Legat contends that its unfair
competition claims are not wholly preempted by the Copyright Act because they
allege acts of "passing off" and false labelling, in addition to copying.  The
Magistrate Judge conceded as much in her report, however, and Legat's reason
for objecting to this aspect of the Magistrate Judge's analysis therefore
remains a mystery. [FN1]    (Report and Recommendation at 20-21).   The Magistrate
Judge never stated that Legat's allegations of "passing off" or false labelling
were subject to preemption.  On the contrary, the Magistrate Judge suggested,
though she did not state conclusively, that Legat's "passing off" and false
labelling claims escaped preemption.  (Report and Recommendation at 20).
  Both case law and the legislative history of Section 301 support the
conclusion that these claims escape preemption.  See Stillman v. Leo Burnett
Company, Inc., 720 F.Supp. 1353, 1363 (N.D.Ill.1989) ("when a copier
misrepresents that he is the creator, nothing in the copyright laws prohibits
the states from providing a remedy.");  Kisch v. Ammirati & Puris Inc., 657
F.Supp. 380, 385 (S.D.N.Y.1987) (plaintiff's state law claim of unfair
competition not preempted to the extent it alleged tort of "passing off");  1
M. Nimmer, Nimmer on Copyright, s 1.01[B][1] at 1-15-1-17 & n. 47
(1990) (discussing legislative history and case law and concluding that
Section 301 of the Copyright Act does not preempt state law claims of unfair
competition of the "passing off" variety because of the added element of
misrepresentation or deception).  This objection, then, is pointless and we
overrule it.
  Legat's second objection, however, has merit.  Legat argues that given the
Magistrate Judge's conclusion that its "passing off" and false labelling claims
escape preemption, the Magistrate Judge erred in recommending denial of its
motion for summary judgment as to liability on those portions of its unfair
competition claims simply because she believed that those claims "added
nothing" to Legat's claims under the Illinois Deceptive Trade Practices Act.
According to Legat, while the footnote in McGraw-Edison supports the
Magistrate Judge's argument that the Illinois Deceptive Trade Practices Act is
a codification of the Illinois common law of unfair competition, the opinion
contains no language which supports the Magistrate Judge's conclusion that
Legat cannot pursue its action under both the statutory and common law theories
of recovery.  Indeed, Legat contends, McGraw-Edison actually lends support
to its argument that it is entitled to proceed under both theories of recovery
because the complaint in McGraw-Edison alleged liability under both theories
of recovery. [FN2]
  We agree.  Section 2 of the Illinois Deceptive Trade Practices Act expressly
states that it "does not affect unfair trade practices otherwise actionable at
common law or under other statutes of this State."  Ill.Rev.Stat. ch. 121
1/2 , P 312.  Although the court in McGraw-Edison noted that the Illinois
Deceptive Trade Practices Act is merely a codification of the Illinois common
law of unfair competition, it neither stated nor implied that the statute was
                        Copr. (C) West 1998 No Claim to Orig. U.S. Govt. Works

designed to preempt or supplant the common law cause of action for unfair
competition.  Instead, the court in McGraw-Edison merely indicated that
because the statute codified the common law, the linchpin of both claims was
the same, thus obviating the need to consider each claim separately.
McGraw-Edison, 787 F.2d at 1173 n. 9.

*4 Given these facts, the Magistrate Judge's recommendation to deny summary
judgment as to liability on those portions of the unfair competition counts not
subject to preemption cannot be reconciled with her recommendation to grant
summary judgment as to liability on those counts brought under the Illinois
Deceptive Trade Practices Act.  The benchmark for liability for both the unfair
competition counts (to the extent that they are based on a "passing off" or
false labelling theory) and the counts brought under the Illinois Deceptive
Trade Practices Act is "likelihood of confusion."  See Ill.Rev.Stat. ch. 121
1/2 , P 312(1), (2), (3), (5), (12). [FN3]  If the Magistrate Judge found that
no genuine issue of material fact exists as to likelihood of confusion under
the Illinois Deceptive Trade Practices Act counts, and that statute is a
codification of the common law of unfair competition, then it logically follows
that no genuine issue of material fact exists as to likelihood of confusion
under the unfair competition counts as well.

That the Illinois Deceptive Trade Practices Act is admittedly broad enough to
include the common law tort of unfair competition and therefore may be
superfluous is inconsequential and, in any event, does not warrant denial of
Legat's motin for summary judgment on the unfair competition counts.  Were we
to rule otherwise, then Legat technically would be allowed to proceed to trial
on those surviving portions of its unfair competition counts when summary
judgment had already been granted on substantively identical claims.  Thus,
while we agree with the Magistrate Judge's conclusion that the unfair
competition counts probably are superfluous, we do not agree with her
conclusion that this fact warrants denial of Legat's motion for summary
judgment as to liability on Counts III through VI.  Instead, consistent with
our adoption of Magistrate Judge Bucklo's recommendation to enter summary
judgment in Legat's favor as to liability on Counts XII through XV (those
counts brought under the Illinois Deceptive Trade Practices Act), we enter
summary judgment in favor of Legat as to liability on those portions of Counts
III through VI which are not preempted by the Copyright Act.  To the extent the
Magistrate Judge recommended ruling to the contrary, we reject her Report and
Recommendation and sustain Legat's objections.

II. Report and Recommendation on USDC's Motion for Partial Summary Judgment as
to Damages

In spite of her recommendation to grant summary judgment in favor of Legat as
to liability on most of the remaining counts of the second amended complaint,
in her subsequent Report and Recommendation of August 7, 1989, Magistrate Judge
Bucklo recommended that we grant defendants' motion for partial summary
judgment on the issue of damages as to all remaining counts and effectively
preclude Legat from recovering any damages other than those already awarded to
Legat by the arbitrator.  Legat filed timely objections to the Magistrate
Judge's report [FN4] and defendants filed a timely response to Legat's
objections.

*5 After reviewing the Magistrate Judge's report, Legat's objections,
defendants' response, and the parties' underlying briefs, we adopt the
                    Copr. (C) West 1998 No Claim to Orig. U.S. Govt. Works

Not Reported in F.Supp.                                          PAGE    5
**(Cite as: 1991 WL 38714, \*5 (N.D.Ill.))**
Magistrate Judge's report in part and reject it in part.  Like the Magistrate
Judge, we conclude that summary judgment should be granted in favor of
defendants on certain aspects of Legat's damages claims.  Unlike the Magistrate
Judge, however, we conclude that certain genuine issues of material fact exist
with respect to other elements of Legat's damages claims.  In arriving at this
latter conclusion, we do not pass judgment on the merits of Legat's claims for
damages;  we merely find that it would be inappropriate to dispose of them via
summary judgment.  We address each theory of recovery in turn.

A. Damages for Copyright Infringement

 Section 504 of the Copyright Act sets forth the remedies and damages available
for copyright infringement and provides that a copyright infringer is liable
for either the copyright owner's actual damages and any additional profits of
the infringer, or statutory damages.  17 U.S.C. s 504(a).  Because these
represent two distinct approaches to damages for copyright infringement, we
analyze them separately.

 1. Actual Damages and Additional Profits

 Section 504(b) provides that "[t]he copyright owner is entitled to recover
the actual damages suffered by him or her as a result of the infringement, and
any profits of the infringer that are attributable to the infringement and are
not taken into account in computing the actual damages."  17 U.S.C. s
504(b).  As the Magistrate Judge pointed out in her report, neither the
Copyright Act nor its legislative history explicitly defines the term "actual
damages."  See Deltak, Inc. v. Advanced Systems, Inc., 767 F.2d 357, 361
(7th Cir.1985) (citing 3 M. Nimmer, Nimmer on Copyright, s 14.02 at 14-6
(1984)).  As a result, the guidelines for computing actual damages and profits
for violations of the Copyright Act, as well as the interrelationship between
actual damages and profits in computing damages, are murky at best.

 Traditionally, when computing actual damages, courts focus on actual losses
sustained by the plaintiff.  Consistent with that notion, under copyright law,
"the plaintiff's [actual] damages may be said to equal the profits which the
plaintiff might have accrued but for the defendant's infringement."  3 Nimmer
on Copyright, s 14.02[A] at 14-7-14-8.  Yet, as Nimmer further explains:

 This measure, however, is not to be confused with the related but
distinguishable right to recover defendant's profits.  The profits in fact
accrued by the defendant are not necessarily equal to the profits which the
plaintiff would have derived but for the infringement....  [T]he defendant's
actual profits may either exceed or be less than the plaintiff's lost profits.
If plaintiff's lost profits are less than defendant's actual profits, plaintiff
may recover its lost profits under the rubric of actual damages, and may
further recover the difference between its lost profits and defendant's actual
profits under the rubric of defendant's profits.

 **\*6** 3 Nimmer on Copyright, s 14.02[A] at 14-8-14-9.

 Under circumstances where an infringement results in neither a profit to the
infringer nor a quantifiable loss to the copyright owner, traditional measures
of actual damage may leave the copyright owner with no recovery at all, even if
the infringer acted willfully and deliberately.  3 Nimmer on Copyright, s 14.02
[A] at 14-12.  In an apparent attempt to avoid this harsh result, this circuit
has held that the value of an infringer's use is a permissible basis for
estimating actual damages.  Deltak, 767 F.2d at 360-61;  see also 3 Nimmer
on Copyright, s 14.02[A] at 14-12-14-18.

                      Copr. (C) West 1998 No Claim to Orig. U.S. Govt. Works

Case 4:97-cv-00340-JFN   Document 91   Filed 12/07/98   Page 114 of 128

Not Reported in F.Supp.
(Cite as: 1991 WL 38714, *7 (N.D.Ill.))

PAGE    7

infringement.    The Magistrate Judge pointed out that defendants had paid Legat
$50,000 for the plans and that Legat could not collect damages under the
contract and simultaneously seek to prevent defendants from using the plans for
their intended purpose.    The Magistrate Judge further found that Legat failed
to produce any additional evidence that it was entitled to profits.
   Legat objects to all aspects of the Magistrate Judge's analysis.    We address
each of its objections in turn.
   a. Denial of Recognition as Author
   Although Legat concedes that the market value of its contract with USDC may be
the primary measure of its actual damages, it reiterates its argument that it
is also entitled to actual damages for being denied recognition as author of
the Royal Oak plans.    This argument, however, not only comes too late, but also
rings hollow.    In November, 1985, over five years ago, Legat sought injunctive
relief before Judge Aspen, who was then assigned to this case.    See Legat I,
625 F.Supp. at 293.    In support of its claim for injunctive relief, Legat
argued, among other things, that the public record did not credit Legat as the
creator or source of the plans, thus engendering confusion.    Judge Aspen
agreed, concluding that "equity would be served if the public record [were]
corrected as to the source and creator(s) of the Plans."    Legat I, 625
F.Supp. at 301.    Instead of issuing a formal remedial order, however, Judge
Aspen suggested that the parties attempt to agree on the terms of such an
order.    Legat I, 625 F.Supp. at 304.
   Several weeks later, Legat, through counsel, wrote a letter to Judge Aspen
setting forth his suggestions as to the form any injunction should take.    (Ex.
"D" to Defendants' Memorandum in Support of Its Motion for Partial Summary
Judgment).    In its letter, Legat declined the offer to attach a clarifying
statement to the architectural plans identifying it as the architect and,
instead, suggested that the court enter an order requiring defendants to recall
all plans and specifications and to obliterate from those plans and
specifications all references to the project architect.    (Ex. "D" at 1-2).    In
declining the proposal to add a clarifying statement, Legat specifically stated
as follows:    "Plaintiff believes it is preferable for Project plans and
specifications to bear no designation of architectural authorship.    Any attempt
to clarify authorship by substituting the Plaintiff's name for Pines' name, or
by merely adding Plaintiff's name to the plans and specifications, might well
increase rather than reduce the likelihood of confusion."    (Ex. "D" at 2).
   *8 Ultimately, Judge Aspen accepted a clarifying statement proposed by the
defendants which essentially stated that Seth Pines' name, signature, or
architectural seal on any of the plans should not be construed as indicating
that he was or is the design architect for Royal Oak Phase III, nor that he was
the exclusive author of the plans.    Judge Aspen entered an order requiring
defendants to attach this clarifying statement to all plans and
specifications.    (Order of Jan. 3, 1986, Aspen J.)
   Despite its rejection of a clarifying statement identifying it as the
architect, Legat now claims that it should be entitled to collect damages for
defendants' misdesignation of authorship.    We disagree.    This type of
intangible injury is typically remedied by injunctive, rather than monetary,
relief.    Indeed, that was Judge Aspen's rationale in granting injunctive relief
in the first instance.    See Legat I, 625 F.Supp. at 301.    Legat cannot now
inflate its injury by shooting itself in the foot.
                    Copr. (C) West 1998 No Claim to Orig. U.S. Govt. Works

Not Reported in F.Supp.                                                      PAGE    8
**(Cite as: 1991 WL 38714, \*8 (N.D.Ill.))**

  Perhaps recognizing this, Legat belatedly asserts that the clarifying
statement ultimately attached to the plans by defendants does not exculpate
them from liability for any misrepresentation which preceded defendants'
compliance with Judge Aspen's order.  (Plaintiff's Response to Defendants'
Motion for Partial Summary Judgment at 4-5 n. 1).  The flaw in this argument,
however, is that Legat has failed to prove any actual damage to it resulting
from this misdesignation.  For these reasons, to the extent that Legat now
claims monetary damages for denial of recognition as an author of the plans, we
enter summary judgment in favor of defendants.
  b. Profits
  Legat also contends that the Magistrate Judge erred in finding that Legat was
not entitled to recover defendants' profits.  Legat admits that the contract
permitted defendants to use and copy the plans to build the Royal Oak project,
but argues that once Legat breached the contract, defendants forfeited their
rights under the contract.  In addition, according to Legat, although the
contract clearly permitted defendants to use and copy the plans to build the
Royal Oak project, the contract did not permit defendants to use the plans in a
manner not permitted by the contract.  Thus, Legat asserts, once the defendants
committed copyright infringement, Legat became entitled not only to defendants'
direct profits, but also to any indirect profits they realized.
  This argument is wholly unpersuasive for several reasons.  First, this
argument conspicuously overlooks the fact that defendants paid Legat $50,000
for the plans at issue.  For Legat to now contend that defendants forfeited
their rights to use those plans for their intended purpose is absurd.  If that
were so, then defendants would have paid $50,000 for a contract conferring
absolutely no benefit upon them.
  Furthermore, Section 504(b) of the Copyright Act allows a copyright owner
to recover only those profits "attributable to" infringement and "not taken
into account in computing actual damages."  17 U.S.C. s 504(b).  Legat bears
the threshold burden of establishing that defendants' profits, if they realized
any, were "attributable to" their infringement, as opposed to commercial
activity clearly contemplated by the contract.  See 3 Nimmer on Copyright, s
14.02[A] at 14-13 n. 30 & s 14.03[A] at 14-25 n. 6.  Legat, however, has failed
to overcome this burden.  Indeed, Legat has produced no evidence suggesting
that defendants realized a profit "attributable to" their use of the infringing
plans.  It is undisputed that defendants neither used the plans for any project
other than Royal Oak, nor sold the plans to a third party.  Cf. Aitken,
Hazen, Hoffman, Miller, P.C. v. Empire Construction Co., 542 F.Supp. 252
(D.Neb.1982) (architectural plans used for another project).  Legat cannot
resist a motion for summary judgment merely by stating that whether defendants'
profits, if any, were "attributable to" their infringement is a question of
fact.
  \*9 Moreover, to the extent that defendants may have derived a monetary
benefit (or profited, in the general sense of the word) from their
infringement, any benefit which inured to them would be taken into account in
computing Legat's actual damages under the "value of use" approach discussed
below.  Thus, Legat's claim for profits fails on this basis as well.
  Finally, endorsement of Legat's analysis of the profits issue would result in
Legat reaping a windfall under the guise of seeking recovery for defendants'
infringing acts.  Legat should not be able to claim profits as an item of
                     Copr. (C) West 1998 No Claim to Orig. U.S. Govt. Works

Case 4:97-cv-00340-JFN    Document 91    Filed 12/07/98    Page 116 of 128

Not Reported in F.Supp.                                                    PAGE    9
**(Cite as: 1991 WL 38714, \*9 (N.D.Ill.))**
damages by reason of defendants' infringement when the defendants would have
realized a profit by reason of their lawful use of the architectural plans in
accordance with the rights conferred upon them by the parties' contract.    This
disposes of Legat's claims to defendants' direct profits as a measure of its
damages.  To the extent that Legat seeks to recover defendants' indirect
profits as well, its claims are appreciably more tenuous and, for the reasons
outlined by the Magistrate Judge, to speculative and remote to withstand a
motion for summary judgment.

 Contrary to Legat's representation, County of Ventura v. Blackburn, 362
F.2d 515 (9th Cir.1966), does not dictate a different conclusion.    Indeed,
other than quoting the statutory provision regarding profits, the court in
Blackburn never even directly addressed the issue of profits.    Thus,
Blackburn does not bolster Legat's claim for profits in any way.    Because
neither this nor any of Legat's other arguments has persuaded us that the
Magistrate Judge erred in her analysis of this issue, we enter summary judgment
in favor of defendants on Legat's claims for profits under the Copyright Act,
and we overrule Legat's objections urging us to rule to the contrary.
 c. Application of the "Value of Use" Test

 Finally, Legat contends that the Magistrate Judge misapplied the "value of
use" test articulated in Deltak to the facts of this case.  According to
Legat, the defendants altered the plans at issue in order to obtain a HUD
endorsement.  Legat claims that if the endorsement failed to proceed, then
defendants stood to lose significant sums of money, which they could not later
recover.  Thus, argues Legat, under the Deltak analysis, defendants' value
of use did not merely equal the fair market value (or balance due) on Legat's
contract.

 Defendants' interpretation of Deltak differs.  In their response to Legat's
objections, defendants insist that under Deltak, "[t]he value which Legat
required from Defendants for the use of the plans he prepared in building Royal
Oak Phase III, was the contract amount."  (Defendants' Response to Plaintiff's
Objections at 6).  Defendants gloss over the HUD endorsement, merely stating
that "[t]he parties have speculated throughout this litigation over the
expiration of the HUD commitment and the effects it might have on Defendants
[sic] project if it were not extended."  (Defendants' Response to Plaitiff's
Objections at 6-7).

 **\*10** The Magistrate Judge agreed with defendants' interpretation of
Deltak, but we do not.  We agree with the Magistrate Judge and defendants
that Legat has failed to offer any colorable evidence that it suffered actual
loss or that defendants realized a profit as a result of their infringement.
Nevertheless, our reading of Deltak leads us to the conclusion that Legat's
damages for copyright infringement are not synonymous with its damages for
breach of contract.

 First of all, the court in Deltak emphasized that the "[a]pplication of the
value of use measure of damages ... is based on actual savings, not
counterfactual sales."  Deltak, 767 F.2d at 363.  Thus, to suggest, as the
Magistrate Judge did, that Legat already has been compensated for the
infringement by virtue of the arbitration award is inaccurate.  The breach of
contract counts and the copyright infringement counts seek to redress two
distinctly different injuries.  In the breach of contract count, Legat seeks
to enforce its rights under the contract to receive the monies due and owing him
                         Copr. (C) West 1998 No Claim to Orig. U.S. Govt. Works

Not Reported in F.Supp.

**(Cite as: 1991 WL 38714, \*10 (N.D.Ill.))**
for the preparation and use of the plans.  In the copyright infringement count,
Legat seeks to recover for defendants' use of the plans in a way which exceeded
its rights under the contract.  While the figure paid to Legat pursuant to the
parties' contract compensated Legat for defendants' use and copying of the
plans in accordance with the contract, it did not compensate Legat for whatever
sums defendants arguably may have saved as a result of their infringement.
 Moreover, while the court in Deltak did state that the "value of use"
approach requires a determination of the fair market value of the infringed
document, the court also indicated that "a defendant infringer 'cannot expect
to pay the same price in damages as it might have paid after freely negotiated
bargaining, or there would be no reason scrupulously to obey the copyright
law.' "  Deltak, 767 F.2d at 363 & n. 3 (quoting in part Iowa State
University Research Foundation, Inc. v. American Broadcasting Cos., 475 F.Supp.
78, 83 (S.D.N.Y.1979)).  This reasoning applies with equal force here.  In this
case, were we to adopt the Magistrate Judge's analysis, defendants, in spite of
their infringement, would be paying Legat the same price in damages that they
would have paid under the contract negotiated at arms length.  As a result, no
matter what they might have saved as a result of their infringement, defendants
would be walking away with impunity and would have no incentive to obey the
copyright laws.  Obviously, defendants believed that they stood to gain or save
something by their infringement;  otherwise, there is no rational explanation
for their behavior.
 Under Deltak, then, Legat's actual damages would be measured by what, if
anything, the defendants saved by their infringement.  That is where the "fair
market value" determination comes into play.  By way of illustration, if the
fair market value of the contract between Legat and USDC equalled $50,000, and
that figure fairly represents what defendants would have been required to pay
to obtain the plans elsewhere (and, therefore, represents what defendants saved
by altering the plans to meet the HUD deadline), then perhaps that figure is an
appropriate measure of defendants' value of use.  Obviously, the extent to
which the defendants saved money as a result of their infringement is a
question of fact, precluding the entry of summary judgment.  Thus, to the
extent that the Magistrate Judge recommended that summary judgment be granted
in favor of defendants on this aspect of actual damages, we reject her report,
sustain Legat's objections, and deny defendants' motion for partial summary
judgment.

2. Election of Statutory Damages
 **\*11** Section 504(c) of the Copyright Act permits a copyright owner to
elect to recover statutory damages instead of actual damages and profits.
17 U.S.C. s 504(c).  Section 412 of the Act, however, conditions the right
to elect statutory damages on registration of the copyright and specifically
provides that no award of statutory damages or attorney's fees shall be made
for "any infringement of copyright in an unpublished work commenced before the
effective date of its registration...." 17 U.S.C. 412(1).
 Applying Section 412(1) to this case, the Magistrate Judge determined that
Legat was barred from electing statutory damages because the architectural
plans at issue were unpublished and defendants' infringement unquestionably
commenced prior to Legat's registration of its copyright.  Although the
Magistrate Judge acknowledged that Legat offered evidence that defendants had
copied the plans after the effective date of registration, she rejected Legat's
Copr. (C) West 1998 No Claim to Orig. U.S. Govt. Works

Case 4:97-cv-00340-JFN   Document 91   Filed 12/07/98   Page 118 of 128

Not Reported in F.Supp.                                                    PAGE   11
(Cite as: 1991 WL 38714, *11 (N.D.Ill.))
argument that this copying should be construed as "commencement of a new
infringement" and found, in any event, that the invoices supplied by Legat to
support this argument were insufficient to create a genuine issue of material
fact.  We agree.
   In urging us to reject this portion of the Magistrate Judge's report, Legat
nonetheless advances two equally meritless arguments.  First, without apparent
regard for the plain language of Section 412, Legat argues that it did not
have the opportunity to register the architectural plans at issue before the
defendants' first act of infringement.  That, however, is inconsequential.
Section 412 contains no exemption for persons who claim that they did not
have the opportunity to register their works or offer some other excuse for
their failure to register.  This argument entirely ignores the clear mandate of
the statute and we reject it summarily.
   Legat also contends that the Magistrate Judge too narrowly interpreted the
statutory language regarding "commencement" when she chose to rely on Singh
v. Famous Overseas, Inc., 680 F.Supp. 533 (E.D.N.Y.1988).  This argument,
however, is unpersuasive for several reasons.  First, as the Magistrate Judge
aptly pointed out, the purpose of Section 412 is to promote public
registration of copyrights and to motivate owners of copyrightable works to
register early.  Singh, 680 F.Supp. at 536 (quoting legislative history).
Second, if Congress had intended to permit recovery for acts of infringement
which occurred prior to registration, then it could have used the word
"occurred," rather than the word "commenced."  Finally, the post-registration
conduct of which Legat complains is defendants' copying and use of the plans to
build the Royal Oak project--activity clearly contemplated and permitted by the
terms of the parties' contract.
   Unlike Legat, we agree with the Magistrate Judge's analysis of this issue.  We
therefore overrule Legat's objections and adopt that portion of the Magistrate
Judge's report recommending that summary judgment be entered in favor of
defendants on Legat's claims for statutory damages under the Copyright Act.
   B. Damages for Violations of Lanham Act
   *12 Section 1117 of the Lanham Act enumerates the remedies available to a
successful plaintiff.  In relevant part, this section provides:
   [T]he plaintiff shall be entitled, subject to the provisions of sections 1111
and 1114 of this title, and subject to the principles of equity, to recover (1)
defendant's profits, (2) any damages sustained by the plaintiff, and (3) the
costs of the action....  In assessing damages the court may enter judgment,
according to the circumstances of the case, for any sum above the amount found
as actual damages, not exceeding three times such amount.  If the court shall
find that the amount of the recovery based on profits is either inadequate or
excessive the court may in its discretion enter judgment for such sum as the
court shall find to be just, according to the circumstances of the case.  Such
sum in either of the above circumstances shall constitute compensation and not
a penalty.  The court in exceptional cases may award reasonable attorney fees
to the prevailing party.
   15 U.S.C. s 1117(a).
   1. Actual Damages
   In this case, the Magistrate Judge recommended that summary judgment be
granted in favor of defendants on Legat's claims for actual damages under the
Lanham Act.  In making this recommendation, the Magistrate Judge correctly held

that a plaintiff seeking to recover damages for a Lanham Act violation must
prove actual damage resulting from actual consumer confusion or deception.
See Schutt Mfg. Co. v. Riddell, Inc., 673 F.2d 202, 206 (7th Cir.1982);
See also Brunswick Corp. v. Spinit Reel Co., 832 F.2d 513, 525 (10th
Cir.1987);  Playboy Enterprises v. P.K. Sorren Export Co., 546 F.Supp. 987,
998 (S.D.Fla.1982).  Applying this authority, the Magistrate Judge noted that
the only evidence of actual damage submitted by Legat was the affidavit of its
president, Wayne Machnich.  After carefully evaluating the affidavit, the
Magistrate Judge rejected this evidence as speculative and insufficient to
create a genuine issue of material fact as to actual damage.
  Despite Legat's objections, we agree with the Magistrate Judge's analysis of
Legat's claims for actual damages under the Lanham Act.  Legat has failed to
produce any colorable evidence that it sustained actual damage resulting from
actual consumer confusion over defendants' expungement of Legat's name from the
plans and/or substitution of Legat's name with that of Pines on the plans or
defendants' filing of plans with altered cover sheets.  Like the Magistrate
Judge, we find Wayne Machnich's affidavit self-serving, speculative, and
legally insufficient to create a genuine issue of material fact.  Accordingly,
we adopt this portion of the Magistrate Judge's report, overrule Legat's
objections, and enter summary judgment in favor of defendants on Legat's claims
for actual damages under the Lanham Act.
  2. Profits and Other Equitable Relief
  The Magistrate Judge rejected Legat's claim for defendants' profits under the
Lanham Act on the same basis offered for denial of Legat's claims for
defendants' profits under the Copyright Act:  that the contract between Legat
and USDC authorized the defendants to use and copy the plans for the purpose of
building Royal Oak and, therefore, any profits realized by defendants were
legitimately realized under the contract and were not attributable to
defendants' unlawful activity.  The Magistrate Judge never addressed the issue
of costs or attorney's fees available under the Lanham Act.
  *13 As we noted previously, we agree with the Magistrate Judge's finding
that Legat should not be entitled to recover defendants' profits to the extent
that any such profit was realized as a result of activities clearly permitted
under the terms of the contract.  Nevertheless, after carefully reviewing the
Magistrate Judge's report, Legat's objections, and defendants' response, we
reject the Magistrate Judge's report insofar as she concludes that Legat, as a
matter of law, is not entitled to any award of profits or other relief under
the Lanham Act.  Recent Seventh Circuit case law (which was not available to
the Magistrate Judge at the time she issued her report) suggests that the
standard of proof required to recover an award of profits and other relief
under the Lanham Act is not only more liberal than the standard of proof
required to recover actual damages under the Act, but also is more liberal than
the standard of proof required to recover an award of profits under the
Copyright Act.
  Indeed, in analyzing the relief available under the Lanham Act, this circuit
recently made clear that "a violation of the Lanham Act can be remedied in more
ways than one."  Web Printing Controls Co., Inc. v. Oxy-Dry Corp., 906 F.2d
1202, 1204 (7th Cir.1990).  The usual way is by an award of damages.  Web
Printing, 906 F.2d at 1204.  A plaintiff seeking to recover damages for a
violation of the Lanham Act must prove three elements:  (1) that the defendant

Case 4:97-cv-00340-JFN   Document 91   Filed 12/07/98   Page 120 of 128

Not Reported in F.Supp.                                              PAGE  13
(Cite as: 1991 WL 38714, *13 (N.D.Ill.))
violated the Act;   (2) that the violation caused actual confusion among
consumers of plaintiff's product;  and (3) that as a result, the plaintiff
suffered actual injury.  Web Printing, 906 F.2d at 1204-05.  The court in
Web Printing emphasized, however, that while a plaintiff's failure to prove
actual injury resulting from actual confusion may preclude an award of damages
under the Lanham Act, other relief remains available:
 WPC did not prove the elements essential to a recovery of damages, of course,
so to it that avenue of relief is foreclosed.  Other avenues of relief,
however, are not foreclosed.  In the past, courts have fashioned wide-ranging
relief for a violation of the Lanham Act, allowing remedies such as a recovery
of defendant's profits, an award of costs of the action, and, in some
exceptional cases, an award of attorney's fees.
 Web Printing, 906 F.2d at 1205.  Noting that the plaintiff in Web
Printing had requested equitable relief in addition to damages, the Seventh
Circuit reversed and remanded the case.
 In doing so, the court in Web Printing explained that these other "avenues
of relief," unlike the damages remedy, do not require proof of injury or
damages:
 These remedies flow not from the plaintiff's proof of its injury or damages,
but from its proof of the defendant's unjust enrichment or the need for
deterrence, for example, or, in the case of costs, merely from its proof of the
defendant's Lanham Act violation.  To collapse the two inquiries of violation
and remedy into one which asks only of the plaintiff's injury, as did the
district court, is to read out of the Lanham Act the remedies that do not rely
on proof of 'injury caused by actual confusion.'  And this, of course, is
improper.
 *14 Web Printing, 906 F.2d at 1205 (emphasis supplied).  See also
Roulo v. Russ Berrie & Co., Inc., 886 F.2d 931, 941 (7th Cir.1989), cert.
denied, --- U.S. ----, 110 S.Ct. 1124 (1990).  ("Profits are awarded
under different rationales including unjust enrichment, deterrence, and
compensation.")  This interpretation of the Lanham Act coincides with this
circuit's repeated admonition that "[t]he trial court's primary function is to
make violations of the Lanham Act unprofitable to the infringing party."
Roulo, 886 F.2d at 941 (7th Cir.1989) (quoting Otis Clapp & Son, Inc. v.
Filmore Vitamin Co., 754 F.2d 738, 744 (7th Cir.1985)).
 Applying the guiding principles articulated in Web Printing and Roulo to
the facts of this case, we conclude that a genuine issue of material fact
exists as to whether Legat is entitled to an award of profits under the
rationales of unjust enrichment, deterrence, or compensation.  As noted
previously, the defendants expunged Legat's name from the plans and/or
substituted the name of their own employee on some sets of plans forcefully
suggests that defendants believed they stood to gain something from their acts,
and Legat claims that defendants saved money by doing so.  Under these
circumstances (and consistent with the "value of use" approach under the
Copyright Act), it may be appropriate to compensate Legat to the extent of
defendants' unjust enrichment, if any.
 The same line of reasoning applies to the need for deterrence.  Although there
is no evidence in the record suggesting that defendants have continued to
commit infringing acts or that they will do so in the future, an award of
profits might serve the purpose of general deterrence.  If the public believes
                    Copr. (C) West 1998 No Claim to Orig. U.S. Govt. Works

that one who engages in unfair competition will not be able to do so with
impunity, than an appropriate award may deter others from violating the Lanham
Act.
  We emphasize that we do not decide here whether such an award is appropriate.
Instead, we merely adhere to the fundamental proposition that all doubts and
reasonable inferences must be resolved in favor of the nonmovant on a motion
for summary judgment.  See New Burnham Prairie Homes, Inc. v. Village of
Burnham, 910 F.2d 1474, 1477 (7th Cir.1990) (citing Anderson v. Liberty
Lobby, Inc., 477 U.S. 242, 255 (1986)).
  We recognize that on the surface, this ruling appears to conflict with our
ruling granting summary judgment in favor of defendants on Legat's claims for
profits under the Copyright Act.  We remind the parties, however, that
Section 1117(a) is an equitable statute.  By vesting this Court with
"discretion [to] enter judgment for such sum as [it] shall find to be just,
according to the circumstances of the case," this section empowers this Court
to fashion Legat's relief so as to eliminate any inconsistency that may result
between the two counts and to prevent double recovery.  15 U.S.C. s
1117(a). [FN8]
  With respect to the issue of costs, Web Printing indicates that an award of
costs flows "merely from [plaintiff's] proof of the defendant's Lanham Act
violation."  Web Printing, 906 F.2d at 1205.  The Magistrate Judge never
addressed the issue of costs in her report on damages; yet, in her report on
the issue of liability, the Magistrate Judge found that defendants clearly
violated the Lanham Act (Report and Recommendation of March 10, 1989 at 11-19),
and we adopted that finding.  Given this finding of liability, Legat is
entitled to an award of costs.
  *15 Finally, the Magistrate Judge never discussed whether this case was
"exceptional" within the meaning of the Section 1117(a), thus warranting an
award of attorney's fees.  This circuit has defined an "exceptional case" as
"one in which the acts of infringement can be characterized as 'malicious,
fraudulent, deliberate, or willful.' "  Nupulse, Inc. v. Schlueter Co., 853
F.2d 545, 547 (7th Cir.1988).  In her report addressing the issue of liability,
the Magistrate Judge specifically found that "USDC's removal of Legat's name,
and its placement of Legat's name with Mr. Pines' name was intentional."
(Report and Recommendation at 16).  Again, we adopted her report.  Given this
finding, a genuine issue of material fact exists as to whether defendants' acts
of infringement were deliberate, thus rendering this an "exceptional case"
within the meaning of Section 1117(a).  For these reasons, we deny
defendants' motion for partial summary judgment on Legat's claims for profits
and other equitable relief under the Lanham Act, but grant defendants' motion
for summary judgment on Legat's claims for actual damages under the Act.  To
the extent that the Magistrate Judge recommended a contrary ruling, we reject
her report and sustain Legat's objections.
  C. Illinois Deceptive Trade Practices Act and Common Law Unfair Competition
Claims
  Section 270a of the Illinois Consumer Fraud and Deceptive Business Practices
Act, which applies equally to the Illinois Deceptive Trade Practices Act,
empowers the court, in its discretion, to award "actual damages or any other
relief which the court deems proper."  Ill.Rev.Stat. ch. 121 1/2 , P
270a(a).  Where a party alleges facts which demonstrate that defendants acted
                              Copr. (C) West 1998 No Claim to Orig. U.S. Govt. Works

**(Cite as: 1991 WL 38714, \*15 (N.D.Ill.))**
deliberately or intentionally, this relief includes an award of punitive
damages.  See Warren v. LeMay, 142 Ill.App.3d 550, 580, 491 N.E.2d 464, 483
(5th Dist.1986).  In addition, Section 270a authorizes the court to award
"reasonable attorney's fees and costs to the prevailing party."
Ill.Rev.Stat. ch. 121 1/2 , P 270a(c). [FN9]
  1. Actual Damages
  In her report, the Magistrate Judge concluded that Legat failed to establish
that it sustained actual damages under the both the Illinois Deceptive Trade
Practices Act counts and the common law unfair competition counts for the same
reasons it failed to establish actual damages under the Lanham Act counts.
Despite Legat's objections to the contrary, we agree and adopt the Magistrate
Judge's report insofar as it reaches this conclusion.
  2. Punitive Damages
  In its objections, Legat also claims that the Magistrate Judge failed to
address its claims for punitive damages.  While that may be so, the Magistrate
Judge undoubtedly believed that her decision to grant defendants' motion as to
Legat's claims for actual damages obviated the need to consider Legat's claims
for punitive damages.  Indeed, under Illinois law, punitive damages are not
recoverable in the absence of actual damages and this applies equally to common
law and statutory claims.  See By-Prod Corp. v. Armen-Berry Co., 668 F.2d
956, 961-62 (7th Cir.1982) (citing and discussing Illinois law); McGrew v.
Heinhold Commodities, Inc., 147 Ill.App.3d 104, 110, 497 N.E.2d 424, 429 (1st
Dist.1986) (restating the general rule).
  **\*16** In this case, we have adopted the Magistrate Judge's finding that Legat
has failed to establish actual damages under these counts as a result of
defendants' wrongful acts.  That finding effectively forecloses Legat from
recovering punitive damages under these counts.  Accordingly, this Court
overrules Legat's objections and adopts the Magistrate Judge's recommendation
to grant summary judgment in defendants' favor as to Legat's claims for
punitive damages under its unfair competition counts and its Illinois Deceptive
Trade Practices Act counts. [FN10]
  III. Conclusion
  For the reasons outlined, this Court grants Legat's motion for partial summary
judgment as to liability on Counts III through XV of the second amended
complaint.  Thus, to the extent that the Magistrate Judge Bucklo recommended
that summary judgment be granted in Legat's favor as to liability on Counts VII
through XV, we adopt her Report and Recommendation of March 10, 1989 and
overrule Legat's objections.  To the extent that the Magistrate Judge
recommended that summary judgment be denied as to liability on those portions
of Counts III through VI not subject to preemption, we reject the Magistrate
Judge's report and sustain Legat's objections.
  As to damages, this Court grants defendants' motion for partial summary
judgment on the following aspects of Legat's claims for damages:  (1) Legat's
claims for actual damages for misdesignation of authorship, as well as its
claims for profits and statutory damages under the Copyright Act;  (2) Legat's
claims for actual damages under the Lanham Act;  and, (3) Legat's claims for
actual and punitive damages under the Illinois Deceptive Trade Practices Act
and the common law of unfair competition.  The Court denies defendants' motion
for partial summary judgment on the following aspects of Legat's claims for
damages:  (1) Legat's claims for actual damages based on defendants' "value of
                         Copr. (C) West 1998 No Claim to Orig. U.S. Govt. Works

Not Reported in F.Supp.                                                PAGE  16
**(Cite as: 1991 WL 38714, \*16 (N.D.Ill.))**
use" under the Copyright Act, and (2) Legat's claims for profits and other
relief under the Lanham Act.  To the extent that the Magistrate Judge Bucklo's
Report and Recommendation of August 7, 1989 is in accord with our ruling, we
adopt her report and overrule Legat's objections.  To the extent that the
Magistrate Judge's Report and Recommendation conflicts with our ruling, we
reject her Report and Recommendation of August 7, 1989 and sustain Legat's
objections.

     FN1. In Counts III through VI of its second amended complaint, Legat
     alleges that each of the defendants engaged in various acts of unfair
     competition, including "copying Legat's original plans and specifications
     for the Royal Oak project."  (Second Amended Complaint, Count III, P 24;
     Count IV, P 24;  Count V, P 24;  Count VI, P 24).  The Magistrate Judge
     correctly found that the act of copying clearly falls within the scope of
     the Copyright Act and, therefore, that the plain language of the Copyright
     Act clearly preempts Legat's unfair competition claims to the extent that
     Legat bases those claims on defendants' alleged copying of its plans.  We
     agree with this portion of the Magistrate Judge's analysis.

     FN2. Legat concedes, of course, that it is not entitled to recover damages
     under both theories.

     FN3. In its second amended complaint, Legat specifically cites these
     subsections as the basis for its claims under the Illinois Deceptive Trade
     Practices Act.

     FN4. At certain points in its objections, Legat berates the Magistrate
     Judge's analysis, crossing the fine line between zealous advocacy and
     unprofessional demeanor.  Legat's invective not only adds nothing to its
     arguments or to this Court's analysis, but also underscores the bitterness
     which has become the hallmark of this litigation.

     FN5. For the record, we note that on one hand, Nimmer commends the
     Deltak approach as one which "fosters reason in the law of copyright by
     serving the Congressional purpose of discouraging infringement and by
     avoiding the anomaly of affording copyright owners a right without a
     remedy...."  3 Nimmer on Copyright, s 14.02[A] at 14-17.  Yet, on the other
     hand, Nimmer appears to question the wisdom and/or validity of the "value
     of use" approach, pointing out that other circuits have declined to follow
     Deltak and noting the "slipperiness of the value of use theory."  3
     Nimmer on Copyright, s 14.02[A] at 14-16 n. 48.1 & 14-17 n. 49.3.  See
     also Business Trends Analysts, Inc. v. Freedonia Group, Inc., 887 F.2d 399,
     405 (2nd Cir.1989) (criticizing Deltak and quoting Nimmer).

     FN6. Legat does not reiterate this claim in its objections to the
     Magistrate Judge's report.  For the record, however, we note that to the
     extent that Legat predicates this claim on the affidavit of Wayne Machnich,
     for reasons more fully explained in the Magistrate Judge's report, this
     claim is too speculative and remote to withstand defendants' motion for
     summary judgment.
                         Copr. (C) West 1998 No Claim to Orig. U.S. Govt. Works

Not Reported in F.Supp.                                    PAGE  17
(Cite as: 1991 WL 38714, *16 (N.D.Ill.))

    FN7. In arriving at this conclusion, the Magistrate Judge also relied
    heavily on May v. Watt, 822 F.2d 896 (9th Cir.1987).  In May, the
    Ninth Circuit affirmed a jury verdict in favor of the plaintiff on his
    breach of contract claim, but also affirmed a directed verdict denying
    recovery to plaintiff under the Copyright Act.  In doing so, the court
    found that the plaintiff had not offered any evidence that he was entitled
    to actual damages greater than those he had been awarded for breach of
    contract.  May, 822 F.2d at 901.  Although May constitutes persuasive
    authority, it cannot be entirely reconciled with the "value of use"
    approach articulated in Deltak.  Obviously, the decision in Deltak is
    binding upon this Court.

    FN8. Obviously, the remedies provided under the Copyright Act and the
    Lanham Act are cumulative because each of them seeks to redress the same
    wrongful conduct.  In order to prevent double recovery, Legat will be
    compelled to elect which of these remedies it wishes to pursue.

    FN9. As mentioned previously, to the extent that the Illinois Deceptive
    Trade Practices Act is merely a codification of the state common law of
    unfair competition, the remedies available under these two theories of
    recovery, except for the statutory provision of attorney's fees and costs,
    are virtually identical and there is no need to address them separately.

    FN10. From a practical standpoint, the Court notes that these counts seek
    to redress the same wrongful conduct as the counts brought under the
    Copyright Act and the Lanham Act;  therefore, they are duplicative.
END OF DOCUMENT
                    Copr. (C) West 1998 No Claim to Orig. U.S. Govt. Works

The statements in the attached Declaration are true and correct and the Witness has executed the Declaration. However, WB's counsel had not received the original Declaration at the time necessary to arrange for delivery of this Motion to the Court for timely filing.  WB will promptly supplement its Motion with the original Declaration.

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF GEORGIA
SAVANNAH DIVISION

| | |
|---|---|
| JACK LEIGH, | ) |
| | ) |
| Plaintiff, | ) |
| v. | ) CIVIL ACTION FILE NO. |
| | ) CV-497-340-JFN |
| WARNER BROS., a Division of | ) |
| TIME WARNER ENTERTAINMENT | ) |
| COMPANY, L.P., | ) |
| | ) |
| Defendant. | ) |

## DECLARATION OF SUZANNE ABRAMSON

Pursuant to 28 U.S.C. § 1746, I, Suzanne Abramson, hereby declare as follows:

1.

My name is Suzanne Abramson. I am of legal age and under no legal disability. I have personal knowledge of the facts stated in this declaration and know them to be true and correct.

2.

I am employed by Warner Bros. ("WB") in its Online Division ("WB Online"). I am the Director of Art for WB Online.

3.

I supervise the department that is responsible for all art created for placement on the WB Online home page, located at "www.warnerbros.com," including all icons created for placement on the home page.

4.

When creating icons to link to motion picture web sites created by WB's theatrical division ("WB Theatrical"), it is the custom and practice of my department to take any images that will be used in the icons from the motion picture web sites created

by WB Theatrical because we want an image that will tie into the movie and because we know that any image that appears as part of the site will have been cleared by WB Theatrical for usage broad enough to encompass our use in the icons.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on the _____ day of December, 1998.

_____

SUZANNE ABRAMSON

ATL01/10405398v1

## CERTIFICATE OF SERVICE

I hereby certify that I have this day served a copy of **APPPENDIX OF EXHIBITS IN SUPPORT OF DEFENDANT'S MOTION FOR SUMMARY JUDGMENT** upon all parties to this matter by hand delivery to Plaintiff's counsel of record as follows:

> Robert Bartley Turner
> Savage, Herndon & Turner
> Post Office Box 8969
> Savannah, Georgia  31412

> Todd Deveau
> Deveau, Colton & Marquis
> Two Midtown Plaza, Suite 1400
> 1360 Peachtree Street, N.E.
> Atlanta, Georgia  30309

This 7th day of December, 1998.

ANGELA PAYNE JAMES
Georgia Bar No. 568086